**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SANDRA BUTLER; RICKY GIBSON;
O'BRIEN MORRIS; RICHARD EMMETT;
ROSELLE DIAZ; KEVIN FAISON;
SHANIQUA JACKSON; CENTER FOR
INDEPENDENCE OF THE DISABLED, NEW
YORK and COALITION FOR THE
HOMELESS

                    Plaintiffs, for
themselves and on behalf of all others
similarly situated,

          -against-

CITY OF NEW YORK, THE NEW YORK
CITY DEPARTMENT OF HOMELESS
SERVICES and STEVEN BANKS, as
Commissioner of the New York City
Department of Social Services,

                    Defendants.

15 Civ. 03783

**AMENDED CLASS ACTION**
**COMPLAINT FOR**
**DISCRIMINATION;**
**DECLARATORY AND**
**INJUNCTIVE RELIEF**

**DEMAND FOR JURY TRIAL**

## NATURE OF THE ACTION

    1.    Plaintiffs bring this class action for themselves and on behalf of all others

similarly situated to challenge the long-term, serious, and systemic failures of the City of New

York and Steven Banks, as Commissioner of the New York City Department of Social Services,

to provide homeless men, women, and children with disabilities meaningful access to the

shelters, programs, and services the New York City Department of Homeless Services ("DHS")

is obligated to provide.  Due to a combination of inadequate policies, mismanagement, and

poorly trained staff, Defendants have repeatedly discriminated against homeless New Yorkers with disabilities by failing to accommodate them throughout the shelter intake and placement process, and by relying upon methods of program administration that unfairly burden people with disabilities throughout various aspects of the shelter system's operation.  These failures have significant consequences for Plaintiffs' health, safety, and quality of life.

2.      This is a class action for declaratory and injunctive relief on behalf of a class of homeless persons with disabilities applying for or residing in shelters administered by Defendants, alleging discrimination on the basis of disability by the DHS, which is overseen by Defendant Banks.  This class action seeks relief under Title II of the Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act of 1973, due process claims under the United States and New York State Constitutions, the New York State and City civil rights statutes and regulations, administrative directive 15-ADM-06 issued by the Office of Temporary and Disability Assistance, and the New York State Social Services Law and regulations.  As a public entity tasked with providing housing assistance to the homeless, DHS is obligated to comply with the aforementioned statutes and provisions.

3.      In addition to the class-wide claims for injunctive relief, specified named plaintiffs also seek compensatory damages.

4.      DHS operates shelters through three different systems: one for single adults (male and female in separate facilities); one for families with minor children; and one for adult families (related individuals with no minor children).  DHS discriminates against people with disabilities in each of the three systems.

2

5.      Plaintiffs and members of the proposed plaintiff class (hereinafter "Class Members") have disabilities that require reasonable accommodations.  These disabilities include significant physical (ambulatory, respiratory, immune-system, dietary, and sensory) and psychological impairments.

6.      Defendants fail to accommodate—and they therefore discriminate against— homeless New Yorkers living with disabilities and functional needs at all stages of the shelter application and placement process, including the following ways:

- At DHS intake offices, the grueling application process has deterred families and individuals from seeking shelter, because the process is particularly onerous and burdensome for Class Members due to their disabilities. The DHS intake process frequently fails to accommodate people with mobility, visual, and auditory impairments, and it often fails to provide interpreter services or transportation services for applicants.

-  DHS denies Class Members placement in the shelter system due to what are frequently uninformed findings that Class Members have failed to establish their eligibility for shelter on the basis that they have alternate housing available to them, without considering the appropriateness of such alternate housing given Class Members' specific needs resulting from their disabilities and without accommodating those needs.

- DHS lacks a systematic approach to screening for, and assessing the functional needs of clients with disabilities at intake offices and shelters, resulting in the uninformed assessment of Class Members and consequently their inappropriate

3

placement—or no placement—in shelters.   This further leads to an *ad hoc* assessment of class members, resulting in dissimilar treatment of individuals with similar disabilities.

- Even when DHS provides shelter to homeless individuals with disabilities, DHS frequently does not provide Class Members with rooms and/or shared spaces that adequately accommodate their disability-caused needs.  For example, the hearing and visually impaired are often denied necessary American Sign Language interpreters or materials in alternate formats;  those with service animals experience inappropriate harassment by staff;  individuals with medically-related dietary restrictions are often denied access to special foods and kitchen facilities;  individuals in need of personal care, home care, or in-home nursing care are unable to receive those services in shelter;  and those dependent on medical devices (such as mobility aids or enhanced oxygen support) are often unable to access shelter, store their devices or use bathing and other shared shelter facilities due to architectural barriers.

- DHS lacks a consistent and effective approach to advise homeless clients with disabilities of their right to reasonable accommodations. Homeless individuals with disabilities do not receive adequate information about the process for obtaining accommodations, nor do they receive adequate information about the grievance process in the event that DHS fails to accommodate their needs.

- DHS does not provide sufficient staff training regarding the right to reasonable accommodations and has no reliable system for record keeping or case

management to ensure that information relating to the disabilities of applicants and the accommodations they require are available to staff in accordance with the law.

- Information regarding DHS shelters' and facilities' compliance with ADA requirements remains scarce, particularly with regard to the physical, programmatic, and linguistic accommodations necessary to administer a program as large as the Defendants' in conformity with the ADA.  This renders it difficult to assess the extent to which Class Members receive the accommodations required by federal law, permitting DHS to continue its non-compliant practices.

- Independent living plans provided by the Department fail to consider the functional limitations of DHS clients and the accessibility of available housing.

7.    Plaintiffs allege that Defendants' failure to accommodate their disabilities reflects systemic deficiencies in the policies and practices by which Defendants administer the DHS shelter system and that many other individuals with disabilities applying for shelter or residing in the DHS shelter system face similar disability-related barriers and obstacles to obtaining services and benefits.  Plaintiffs therefore bring this action both to address their immediate needs and to compel the Defendants to re-examine and modify their policies and procedures with respect to the application process, consideration of alternate housing, and placements and transfers within the shelter system, and the manner in which shelter-related services and programs are provided so that those with disabilities have as much access to shelter services as those without disabilities, as required by law.

8.      Plaintiffs further seek, in compliance with the rulemaking provisions called for under the City Administrative Procedure Act ("CAPA"), that the Defendants provide those with disabilities, and the general public, notice and opportunity to review and comment upon the rules that Defendants have developed—or need to develop—concerning how requests for reasonable accommodations are to be made, decided upon, and if necessary, appealed.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343(a)(3) and (4).  The action arises under the Americans with Disabilities Act, 42 U.S.C. §§ 12101 et seq., Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and the Due Process Clause of the United States Constitution (U.S. Const. amend. XIV).

10.      This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiffs' claims under the New York State Constitution and state and local laws prohibiting disability discrimination and rule-making.

11.      Venue properly lies in this district pursuant to 28 U.S.C. § 1391(b) as Defendants are located within the District in which this complaint is filed and a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this District.

## PARTIES

**A.      Plaintiffs**

12.      Named Plaintiffs and the class they represent are homeless New York City residents with disabilities who currently rely on, or may in the future need to rely on, DHS for shelter.

6

13.     Named Plaintiffs and the class they represent are qualified individuals with a disability as defined by the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq., and the Rehabilitation Act, 29 U.S.C. § 794.  Specifically, named plaintiffs and the class they represent suffer from disabilities that substantially limit one or more major life activity under 42 U.S.C. § 12102(2)(A) and 29 U.S.C. § 705(9)(B) and 20(B).

14.     Named Plaintiffs and the class they represent are eligible for shelter assistance pursuant to regulations promulgated by the New York State Office of Temporary Assistance, Title 18 New York Codes, Rules and Regulations, § 900.2.  Plaintiffs are qualified to participate in the shelter program administered by DHS.

**B.     Class Representatives**

15.     Class representatives include individual named disabled homeless residents of New York City as well as Organizational Plaintiffs Center for Independence of the Disabled, New York ("CIDNY") and the Coalition for the Homeless ("Coalition").  New York Courts recognize that the Coalition and similar organizations attain organizational standing by virtue of their role in serving class representatives.

<u>**Named Plaintiffs**</u>

**Sandra Butler and Ricky Gibson**

16.     DHS failed to accommodate the disabilities of Sandra Butler and Ricky Gibson in making shelter placement decisions despite their obvious and apparent need.

17.     Ms. Butler experiences sickle cell disease, chronic asthma, a seizure disorder, hypertension and high blood pressure.  She requires the use of a walker and is unable to access stairs.  She receives treatment through systemic steroids which cause her immune system to be

susceptible to infection.  She also uses an oxygen tank and electric oxygen concentrator and nebulizer several times a day and every night.

18.   Mr. Gibson sustained injuries in two automotive accidents and has been diagnosed with lumbar spondylosis, cervical spondylosis, and cervical radiculitis.

19.   At the time of his initial application for shelter, Mr. Gibson was experiencing severe back pain and occasionally needed the assistance of a cane to walk.

20.   Mr. Gibson and Ms. Butler have one or more impairments that substantially limit major activities within the meaning of the ADA.

21.   After Ms. Butler and Mr. Gibson became homeless and sought shelter from DHS, DHS staff working at the Adult Families Intake Center ("AFIC")—the intake office for families with no minor children or pregnant women at the Bellevue campus in Manhattan—failed to assess or address their disabilities.  AFIC staff assigned them to multiple temporary "conditional" shelter placements that did not accommodate their needs, particularly their collective mobility issues and Ms. Butler's susceptibility to infection. For example, on August 13, 2014, DHS placed the couple at the El Camino Hotel where the elevators were consistently broken, there were not enough electrical outlets for Ms. Butler's medical equipment, and the room was dirty with vermin and required daily sterilizations.

22.   DHS staff also erroneously determined that the couple was ineligible for shelter because they could live with Ms. Butler's mother in Far Rockaway, at a home that could not accommodate the couple's disabilities.  This home was grossly overcrowded, exposing Ms. Butler to infection and limiting her access to medical equipment, and was only accessible by

stairs, making it inaccessible for Ms. Butler.  AFIC staff also counseled the couple to seek shelter separately, despite Ms. Butler's reliance on Mr. Gibson for her daily care.

23.     The couple eventually received a conditional placement that accommodated their disabilities.  As recently as May 26, 2016, however, DHS failed to accommodate Ms. Butler when shelter staff refused to repair or replace a broken air conditioner in her shelter unit, placing Ms. Butler at high risk for an asthma attack and seizure.

**O'Brien Morris**

24.     When Mr.  Morris and his wife Andrea Anderson became homeless, DHS failed to provide them with a shelter unit that accommodated Mr. Morris's disabilities.

25.     Mr. Morris suffers from edema, spasm of the muscle, chronic pain in the limb, venous insufficiency, foot pain, and diabetes.  Due to mobility issues and a hip replacement surgery, he uses a wheelchair to ambulate and requires a hospital bed for sleeping.  In order to use a toilet, he requires the use of a device that is attached to a regular toilet seat.

26.     Mr. Morris has one or more impairments that substantially limit a major activity within the meaning of the ADA.

27.     Previously, DHS placed the family at the agency's Auburn Residence ("Auburn"), where they were forced to use congregate bathrooms.  It was both unsanitary and painful for Mr. Morris to use his special toilet seat in Auburn's congregate bathrooms.  As a result, he was forced to leave the shelter and travel to a friend's home whenever he needed to attend to his bodily needs.

28.     Additionally, Mr. Morris did not have access to cooking facilities at Auburn. Auburn provides processed food and does not allow residents to cook or bring their own food. These limitations contributed to Mr. Morris's inability to properly manage his diabetes.

29.     DHS was unable to transfer the family to a facility that would accommodate Mr. Morris's disabilities for two months.

**Richard Emmett**

30.     Richard Emmett is a homeless single man who suffers from Hepatitis C.  He resides at DHS's Bellevue men's shelter.

31.     Mr. Emmet has an impairment that substantially limits one or more major life activities within the meaning of the ADA.

32.     Mr. Emmet's doctor has prescribed him Harvoni pills, a medication that can cure Hepatitis C if taken daily for 90 days.  Each Harvoni pill costs over $1,000.  Due to the pills' value, Mr. Emmett's doctor instructed him to carry no more than four to five pills with him at a time and to leave the rest with a friend who does not live in a communal shelter.  The doctor gave Mr. Emmett an unmarked container in which to store the four to five pills to help conceal their value.

33.     On July 1, 2016, Mr. Emmett left the shelter to get breakfast. He returned and emptied out his pockets, per DHS security's instructions.  A female DHS police sergeant was present for the security screen. She picked up the unmarked container holding the pills and asked Mr. Emmett about them.  He explained that they were pills to cure his Hepatitis C.  He was then handcuffed by the sergeant.  She took him to her office and researched the name of the medication. When Mr. Emmet asked if he could get his pills back, she refused.  He volunteered

to have his friend bring the original prescription bottle to prove that the pills were Harvoni and prescribed to him.  The sergeant refused to call the friend and smashed Mr. Emmett's cell phone, so that it no longer functioned.  She then wrote him a ticket for disorderly conduct.

34.     Mr. Emmett has asked the staff at the shelter to help him locate the pills, but no one has been able to assist him.  His doctor cannot order additional pills, as Mr. Emmett's insurance will not cover the missing pills.  Mr. Emmett is at risk of not being able to cure his Hepatitis C if he does not have access to the full 90-day pill regimen.  He continues to suffer from dizziness and chest pains due to the stress of this situation.  Recently, he suffered a seizure due to stress and was hospitalized for multiple days.

**Roselle Diaz Family**

35.     Ms. Diaz, her adult daughter, and her teenaged daughter are homeless and are currently placed at a DHS-contracted shelter.  Ms. Diaz is living with multiple serious chronic conditions, including major depressive disorder, panic disorder with agoraphobia, dysthymic disorder, asthma, vitiligo, Bell's Palsy, transient ischemic attack, herniated lumbar disc, migraine headaches, diabetes, and high blood pressure. She uses a wheelchair to ambulate and she receives home health care services seven days a week for seven hours per day.  When the home health aide is not present, Ms. Diaz relies on her daughters to help care for her.  Ms. Diaz receives Supplemental Security Income ("SSI") and has been designated as "homebound" by the New York City Human Resources Administration ("HRA"), which means that Ms. Diaz is unable to attend office appointments at HRA or the DHS intake facilities.

36.     Ms. Diaz has one or more impairments that substantially limit one or more of her major life activities within the meaning of the ADA.

37.     In addition to the two daughters who currently reside with her in shelter, Ms. Diaz has another daughter, Sabrina Diaz.  Sabrina previously resided in shelter with Ms. Diaz and, during that time, she gave birth to a baby girl named L.D. on April 4th, 2016.  L.D. had surgery shortly after birth because of a birth defect relating to the connection between her esophagus and stomach.  As a result, L.D. is eligible for homecare services and will need to have surgery.

38.     When Ms. Diaz notified shelter staff that Sabrina and L.D. would be coming back to the shelter after they were discharged from the hospital, shelter staff required Ms. Diaz to travel on her own to Prevention Assistance and Temporary Housing ("PATH"), DHS's intake center for families with children, to add her new grandchild to her family's case, despite the fact that DHS knew Ms. Diaz was not physically capable of enduring the application process or the required travel.  Ms. Diaz became so ill from the travel that she was forced to immediately leave the intake center and return to her shelter, without being able to complete the add-on process until her counsel intervened that afternoon.  The add-on process was not completed until later that evening, keeping Sabrina and L.D. separated from the family for nearly the entire day.

39.     A few months later, in the middle of the summer, shelter staff turned off the air conditioning unit in Ms. Diaz's shelter room because the unit was leaking.  An air conditioner is necessary to prevent exacerbation of Ms. Diaz's conditions.  The shelter staff refused to replace the unit, leaving Ms. Diaz without air conditioning for nearly two weeks until her counsel intervened.  Ms. Diaz experienced difficulty breathing while waiting for the replacement air conditioner.  Shortly after, the elevators in the building malfunctioned, trapping Ms. Diaz in her shelter unit for three days.  As a result, Ms. Diaz was unable to attend her medical appointment to obtain medication for the migraines she was experiencing or to update her other prescriptions.

**Kevin Faison**

40.     Kevin Faison and his wife, Ivy Faison, are homeless and reside in a DHS-contracted shelter.

41.     Mr. Faison has severe asthma and experiences seizures, high blood pressure, anemia, back pain, and has mobility impairments due to trauma (he has a bullet lodged in his spine that cannot be removed without causing him to be paralyzed). He uses a cane to ambulate. He receives disability benefits from the Social Security Administration.

42.     Mr. Faison has one or more disabilities that substantially limit one or more major life activities within the meaning of the ADA.

43.     Exposure to heat significantly increases Mr. Faison's likelihood of experiencing an asthma attack and seizure.  Last year, DHS refused to allow him to turn on the air conditioner in his shelter unit until his lawyers requested an accommodation from the agency.  This left Mr. Faison without air conditioning for weeks.

44.     This year, DHS again refused to permit him to air condition the unit until his lawyers again intervened.  When Mr. Faison was granted permission to use an air conditioning unit, the facility in which Mr. Faison resided did not have a functioning air conditioner to offer the family.  DHS eventually transferred the family to a new facility with a functioning air conditioner. However, Mr. Faison experienced repeated seizures on an almost daily basis while waiting to be provided with an air-conditioned unit.

**Shaniqua Jackson Family**

45.     Shaniqua Jackson is homeless and lives with her partner, their two children, and her son T.J., in shelter.  T.J. is seventeen months old and was born prematurely at 29 weeks. As

a result, he suffers from chronic lung disease, which requires a tracheostomy and ventilator support.  He also suffers from pulmonary stenosis, congenital heart issues, and a feeding issue requiring a gastrointestinal tube.  He receives nursing care at the shelter 24 hours a day, seven days a week.

46.    T.J. has one or more impairments that substantially limit one or more major life activities within the meaning of the ADA.

47.    DHS initially placed the family in a shelter unit that could not accommodate T.J.'s needs, thereby requiring him to live separately from his family with another relative.  After Ms. Jackson's counsel intervened, DHS moved the family to a shelter unit in the Bronx where T.J. could be reunited with his family and receive the necessary nursing care.  However, that unit was too small to fit all of his medical equipment.  The family of four and the full-time nurses were forced to share one small room.

**<u>Center for Independence of the Disabled, New York</u>**

48.    Organizational Plaintiff CIDNY is an independent living center serving persons with disabilities throughout New York City.  Founded in 1978, CIDNY is a consumer-based non-profit organization, advocating and providing services for independent living for individuals with disabilities.  CIDNY's goal is to ensure full integration, independence, and equal opportunity for all people with disabilities by removing barriers to the social, economic, cultural, and civic life of the community.  Fifty-three percent of CIDNY's board members and fifty-seven percent of CIDNY's staff are persons with disabilities.  In 2015, CIDNY reached 15,000 New Yorkers.

49.     CIDNY has expended extensive time and resources on addressing emergency housing needs for persons with disabilities.  For example, CIDNY provides referrals, assistance, and resources for individuals looking for affordable and accessible housing.  It helps people apply for Housing Development Corporation low and middle income housing lotteries, United States Department of Housing and Urban Development subsidized housing, Mitchell Lama housing, New York City Housing Authority apartments, Section 8, the New York City Rent Freeze Program, family homes for adults, furnished rooms, Department for the Aging housing, and supportive housing.  In addition, it helps people seek accessibility modifications by applying for Access to Home.  CIDNY helps people avoid eviction by obtaining subsidies to address rental arrears. CIDNY estimates that over the past five years, it has received requests for assistance with housing from 15,097 people.  For most of the people with disabilities that it serves, CIDNY has found that secure housing is all but unattainable.  This has contributed to a high rate of homelessness among CIDNY's consumers.  CIDNY estimates that 22 percent of CIDNY consumers in the last year have self-identified as shelter homeless. CIDNY is often contacted by individuals with disabilities in nursing facilities or hospitals as they are threatened with discharge to homeless shelters.

50.     CIDNY was a lead plaintiff in landmark litigation on behalf of people with disabilities in Brooklyn Ctr. for Independence of the Disabled v. Bloomberg, 980 F. Supp. 2d 588 (S.D.N.Y. 2013).  The case established that people with disabilities had been discriminated against by the City of New York, which had failed to include them in its plans for and response to large scale disasters.  In particular, the Court identified that the City had failed to provide

15

shelter that complies with the architectural requirements of the ADA, failure to provide reasonable accommodations, or accessible transportation to shelters.

51.     Research conducted by CIDNY in conjunction with the University of New Hampshire Institute on Disability indicates that the employment rate of people with disabilities is 29.1 percent.   Even when individuals with disabilities are employed, their income is significantly lower than it is for people without disabilities.  This income gap is wider in New York City than it is across New York State or nationally.  The poverty rate for people with disabilities in New York City is 36.5 percent—double the poverty rate of people without disabilities (16.7 percent).  People with disabilities in New York City are more likely to be living in poverty than they are at the state level (32.5 percent) or at the national level (30.5 percent).  People with disabilities are more likely to be homeless or insecurely housed than are people without disabilities because they are unable to afford their rent and cannot find accessible housing.  In New York City, people with disabilities are 9.8 percent more likely than people without disabilities to spend more than 50 percent of their income on rent.  In New York City, 52.39 percent of people with disabilities spend more than one-third of their income on rent compared with 42.1 percent of their nondisabled peers.  This rent burden is a significant contributor to chronic homelessness.

52.     CIDNY's research further reveals that many intake centers and shelters are physically inaccessible because the shelter system fails to provide accessible entries, doorways, bathrooms, and services for those with ambulatory disabilities.  Thus, people with ambulatory disabilities are forced to travel to accessible sites and their travel time and burden is an obstacle for them in accessing the services.  Those with service animals are subject to harassment by

16

shelter personnel.  People with respiratory disabilities or other chronic disabling conditions are placed in environments in which they are unable to maintain their health status.  People who are blind or have limited vision are unable to obtain materials in alternate formats.  People with cognitive disabilities are unable to get assistance obtaining appropriate placements in shelters. Individuals with disabilities who require personal assistance with activities of daily living (such as help with eating, toileting, bathing, transferring) have access to only 32 beds in total in the Barrier Free Living shelter in a shelter system with 14,907 beds.  People with disabilities may be held for an extended period at an assessment shelter without assistance.  People with disabilities may be forced to travel to an accessible assessment shelter, unlike their non-disabled counterparts. Compliance with independent living plans—required of all shelter residents at the risk of being forced out of shelter and into the streets—may call for individuals to view a certain number of apartments in a given period of time, even though accessible transportation is not provided and the apartments themselves are not accessible.  Individuals have been pressured to accept inaccessible apartment placements and, if they refuse, they are told that they are not complying with their shelter plan.  Transfers can be difficult and time consuming to arrange. Individuals have been told that they are ineligible for reasonable accommodations while they are in the eligibility assessment process.  When people seek reasonable accommodations they report that they experience retaliation, in the form of sudden and frequent transfers among shelters.

53.     CIDNY's staff of benefits counselors has worked with individuals experiencing many of these access problems.

54.     CIDNY is directly harmed by Defendants' failure to ensure compliance with civil rights law in the operation of its shelter system.  CIDNY staff expends considerably more time

and resources attempting to obtain accommodations for individuals in the evaluation process and in the shelters than they would if the DHS shelter system were managed in a way that comports with the ADA.

**Coalition for the Homeless**

55.     Organizational Plaintiff Coalition for the Homeless (hereinafter the "Coalition") is the nation's oldest advocacy and direct service organization helping homeless men, women, and children.  The Coalition, founded in 1981, assists more than 3,500 New Yorkers each day who are homeless or who are at risk of homelessness.  The Coalition's advocacy protects the rights of homeless people because the Coalition serves as a plaintiff in litigation regarding the right to emergency shelter, the right to vote, and housing and services for homeless people living with mental illness and HIV/AIDS.  The Coalition operates 12 frontline direct service programs, offering vital services to homeless, at-risk, and low-income New Yorkers, including individual advocacy and case management services to over 1,000 homeless and at-risk households each month with referrals for shelter and emergency food programs and assistance with public benefits.  The Coalition seeks to bring this claim as an organization on behalf of the population that is threatened by DHS's actions and inactions.  The Coalition plays a unique role advocating on behalf of individuals who have severe barriers to self-advocacy in this context.

56.     The Coalition brought landmark litigation on behalf of homeless men and women in Callahan v. Carey and Eldredge v. Koch, and was a plaintiff in the consolidated cases establishing a right to shelter and guaranteeing basic standards for shelters for homeless men and women.  See Callahan v. Carey, 12 N.Y.3d 496 (2009).  Pursuant to the Callahan consent decree,

the Coalition serves as court-appointed monitor of municipal shelters for homeless adults.  Id.

The City has also appointed the Coalition to be the monitor for the family shelter system.

57.    The Coalition has expended extensive time and resources in addressing emergency housing needs for persons with disabilities.

58.    The Coalition is directly harmed by Defendants' failure to adequately accommodate the disabilities of homeless New Yorkers as described above by having to devote its own resources and staff time to correcting these failures on behalf of individual clients and groups of clients.

**Defendants**

59.    Defendant City of New York is a municipal corporation chartered under the laws of the State of New York.  The City of New York receives federal funding and is subject to the provisions of Title II of the Americans with Disabilities Act ("ADA"), Section 504 of the Federal Rehabilitation Act ("Rehabilitation Act"), the Due Process Clause of the United States Constitution, the New York State Constitution, New York State Civil Rights Law § 40-c, the New York State Human Rights Law (Executive Law § 296), and the New York City Human Rights Law, N.Y.C. Administrative Code § 8-107(4)(a).

60.    Defendant Steven Banks, as the Commissioner of the New York City Department of Social Services, is the head of an executive agency of the City of New York responsible for the operation and administration of the homeless shelter programs for New York City residents. Defendant Banks is also the Commissioner of the New York City Department of Homeless Services and the New York City Human Resources Administration ("HRA").  Mayor de Blasio announced on April 11, 2016 that he will restructure the agencies so that both DHS and HRA

will report to the Commissioner of Social Services.  DHS is presently being administered by Defendant Banks.

## FACTUAL ALLEGATIONS

61.     Nearly 60,000 homeless adults and children are currently living in New York City shelters.  This number is close to an all-time high for the city and also represents what DHS authorities are calling a "capacity crisis."  As a result of DHS's inability to manage a shelter population of this magnitude, individuals and families have been forced into unlawful multiple "overnight" placements.  Other homeless families and individuals have grown so tired of waiting for placements that they have left the intake centers to sleep in cars or on the street.  While the capacity crisis has made the intake process difficult for all homeless New Yorkers, individuals and families with disabilities face additional barriers in accessing the shelter system due to DHS's violations of their civil rights, in particular due to its failure to provide shelters that are compliant with the architectural provisions of the ADA.

62.     DHS does not have a system in place to track the prevalence of disabilities amongst the clients they turn away or deny services.  Notwithstanding the above, DHS recognizes that a disproportionately large percentage of those who receive or seek services from DHS have one or more disabilities within the meaning of that term as used in the ADA or the State or City Human Rights laws.  Although only 12 percent of the New York City population has a disability according to the American Community Survey, at least 42.2 percent of the shelter population is estimated to have a disability.  See HUD, 2014 Annual Homeless Assessment Report to Congress, Part 2, p. 7-8 (at least 42.2% of adults using shelter nationwide have a disability).

**A.      Defendants' Intake Process Discriminates Against Homeless New Yorkers with Disabilities.**

63.      A homeless individual seeking shelter in New York City must apply for housing through an intake center, which may itself be inaccessible and fail to meet the requirements of the ADA.   The intake centers are divided into three categories based on family status: (1) pregnant women or families with children (PATH); (2) adult families (AFIC); or (3) single men or women.   A homeless individual may only apply for shelter to an intake center that corresponds to his or her family status.   All intake centers are open 24 hours, but PATH and AFIC, the intake centers for families, only process applications from 9 am to 5 pm or 7 pm, respectively.   Families with children who apply after business hours "may be assigned a temporary shelter placement for the night and transported back to PATH the next morning to complete their application."    PATH Brochure, "Welcome to PATH", <u>available at</u> http://www.nyc.gov/html/dhs/downloads/pdf/path_brochure.pdf.    Adult families who apply outside business hours are forced to wait on the intake center's chairs overnight until the following morning.

64.      Application for shelter at DHS intake involves meetings with DHS staff, during which DHS asks for specific details regarding an applicant's personal and housing history; this can involve several meetings over many hours.   All family members are required to be present for any new application, so children must miss school in order to attend and adults must forgo work, medical appointments, and other necessary activities.   This process can be emotionally and physically challenging for all those in the midst of a crisis, but it poses an even greater challenge for families and individuals with any disabilities.

65.     Defendants' intake application and assessment processes fail to accommodate, and therefore discriminate against, people with disabilities.  To begin with, DHS almost never accepts an individual's self-attestation as to their disabilities and need for accommodations even when the individual's disability is readily apparent.   Nor will DHS accept as sufficient statements from third parties without medical licenses, even those who might be deemed both credible and reliable.  As a result, applicants' disabilities are often overlooked or ignored during the application process.  For example, DHS ignored Plaintiffs Sandra Butler and Ricky Gibson's clear physical needs during their shelter applications, which at a minimum were obvious by their respective uses of a walker and cane.  Moreover, Ms. Butler and Mr. Gibson informed the staff of their disabilities and requested appropriate help, which went wholly unaddressed, thereby making it almost impossible for the couple to physically remain at the intake center throughout the entire intake process.

66.     At intake, DHS does not have an effective screening process to identify possible physical, psychiatric, vision, or cognitive impairments, including learning intellectual or learning disabilities or traumatic brain injuries that might hinder an applicant's ability to complete the application process.

67.     Additionally, there are currently no procedures for a client to request disability accommodation during the initial application process.   Applicants are given little or no information about how they might request accommodation of their disabilities from intake staff.  For example, Ms. Diaz did not know that she had the option to be excused from PATH appointments due to her homebound status.  Her case worker at the shelter told her that she had to go to PATH, even though she was ill and disabled. In addition, applicants are not offered

American Sign Language interpreters or materials in alternate formats, nor are they offered assistance in completing applications or understanding the process.

68.     The physical conditions at the intake offices and the length of time necessary to complete the intake process further discriminates against Class Members because of a failure to accommodate their disabilities.   First, no disability-accessible transportation to intake offices is available for applicants.   Once at the intake office, applicants wait on hard plastic chairs in the small intake office, often for many hours, and are not offered accommodations to make the process accessible.   At the AFIC application process, for example, the total time to apply frequently takes from 6 to 12 hours, and frequently continues overnight while clients wait in plastic chairs.   Applicants are limited to brief breaks and are afraid to leave the premises because, if they do not respond when their names are called, they are deemed to have abandoned their application and are required to start the process anew when they return even if the reason for having to leave was disability-related.   Furthermore, no food is allowed in the intake office other than the pre-packaged food provided by DHS which may not accommodate the diets needed by people with disabilities seeking shelter.

69.     Indeed, Ms. Butler and Mr. Gibson spent hours a day and full overnights sitting upright in hard chairs and without access to outlets that were required to help Ms. Butler utilize her medical equipment.   The chairs also exacerbated Ms. Gibson's back problems, causing him more pain.

70.     The lack of timely assessment of a client's need for reasonable accommodations coupled with the inflexibility of the process has resulted in applications that are abandoned or

applications that include inaccurate information that can lead to erroneous shelter denials or inappropriate placement of families and individuals in shelters which are not accessible to them.

71.     DHS has an unpublished rule that requires families applying for emergency shelter to list and document every place they have lived over the past two years—including friends or acquaintances who might have put them up for a few nights, or even subway cars—as a condition of "establishing" their homelessness and eligibility for shelter.  Many other public systems, however, define homelessness to include individuals and families in exactly these types of situations in which they have unstable arrangements that allow them to temporarily shield themselves from the elements.  See, e.g., Homeless Emergency Assistance and Rapid Transition to Housing Act of 2009, 42 U.S.C. § 11302(a)(1) (defining "homeless," "homeless individual," and "homeless person" to include "an individual or family who lacks a fixed, regular, and adequate nighttime residence."); see also The Public Health and Welfare Act, 42 U.S.C. § 254b(h)(5)(A) (defining "homeless individual" as "an individual who lacks housing (without regard to whether the individual is a member of a family), including an individual whose primary residence during the night is a supervised public or private facility that provides temporary living accommodations and an individual who is a resident in transitional housing.").

72.     Recounting and documenting a two-year housing history is difficult for many applicants, especially those with cognitive impairments, psychiatric disabilities, or other disability-related impairments, particularly in a time of crisis.

73.     The consequence of not being able to recount and document a two-year history is severe.  For adult families, the application is denied, and the individual family members are turned away or told they can split up and apply for shelter in the singles system.  Families with

children are given a ten-day temporary, conditional placement, by which time they will have to document every single place they may have stayed over the past two years.

74.    Homeless applicants with disabilities are offered little or no assistance with obtaining information demanded by DHS to complete the application—even information that may be within the custody and control of DHS or another City agency.

75.    Once an initial application is completed, applicants are referred for conditional placement, frequently very late in the evening.  Many of the conditional placements DHS offers cannot accommodate the applicants' disabilities.  The Morris, Jackson, Faison, Diaz, and Butler families were all given conditional placements that did not accommodate their disabilities.

**B.    Defendants Discriminate Against Homeless New Yorkers with Disabilities when DHS Finds Individuals Ineligible for Shelter without Regard to their Disabilities.**

76.    Applicants who are pregnant or applying with other family members at PATH are provided with temporary housing for up to ten days while DHS conducts an investigation into whether the family may have other housing options besides a DHS shelter.

77.    Defendants have not implemented effective practices to assess whether the recommended housing option ("RHO") is suitable for the applicant given the applicant's disabilities, assuming that they have identified the applicant's disabilities.  Procedures adopted in March of this year do not address this serious problem.  See infra ¶¶ [110-112].

78.    As a result of the failures to incorporate an effective process to identify disabilities in the application stage and to adequately assess whether a RHO with relatives or others is in fact suitable given the applicants' disabilities, DHS regularly denies shelter placements to individuals and families on the basis that they have access to other housing without adequately assessing the appropriateness of that alternative housing.

79.     DHS failed to accommodate Ms. Butler and Mr. Gibson during their intake process, causing the couple to suffer through multiple applications and reapplications.

80.     DHS repeatedly denied the couple access to conditional shelter placements because DHS staff believed the couple could reside with Ms. Butler's mother.  However, Ms. Butler's mother's home was physically inaccessible to Ms. Butler, grossly overcrowded, and therefore, not a suitable RHO.  As Ms. Butler and Mr. Gibson did not have anywhere else to live, they spent much of the winter of 2014-2015 in a parked car outside of the family home, connecting their required medical devices to an outlet inside the house with an extension cord.

81.     Having to sit upright in their car in order to sleep, through a cold winter, exacerbated the couple's medical issues.

**C.     Defendants Discriminate Against Homeless New Yorkers with Disabilities when DHS Places or Transfers Individuals into Shelters that are Inappropriate for Individuals' Disabilities.**

82.     DHS does not have a reliable system in place to identify and correlate its physical housing stock and its various contractors with the aggregate and specific needs of homeless individuals with disabilities who apply for shelter assistance.  Nor does DHS have surveys of contractor-operated shelters that demonstrate compliance with the architectural provisions of the ADA.  DHS has only identified one shelter for adult families, Starbright, as wheelchair accessible.  Furthermore, DHS has identified Barrier Free Living as the only accessible shelter operated for persons requiring personal assistance with daily living activities.  Barrier Free Living, however, only houses 32 beds.

83.     DHS does not have housing stock among the existing facilities it operates, or for which it contracts, adequate to serve the needs of homeless families and individuals with

26

disabilities.  DHS also lacks surveys of its own facilities that demonstrate compliance with the architectural provisions of the ADA.

84.     New York City has a number of shelters that can reasonably accommodate the needs of a disabled person either because the shelter provides comprehensive personal assistance or, at the very least, because the shelter includes facilities that better accommodate a disabled applicant's needs, such as ramps, wide doors, accessible bathrooms, ground floor apartments or elevators or all services on the first floor.

85.     However, given the lack of integrated systems to identify facilities that are accessible or can accommodate various disabilities, and an overall shortage of available architecturally compliant housing stock, intake services and the DHS staff are not currently able to match individual applicants with shelter placements that accommodate their disabilities in a systematic and efficient manner.  Even when placements are clean and safe for the majority of residents, they are frequently inappropriate for those with disabilities, such as the Morris, Jackson, Diaz, Butler, and Faison families.  As a result, DHS places homeless individuals with disabilities in shelters that cannot reasonably accommodate their needs.

86.     Defendants provide inappropriate placements to Class Members when they place individuals and families in placements that are not compliant with the architectural provisions of the ADA and therefore unsuitable for Class Members' ambulatory disabilities.  For example, DHS places individuals who require canes, walkers, rollators, wheelchairs, or scooters in shelters without access ramps, elevators, or beds that permit transfer from a wheelchair.  DHS places those individuals or families with ambulatory disabilities in rooms that have doorways too

narrow for walkers or wheelchairs to pass through or too small to turn around in to access an outlet to charge an electronic wheelchair or scooter.

87.     DHS further denies individuals and families access to bathing and toilet facilities when it places Class Members in shelters without accessible bathrooms, such as was the case with Mr. Morris, who could not use  the communal bathroom at Auburn.

88.     DHS also inappropriately places individuals and families with specific functional needs and dietary restrictions related to their disabilities in placements without separate kitchen facilities or without access to refrigerators where they can store insulin or other life-sustaining medications, despite the fact that there are such accommodations available in the DHS shelter system.  As a result of DHS action, individuals are denied the necessary medical care and treatments recommended by their doctors.

**D.     Defendants Discriminate Against Homeless New Yorkers with Disabilities when DHS Fails to Provide Reasonable Transportation Accommodations.**

89.     DHS regularly provides transportation services to clients, including services such as transporting clients and their properties from one facility to another, as well as transporting clients to search for permanent housing.

90.     DHS fails to provide wheelchair accessible transportation to accommodate individuals with disabilities who are entitled to DHS-provided transportation to another facility or to search for permanent housing.

91.     For example, Ms. Diaz was not offered any transportation to PATH when her case worker told her to go to PATH to add her new grandchild to her case. As a result, she was forced to take public transportation and became so ill from the journey she could not complete the add-on process.

28

**E.    Defendants Discriminate Against Homeless New Yorkers with Disabilities when DHS Segregates Homeless Clients with Psychiatric and other Disabilities.**

92.    DHS has identified through its own processes hundreds—if not thousands—of applicants for shelter who have one or more psychiatric disabilities.

93.    DHS has adopted a method of administration through a pattern and practice of placing individuals—particularly those in the Defendants' single adult system—involuntarily in facilities that DHS has internally designated as appropriate for persons with psychiatric disabilities.

94.    As a result of DHS's placement policies and practices, certain DHS facilities have a disproportionate number and concentration of clients who DHS has identified as having psychiatric disabilities.

95.    In segregating and involuntarily clustering homeless adults with psychiatric disabilities in certain shelters, DHS is denying these individuals access to the most integrated living situation that would otherwise be available to them.

96.    DHS also has a practice of limiting homeless disabled New Yorkers who require personal care services to only one or two facilities.  These individuals would be able to receive shelter and services in a far larger number of facilities if architectural alterations were made to bring them into compliance with the architectural provisions of the ADA and/or modifications were made to agency policies and procedures.

**F.    Defendants Generally Fail to Accommodate Disabilities.**

97.    Because Defendants have failed to provide for the needs of persons with disabilities in DHS's intake processes and the shelter system as a whole, Defendants are denying Class Members meaningful access to New York City's emergency shelter programs.

29

98.     Defendants do not have accurate and complete information on the ADA compliance of their shelters. Nor do they have effective procedures in place to ensure that families and individuals are provided with shelter placements that allow applicants to have physical access to and within the shelter and do not present applicants with architectural barriers.

99.     Defendants do not have effective procedures in place to provide materials in alternate formats for individuals who have vision disabilities.  Nor do they have effective procedures in place to provide access to American Sign Language interpretation or procedures in place for or auxiliary aids to assist individuals with speech disabilities.

100.    Defendants do not have effective procedures in place to reasonably accommodate individuals' physical, cognitive and mental disabilities by providing assistance with the application process and explanations and guidance in the process of seeking and using shelters.

101.    Defendants do not have effective procedures in place to ensure that homeless individuals with disabilities are provided with information as to their rights under the ADA and the Rehabilitation Act, including but not limited to procedures for filing requests for accommodations, grievances and appeal procedures, and an expeditious process for approving such accommodations.

102.    Defendants have failed to establish an expeditious process for approving reasonable accommodations, recording them and ensuring that they are provided.

103.    Defendants have failed to adequately train and supervise DHS staff in the requirements of the ADA, including about how to accommodate clients with disabilities in the application process, in the shelter placement and transfer process, and during the time the person

or family resides in a DHS shelter, which includes the process by which the applicants find and secure accessible and stable permanent housing.

104.    Defendants have not published for public comment the rules for individuals applying for or receiving reasonable accommodations within the homeless shelter system, pursuant to procedural requirements set forth in the New York City Charter, Chapter 45, § 1043, CAPA.

105.    Defendants regularly deny disabled homeless individuals access to shelter based on the determination that a particular RHO is available to those individuals without adequately investigating whether such accommodations are accessible to applicants because of the disabilities of the applicants or current tenants.

106.    Plaintiffs have no plain and adequate remedy at law to redress the deprivation of their rights by the Defendants under the ADA, federal Rehabilitation Act, the Due Process Clause of the United States Constitution, and the various state and local laws which Defendants are alleged to have violated.

**G.    DHS Fails To Comply With Administrative Directive 15-ADM-06.**

107.    DHS has failed to comply with the mandates of Administrative Directive 15-ADM-06, which is issued by the Office of Temporary and Disability Assistance ("OTDA") and is controlling for local social services districts ("SSD") such as the New York City DHS.  The Administrative Directive sets standards for the assessment of an individual or family's temporary housing related needs, for the creation of an independent living plan ("ILP"), and for the process by which an individual or family applies for these services.  DHS has failed to meet these standards.

31

108. The Administrative Directive states that an SSD's assessment of an individual or family's housing related needs should explore care needs, such as a person's ability to live independently, and, in assessing an applicant, the SSD "must be particularly attentive to identifying mental and physical impairments." DHS has failed to train their staff members to adequately assess applicants according to their individual needs arising out of physical or mental impairments. DHS has made placements for individuals and families in inappropriate shelters, or has denied shelter to applicants citing alternative housing at relatives' residences that were in fact inappropriate due to the applicant's needs and a doctor's recommendations.

109. SSDs are also responsible for assessing whether a person's physical or mental impairment is or may become the cause of noncompliance with the SSD's rules. Temporary housing assistance may not be discontinued or denied as a result of noncompliance due to a physical or mental impairment. When a mental or physical impairment seems to be the reason for a person's noncompliance with SSD rules, the Administrative Directive mandates that the SSD refers the individual for an evaluation by an appropriate professional. Although a person who claims that a mental or physical impairment is the cause of noncompliance must provide documentation of that impairment, the Administrative Directives states that if the person does not have such documentation the SSD may refer the individual to a qualified professional for evaluation and "should work with the individual to facilitate cooperation." On the other hand, an SSD must never dismiss a claim of noncompliance due to a physical or mental impairment outright. Instead, the SSD must give the claim serious consideration and investigate further. When the applicant is unable to obtain necessary information from a third party, the SSD must assist in obtaining the information from the third party.

32

110.    When applicants are unable to comply with the rules of the intake procedure due to physical or mental impairments, DHS fails to give serious consideration to the cause of non-compliance, work with the applicant to facilitate the intake process, refer the applicant to a qualified professional, or investigate further when the applicant did not have documentation of the impairment.  In general, DHS has failed to provide the proactive assistance mandated by the Administrative Directive and has failed to comply with prohibitions of the same directive meant to protect Class Members.

111.    Even when the SSD has denied temporary housing for an individual or family, the Administrative Directive mandates that the SSD may in "no instance" deny that individual or family from reapplying for temporary housing or other temporary assistance.  DHS has failed to comply with this requirement by refusing to allow non-complying Class Members to reapply as a family when Class Members are unable to account for all of the family's living arrangements in the two years prior to applying for emergency housing.

112.    DHS has never published any procedures with respect to requesting or obtaining reasonable accommodations pursuant to the rulemaking provisions of CAPA, New York City Charter, Chapter 45, § 1041 et seq.  CAPA requires each agency to publish the full text of the proposed rule in the City Record at least 30 days prior to the date set for the public hearing or the final date for receipt of written comments, whichever is earlier.

**H.    DHS Fails To Comply With Its Own Policies And Procedures.**

113.    Without any prior notice to the public, on March 27, 2015, DHS approved Procedure No. 15-211, entitled the Reasonable Accommodation Procedure for Clients with Disabilities (the "Procedure").  The Procedure, approved by then-Commissioner Gilbert Taylor,

is meant to apply to all homeless families served by DHS, DHS shelter intake facilities for homeless families, DHS operated and contracted family shelter facilities, and DHS contracted drop-in centers, including the PATH intake center and AFIC, discussed below.

114.    DHS's new unpublished Procedure extends no more protections to the disabled than it had previously.  In addition, Defendants have failed to train and supervise DHS staff members regarding compliance with the requirements of the ADA and the Rehabilitation Act, even though the Procedure specifically recognizes that the disabled individuals are protected by the ADA, the Rehabilitation Act, and state and local law.  Consequently, the Procedure is rarely implemented and routinely ignored.

115.    Thus, despite the legal imperative and DHS stated policy, Defendants City of New York and DHS do not currently have effective practices in place to ensure that Class Members are provided with access to the shelter system application and placement process in a manner that recognizes, addresses, and meets their foreseeable needs for reasonable accommodations for their disabilities equal to those of other New Yorkers.   Plaintiffs' experiences demonstrate that DHS repeatedly fails to notify clients of their rights under the law. Furthermore, the Defendants' treatment of disabled Plaintiffs indicates that DHS fails to enforce departmental policy.    The Plaintiffs' respective struggles to access the appropriate accommodations reveal that DHS staff is neither trained nor supervised properly.  Additionally, and in spite of the Procedure, Defendants City of New York and DHS currently have no effective system in place to ensure that homeless individuals with disabilities are provided with information as to their rights under the ADA and the Rehabilitation Act, including but not

limited to procedures for filing accommodation requests, pursuing grievances, and appealing unworkable placements.

## CLASS ACTION ALLEGATIONS

116.    Pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, the named Plaintiffs bring this action for injunctive and declaratory relief on their own behalf, on behalf of their members, and on behalf of all persons similarly situated.   The class that the named Plaintiffs seek to represent consists of all persons in New York City who have disabilities that substantially limit one or more major life activities and are currently or will in the future be homeless, and whose disability may impact their ability to access DHS shelters and shelter-related services.

117.    The proposed class is so numerous that joinder of all its members is impracticable.   Upon information and belief, there are thousands of indigent individuals with disabilities who require shelter from DHS.   In addition, joinder of all members of the proposed class is impracticable because membership of the proposed class changes constantly, as additional persons become eligible for shelter services from DHS, and other persons find other more permanent shelter outside the DHS-administered system.

118.    The questions of law and fact presented by the named plaintiffs are common to other members of the class.

119.    Common questions of law and fact raised by Plaintiffs' allegations predominate, including whether, under federal and state law, Defendants sufficiently accommodate the disabilities of indigent individuals who are homeless and in need of shelter from DHS, and more specifically:

A.   Whether Defendants have adequate and effective procedures in place to ensure that individuals with disabilities are provided with ADA-compliant intake and shelters that are physically accessible and provide auxiliary aides and services;

B.   Whether Defendants have adequate and effective procedures in place to ensure that individuals with disabilities are provided with reasonable accommodations so that they have equal access to the application and placement process of DHS's emergency housing system;

C.   Whether Defendants have adequate and effective procedures in place to ensure that homeless individuals with disabilities are provided with information as to their rights under the ADA and the Rehabilitation Act, including but not limited to procedures for filing requests for accommodations, grievances and appeal procedures and their expeditious approval;

D.   Whether Defendants have failed to adequately train and supervise the staff at DHS regarding compliance with the requirements of the ADA and the Rehabilitation Act in how to accommodate clients with disabilities; and

E.   Whether Defendants have failed to record reasonable accommodations provided for purposes of ensuring that these are consistently provided to individuals for the duration of their involvement in the shelter system.

120.   The violations alleged by the named Plaintiffs are typical of those experienced by the class.  The entire class will benefit from the relief sought.

121.   The named Plaintiffs will fairly and adequately protect the interests of the class and their claims are typical and not in conflict with the interests of the class as a whole. Defendants' omissions and violations of law as alleged herein have caused named Plaintiffs,

36

Plaintiffs' members and Class Members to be deprived of the opportunity to effectively utilize Defendants' emergency shelters.

122.    The attorneys representing the class are experienced both in disability law and in class action institutional litigation.  Counsel representing the Plaintiff class is qualified to fully prosecute this litigation and Counsel possesses adequate resources to see this matter through to resolution.  The Legal Aid Society is a legal service organization with experience in class action civil rights and poverty law litigation that has secured court-ordered relief in class-action cases involving public benefits, disability-based discrimination, and the treatment of homeless persons. White & Case LLP, pro-bono co-counsel for Plaintiffs, is a private law firm with experience in class-action litigation.

123.    Defendants have acted or failed to act on grounds generally applicable to the class as a whole, making appropriate final injunctive or corresponding declaratory relief with respect to the class as a whole.  Fed. R. Civ. P. 23(b)(2).

## CLAIMS FOR RELIEF

Based on the foregoing factual allegations, the named Plaintiffs assert the following claims for relief:

## FIRST CLAIM FOR RELIEF
## FOR VIOLATIONS OF THE AMERICANS WITH DIABILITIES ACT,
## 42 U.S.C. § 12132, ET. SEQ.

124.    Plaintiffs reallege and incorporate herein all previously alleged paragraphs of the Complaint.

125.    Title II of the ADA, 42 U.S.C. § 12132, prohibits a public entity from excluding a person with a disability from participating in a public program, denying the benefits of a public

program to a person with a disability, or otherwise discriminating against a person on the basis of

disability.  To establish disability discrimination under the ADA, plaintiffs must demonstrate that

"(1) they are 'qualified individuals' with a disability; (2) that the defendants are subject to the

ADA; and (3) that plaintiffs were denied the opportunity to participate in or benefit from

defendant['s] services, programs, or activities, or were otherwise discriminated against by

defendant . . .  by reason of plaintiffs' disabilities."  Henrietta D. v. Bloomberg, 331 F.3d 261,

272 (2d Cir. 2003).

126.    The plaintiff class is composed of qualified individuals with disabilities, as

defined under the ADA, 42 U.S.C. § 12131(2) and 28 C.F.R. § 35.104, and are served by the

organizational Plaintiffs.  In relation to public services, a qualified individual with a disability is

"an individual with a disability who, with or without reasonable modifications to rules, policies,

or practices, the removal of architecture, communication, or transportation barriers, or the

provision of auxiliary aids and services, meets the essential eligibility requirements for the

receipt of services or the participation in programs or activities provided by a public entity."

Under Title II of the ADA, an individual with a disability (1) has a physical or mental

impairment that substantially limits one or more major life activities; (2) has a record of physical

or mental impairment that substantially limits one of more major life activities; or (3) is regarded

as having an impairment, regardless of whether or not the impairment actually exists.  DHS's

essential eligibility requirements include applicant compliance with the application process and

no availability of any other appropriate housing options to the applicant.  See Applying for

Temporary    Housing    Assistance,    NYC    Department    of    Homeless    Services,

http://www.nyc.gov/html/dhs/html/housing/families.shtml (last visited May 27, 2015).    The

Class Members are individuals with disabilities because they all exhibit physical and/or mental impairments that substantially limit one or more major life activities.  The Class Members are "qualified individuals" with disabilities in relation to public services because they meet the essential eligibility requirements for the receipt of services or participation in programs and activities provided by the City of New York and DHS.

127.    Defendants are subject to Title II of the ADA because they are public entities within the meaning of the ADA, 42 U.S.C. § 12131(1) and U.S. Department of Justice implementing regulations, 28 C.F.R. § 35.104, or are agents of such public entities.  Under both the ADA and the implementing regulations, a public entity includes "any department, agency, special purpose district, or other instrumentality of . . . local government."  42 U.S.C. § 12131(1)(b).  DHS is a public entity because it is a department of the City of New York.

128.    Defendants discriminated and continue to discriminate against the Class Members in violation of 42 U.S.C. § 12131 and its implementing regulations, 28 C.F.R. § 35.130, in the following ways:

A.    Defendants discriminated against Class Members by failing to provide reasonable modifications necessary for the Class to obtain temporary shelter in violation of 42 U.S.C. § 12112(b)(5)(A) and 28 C.F.R. § 35.130(b)(7);

B.    Defendants discriminated against Class Members by failing to provide them with temporary shelter and other DHS program benefits in a manner that is as effective in affording equal opportunity to obtain the same result, gain the same benefit, and reach the same level of achievement as that provided to others, in violation of 28 C.F.R. §§ 35.130(b)(1)(i)&(iii);

C.      Defendants discriminated against Class Members by failing to ensure that its facilities and its contractors' facilities are accessible, and by placing them in shelters with unreasonable architectural barriers that in effect defeat or substantially impair individuals' right to shelter in violation of 28 C.F.R. §§ 35.130(b)(4)(i)-(ii);

D.      Defendants discriminated against Class Members by failing to provide reasonable modifications to allow disabled persons to access intake centers that are free of architectural barriers or to complete intake  processes in violation of 28 C.F.R. §§ 35.130(b)(7);

E.      Defendants discriminated against Class Members by using methods of administration that subject the Class Members to discrimination in violation of 28 C.F.R. §§ 35.130(b)(3)(i)-(ii);

F.      Defendants discriminated against Class Members by adopting eligibility procedures that screen out or tend to screen out individuals with a disability from fully and equally enjoying shelter services and programs in violation of 28 C.F.R. §§ 35.130(b)(8); and

G.       Defendants discriminated against Class Members by failing to provide auxiliary aids and devices where necessary to afford an individual with a disability an equal opportunity to participate in and enjoy the benefits of a service, program, or activity of a public entity in violation of 28 C.F.R. § 35.160(b)(1);

H.      Defendants discriminated against Class Members by failing to ensure that interested persons with vision impairments or hearing impairments can obtain information on the existence and location of accessible services, facilities, and activities in violation of 28 C.F.R. § 35.163(a);

I.     Defendants discriminated against Class Members by failing to place signage directing individuals to accessible entrances or to locations where they can obtain information about accessible facilities in violation of 28 C.F.R. § 35.163(b);

J.     Defendants discriminated against Class Members by unnecessarily segregating them in facilities that are different than those afforded similarly situated non-disabled persons and failing to offer them shelter and services in the most integrated settings in violation of 28 C.F.R. §§ 35.130(a) & 35.130(b)(1)(i)-(ii) & (vii) & (b)(2) and 28 C.F.R. §§ 35.130(4)(i).

129.   As a result of DHS's discrimination, Class Members were denied the opportunity to participate in, or benefit from, adequate DHS-operated accommodations by reason of the Class Members' disabilities.

### SECOND CLAIM FOR RELIEF
### FOR VIOLATIONS OF THE AMERICANS WITH DIABILITIES ACT,
### 42 U.S.C. § 12132, ET. SEQ.

130.   Plaintiffs reallege and incorporate herein all previously alleged paragraphs of the Complaint.  Pursuant to 28 C.F.R. § 35.106, "a public entity shall make available to applicants, participants, beneficiaries, and other interested persons information regarding the provisions of this part and its applicability to the services, programs, or activities of the public entity, and make such information available to them in such manner as the head of the entity finds necessary to apprise such persons of the protections against discrimination assured them by the Act and this part."

131.   Defendants violated the ADA by failing to adhere to 28 § C.F.R. 35.106. Defendants fail to inform, and have no effective procedures in place to inform, Class Members

of (1) their rights under the ADA and (2) the manner by which Class Members could seek a reasonable modification of DHS policies and have DHS accommodate their disabilities in the process of placing them in a shelter.

**THIRD CLAIM FOR RELIEF**
**FOR VIOLATIONS OF THE REHABILITATION ACT**

132.   Plaintiffs reallege and incorporate herein all previously alleged paragraphs of the Complaint.

133.   Under Section 504 of the Rehabilitation Act, no qualified individual with a disability "shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ."

134.   Class Members are "handicapped persons," as that term is defined in regulations implementing Section 504.  Section 504 regulations define a handicap as a physical or mental impairment that substantially limits one or more of the major life activities of such individual. 28 C.F.R. § 41.31(a) and 45 C.F.R. § 84.3(j), (l).

135.   Class Members have at least one "disability," as that term is used in Section 504 of the Rehabilitation Act.  Like the ADA, Section 504 defines a disability as a physical or mental impairment that substantially limits one or more of the major life activities.   29 U.S.C. § 705(9)(B) and (20)(B).

136.   Class Members meet the essential eligibility requirements for the receipt of temporary shelter services and are therefore a "qualified handicapped person" as that term is defined in regulations implementing Section 504, 28 C.F.R. § 41.32 and 45 C.F.R. § 84.3(l).

137.    Defendants discriminated and continue to discriminate against Class Members in violation of 29 U.S.C. § 794(a) and its implementing regulations, 28 C.F.R. § 41.51 and 45 C.F.R. § 84.4 in the following ways:

A.    Defendants discriminated and continue to discriminate against Class Members by failing to provide reasonable modifications necessary for Class Members to participate in the temporary shelter program in violation of 29 U.S.C. § 794(a);

B.    Defendants discriminated and continue to discriminate against Class Members by failing to (i) afford them such benefits and services as are offered to individuals who do not include persons with disabilities in a manner that is equal to others; and (ii) by failing to provide Class Members with benefits in a manner that is as effective in affording equal opportunity to obtain the same result, and gain the same benefit, in violation of 28 C.F.R. §§ 41.51(b)(1)(ii)-(iii); 45 C.F.R. §§ 84.4 (b)(2) and 84.4(b)(1)(ii)-(iii);

C.    Defendants discriminated against Class Members by using methods of administration that subject the plaintiff to discrimination, in violation of 28 C.F.R. §§ 41.51(b)(3)(i)-(ii) and 45 C.F.R. § 84.4(b)(4)(i)-(ii); and

D.    Defendants discriminate against Class Members by placing them in a shelter with architectural barriers and without accommodations (i.e., ramps, elevators, accessible bathroom facilities, accessible bed and living facilities, and accessible offices for meetings related to services), such as through assigning a fourth floor room when an individual's disability prevents him from walking up stairs.

138.    The administration by the City of New York and DHS of the temporary shelter program, which is funded in part with federal financial assistance, constitute "programs or

activities" subject to section 504 of the Rehabilitation Act of 1973.  29 U.S.C. § 794(b)(1).  A "'program or activity' means all of the operations of . . . a department, agency, special purpose district, or other instrumentality of . . . a local government."  Id.  Temporary shelter programs are a "program or activity" because they are a part of DHS's operations.

139.     Defendants are recipients of "Federal financial assistance," as defined by Section 504 of the Rehabilitation Act and the implementing regulations promulgated by the U.S. Department of Justice and the U.S. Department of Health and Human Services, thereby rendering the City of New York and DHS subject to Section 504, pursuant to 29 U.S.C. § 794(b)(1); 28 C.F.R. §41.3(d)-(e); 45 C.F.R. §84.3 (f)-(h).

140.     With respect to each kind of discrimination, paragraphs (A)-(D), the defendants discriminated or continue to discriminate against plaintiffs because of their disabilities.

## FOURTH CLAIM FOR RELIEF
## FOR VIOLATIONS OF THE REHABILITATION ACT

141.     Plaintiffs reallege and incorporate herein all previously alleged paragraphs of the Complaint.

142.     Pursuant to 28 C.F.R. § 39.111, a regulation implementing Section 504, "[t]he agency shall make available to employees, applicants, participants, beneficiaries, and other interested persons such information regarding the provisions of this part and its applicability to the program or activities conducted by the agency, and make such information available to them in such manner as the Attorney General finds necessary to apprise such persons of the protections against discrimination assured them by section 504 and this regulation."  See also 45 C.F.R. § 84.8(a) ("A recipient that employs fifteen or more persons shall take appropriate initial

and continuing steps to notify participants, beneficiaries, applications, and employees . . . that it does not discriminate on the basis of handicap in violation of section 504 and this part.").

143.   Defendants City of New York and DHS violated Section 504 of the Federal Rehabilitation Act pursuant to 28 C.F.R. § 39.111 by failing to inform Plaintiffs of their rights under the Rehabilitation Act and the manner by which Plaintiffs may seek a reasonable modification of DHS policies to accommodate Plaintiffs' disabilities during the intake process at a shelter.  Defendants have also violated Section 504 of the Federal Rehabilitation Act pursuant to 45 C.F.R. § 84.8(a) for the same reasons stated in the previous sentence, and because Defendants City of New York and DHS employ more than fifteen people.

**FIFTH CLAIM FOR RELIEF**
**FOR VIOLATIONS OF § 296.2(a) OF THE NEW YORK STATE HUMAN RIGHTS LAW**

144.   Plaintiffs reallege and incorporate herein all previously alleged paragraphs of the Complaint.

145.   Under New York State Human Rights Law Section 296.2(a), "[i]t shall be an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place of public accommodation, resort or amusement, because of the race, creed, color, national origin, sexual orientation, military status, sex, or disability or marital status of any person, directly or indirectly, to refuse, withhold from or deny to such person of the accommodations, advantages, facilities or privileges thereof . . . ."

146.   The homeless shelter program administered by DHS is a public accommodation. N.Y. Exec. Law § 292(9).  Public accommodation includes "inns, taverns, road houses, hotels, motels, whether conducted for the entertainment of transient guests or for the accommodation of

those seeking health, recreation or rest . . . ."   Homeless shelters are conducted for the accommodation of those seeking health and rest and, therefore, are accommodations.

147.    Class Members are people with a disability within the meaning of N.Y. Exec. Law § 292(21).  Under Section 292(21), "[t]he term 'disability' means (a) a physical, mental or medical impairment resulting from anatomical, physiological, genetic or neurological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques or (b) a record of such an impairment or (c) a condition regarded by others as such an impairment, provided, however, that in all provisions of this article dealing with employment, the term shall be limited to disabilities which, upon the provision of reasonable accommodations, do not prevent the complainant from performing in a reasonable manner the activities involved in the job or occupation sought or held."   Class Members have all exhibited physical and mental impairments demonstrable by medically accepted clinical or laboratory diagnostic techniques.

148.    Defendants City of New York and DHS have subjected and continue to subject Class Members to discrimination by failing to appropriately accommodate persons with disabilities during the intake process and during the assessment for housing options, as well as by adopting policies, procedures and methods of administration that have an unequal impact on disabled persons in violation of the State Human Rights Law.  N.Y. Exec. Law § 296.2(a).

## SIXTH CLAIM FOR RELIEF
### FOR VIOLATIONS OF THE REGULATIONS OF THE NEW YORK STATE DEPARTMENT OF SOCIAL SERVICES

149.    Plaintiffs reallege and incorporate herein all previously alleged paragraphs of the Complaint.

150.   Defendants discriminated and continue to discriminate against Plaintiffs in violation of the "Social Services District Policy," 18 N.Y.C.R.R. § 303.1, which prohibits discriminatory practices by agencies, organizations, or institutions providing aid, care, services, benefits, or privileges,  including but not limited to the following ways:

A.   By establishing policies and practices which have the effect of discriminating against Class Members on the basis of handicap or disability in violation of 18 N.Y.C.R.R. § 303.1(a);

B.   By denying Class Members an aid, care, service or other benefit and privilege on the basis of handicap in violation of 18 N.Y.C.R.R. § 303.1(b)(1); and

C.   By restricting Class Members in the enjoyment of an advantage or privilege enjoyed by others receiving aid, care, services, and other benefits or privileges on the basis of their handicaps in violation of 18 N.Y.C.R.R. § 303.1(b)(4).

D.   By failing to provide accessible shelter to Class Members with physical or sensory disabilities who need certain facilities provided to shelter users—such as entryways, beds, refrigeration, and bathroom facilities—to be made physically accessible for their use.

151.   Regarding 18 N.Y.C.R.R. § 303.1(b)(1), the provision of safe and healthy shelter to persons in need is a benefit or privilege New York City provides through DHS.  DHS's neglect in transferring a disabled homeless person to a shelter with appropriate facilities and physically accessible accommodation is a denial of that benefit or privilege.  While it is unlikely that DHS is denying this benefit or privilege purely because a homeless person has disabilities, the effect is a pattern of denial of benefits and privileges specifically directed at disabled

47

homeless individuals.   Evaluating discrimination as measured by the effects of a policy on a particular population is consistent with this statute, as evidenced by Section 303.1(a).

152.    Under 18 N.Y.C.R.R. § 303.1(b)(4), New York City is obligated to provide the benefit or privilege of safe and healthy shelter to homeless residents.  Class Members residing in an inappropriate placement are restricted in their enjoyment of this benefit or privilege. Moreover, when a Class Member brings this restriction to the attention of a DHS official and the DHS official neglects or refuses to transfer the resident to a more appropriate facility, a Class Member is further restricted in his or her enjoyment of the benefit or privilege.

## SEVENTH CLAIM FOR RELIEF
## FOR VIOLATIONS OF THE NEW YORK CITY HUMAN RIGHTS LAW

153.    Plaintiffs reallege and incorporate herein all previously alleged paragraphs of the Complaint.

154.    Under New York City Administrative Code Section 8-107(4)(a), "[i]t shall be an unlawful discriminatory practice for any person, being the . . . agent or employee of any place or provider of public accommodation, because of the actual or perceived race, creed, color, national origin, age, gender, disability, marital status, partnership status, sexual orientation or alienage or citizenship status of any person, directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof . . ."  Moreover, "any person prohibited by the provisions of this section from discriminating on the basis of disability shall make reasonable accommodation to enable a person with a disability to . . . enjoy the right or rights in question provided that the disability is known or should have been known by the covered entity."  N.Y.C. Administrative Code § 8-107(15)(a).

155.     Defendants City of New York and DHS are each a "person" subject to N.Y.C. Administrative Code § 8-107(4)(a).

156.     Plaintiffs have a disability within the meaning of N.Y.C. Administrative Code § 8-102(16).

157.     Defendants discriminate against plaintiffs in violation of N.Y.C. Administrative Code § 8-107(4)(a) by refusing, withholding from or denying plaintiffs accommodations, advantages, facilities or privileges because of her disabilities, and by engaging in practices which have the effect of discriminating against them.

## EIGHTH CLAIM FOR RELIEF
### FOR VIOLATIONS OF THE NEW YORK CITY CHARTER,
### CITY ADMINISTRATIVE PROCEDURE ACT

158.     Plaintiffs reallege and incorporate herein all previously alleged paragraphs of the Complaint.

159.     To the extent that the Defendants have devised policies, procedures and protocols with respect to how individuals applying for, or residing in, DHS shelter facilities, such policies procedures and protocols constitute "rules" within the meaning of the CAPA, § 1041(5).

160.     By failing to follow the rulemaking procedures required under CAPA, Defendants have proceeded to impose a regimen of rules with respect to how people with disabilities are treated when they apply for, or reside in, the DHS shelter system, without ever having presented them in a structured manner for comment and review by people with disabilities, community boards, civic organizations, the news media, member of the City Council and the general public, in violation of CAPA § 1043(b)(1) and (2).

**NINTH CLAIM FOR RELIEF**
**FOR VIOLATION OF PLAINTIFFS' RIGHT TO DUE PROCESS OF LAW**

161.    Plaintiffs reallege and incorporate herein all previously alleged paragraphs of the Complaint.

162.    At all times relevant herein, defendants City of New York and DHS were acting under color of statutes, ordinances, regulations, custom, or usage of the State of New York. Defendants violated and continue to violate the rights of plaintiffs guaranteed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution, which is actionable pursuant to 42 U.S.C. § 1983 and the New York State Constitution, Article 1, § 6.

163.    Class Members have a protected property interest in their right to emergency shelter.

164.    Class Members have a protected liberty interest in their right to be treated as a lawfully registered couple or family, when appropriate.

165.    Defendants' denial of Class Members' application for shelter, and Defendants' offer to conditionally place them apart from their families in sex-segregated shelters, was arbitrary, capricious and irrational given the disabilities of Class Members because a fair and reasonable evaluation of their application would not have relied on RHOs at which they were a) unwelcome and uninvited; b) subject to overcrowded conditions; c) denied access to a physically accessible facility;   and d) denied reasonable accommodations.   As such, Defendants have violated Plaintiffs' right to due process of law as protected under the Fourteenth Amendment of the United States Constitution and Article I, § 6 of the New York State Constitution.

166.    When DHS handles placements by splitting up adult families, because one or more of them has a disability that the agency is not accommodating, DHS violates the adult

50

family members' due process rights by arbitrarily denying them equal housing opportunities. Adult family members in such circumstances are forced to choose between being housed independently through the sex-segregated placement system for single persons and being housed together in a medically inappropriate placement. This requires adult family members to forfeit either their liberty interest in companionship through cohabitation or their liberty interest in medically appropriate shelter accommodations.

## TENTH CLAIM FOR RELIEF
### FOR VIOLATION OF PLAINTIFFS' RIGHT TO BE SHELTERED TOGETHER PURSUANT TO NEW YORK STATE SOCIAL SERVICES LAW

167.    Plaintiffs reallege and incorporate herein all previously alleged paragraphs of the Complaint.

168.    According to N.Y. State Social Services Law § 131(3), "families shall be kept together, they shall not be separated for reasons of poverty alone, and they shall be provided services to maintain and strengthen family life."   In offering to provide plaintiffs conditional shelter only if they were willing to go in to separate, sex-segregated shelters at different locations, Defendants violated N.Y. State Social Services Law § 131(3), by failing to offer them services in a manner that kept the family together and strengthened family life.

169.    When DHS offers adult family members separate, individualized placements in order to accommodate disabilities, DHS forces adult family members to choose between their right to shelter and their right, as New Yorkers, to be housed with family. As such, adult family members are required to elect between their liberty interests.

**ELEVENTH CLAIM FOR RELIEF**
**FOR VIOLATIONS OF NEW YORK STATE CIVIL RIGHTS LAW**

170.    Plaintiffs reallege and incorporate herein all previously alleged paragraphs of the Complaint.

171.    Under New York Civil Rights Law 40-c(2), "[n]o person shall, because of race, creed, color, national origin, sex, marital status, sexual orientation or disability, as such term is defined in section two hundred ninety-two (292) of the executive law, be subjected to any discrimination in his or her civil rights, or to any harassment, as defined in section 240.25 of the penal law, in the exercise thereof, by any other person or by any firm, corporation or institution, or by the state or any agency or subdivision of the state."

172.    DHS has subjected Class Members residing in inappropriate shelters to a pattern of behavior that discriminates against a disabled person's exercise of civil rights.

**TWELFTH CLAIM FOR RELIEF**
**FOR VIOLATIONS OF THE ADMINISTRATIVE DIRECTIVE OF THE NEW YORK STATE OFFICE OF TEMPORARY AND DISABILITY ASSISTANCE**

173.    Plaintiffs reallege and incorporate herein all previously alleged paragraphs of the Complaint.

174.    According to Administrative Directive 15-ADM-06 issued by the Office of Temporary and Disability Assistance, "[a]t the time of application, SSDs are responsible for evaluating an individual's or family's housing related temporary assistance and care needs, including the need for treatment of physical and mental health impairments." Defendants have placed Plaintiffs in temporary housing that failed to meet the Plaintiffs' needs arising from physical or mental impairments. Defendants have also placed Plaintiffs in separate housing from family members, despite Plaintiffs' dependence on those family members for assistance for their

daily activities and medical care. Defendants have therefore failed to adequately administer their responsibilities in evaluating applicants for physical or mental impairments.

175.    Administrative Directive 15-ADM-06 states that temporary housing assistance "may not be denied or discontinued when the non-compliance is due to a physical or mental impairment"; when it appears non-compliance may be due to a physical or mental impairment, the Directive states that services cannot be discontinued until the appropriate professional has determined that the impairment was not the cause of the noncompliance. Defendants have violated this mandate by denying housing to Plaintiffs when Plaintiffs were unable to comply with DHS intake procedures due to physical or mental impairments. Defendants denied housing to Plaintiffs that were unable to stay in the intake centers on hard chairs for the entire night due to physical disabilities or other health needs. Defendants also denied housing to Plaintiffs who were unable to recount their housing histories for the last two years due to mental health disabilities. Defendants did not refer Plaintiffs to the appropriate medical professional before denying housing services. By denying Plaintiffs housing when non-compliance was due to physical or mental disabilities and by failing to refer Plaintiffs to an appropriate professional to determine if non-compliance was unrelated to a disability, DHS violated the mandates of the Administrative Directive.

176.    The Administrative Directive also states that an applicant's claim that noncompliance was due to a mental or physical impairment "must never be dismissed outright but rather must be given serious consideration and investigated further, referring the client to a qualified professional if appropriate." Defendants have violated this mandate of the Administrative Directive by failing to acknowledge Plaintiffs' disabilities when there is no

documentation, when there is testimony from third-party non-medical professionals, and even when Plaintiffs have documentation from a medical professional.

177.   Lastly, the Administrative Directive states that "[i]n no instance may an individual or family who previously applied for THA be denied the right to reapply for THA or other forms of TA." Defendants have violated this mandate by refusing to allow Plaintiffs to reapply for temporary housing as a family when Plaintiffs had failed to comply with the intake requirement of accounting for the last two years of housing.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court grant them the following relief:

A.   Adjudge and declare that the policies, practices, omissions and conditions described above are in violation of the rights of the Plaintiffs under the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, the Due Process Clauses of the United States Constitution, the New York State Constitution, the New York State Civil Rights Law, the New York State Social Services Law and its implementing regulations and the New York City Civil Rights Law and the New York City Charter, City Administrative Procedure Act.

B.   Order Defendants to comprehensively assess the compliance of each homeless shelter with the ADA's architectural, communications and auxiliary aid requirements and programmatic access requirements and create and complete a specific schedule for remediation of architectural barriers to create a stock of homeless shelters that are accessible and meet the needs of people with physical, sensory, and other disabilities who use or may use the homeless shelter system.

      C.     Order Defendants to provide reasonable accommodations during the eligibility and application process.

      D.     Permanently enjoin Defendants, their agents, employees and all persons acting in concert with them:

      i.     From assigning Plaintiffs to any homeless shelter, room, or other abode which does not accommodate their disabilities, including requiring individuals with disabilities to accept inaccessible shelter placements;

      ii.     From assigning Plaintiffs with disabilities involuntarily to certain facilities because of their disabilities; and

      iii.     From employing methods of administration that have the effect of discriminating against Plaintiffs based on their disabilities.

      E.     Order Defendants to promulgate such policies and procedures that are relevant to applying for or implementing reasonable accommodations, including policies that ensure:

      i.     That Class members are informed of their rights under the ADA and the Rehabilitation Act;

      ii.     That shelter residents with disabilities are appropriately assessed so that their shelter placements conform to law, including physical accessibility of the shelter;

      iii.     That Class Members are granted reasonable accommodations on an expeditious basis;

      iv.     That shelter and services are provided to individuals with disabilities in the most integrated setting;

v.      That Class members have an opportunity to reasonably object to any future denial, transfer or reassignment on the ground that their need for reasonable accommodations based on their disabilities will not be met by such transfer or reassignment and/or that their rights under the ADA or Rehabilitation Act are being or will be violated thereby; and

vi.      That Class members have access to an appeal processes or grievance procedures, pursuant to the rulemaking provisions of the City Administrative Procedure Act, and obtain timely decisions on their appeals.

F.      Order Defendants to make a record of reasonable accommodations sought, provided, and denied to ensure that policies and procedures result in effective accommodations, that policies and procedures are being put into effect and that no individual is being unreasonably denied an accommodation.

G.      Order Defendants to train and supervise DHS employees, contractors and other agents in providing shelter and other services in a manner consistent with the ADA.

H.      Award Plaintiffs, pursuant to 29 U.S.C. § 794(b), 42 U.S.C. § 1988, and 42 U.S.C. § 12205, and the New York City Human Rights Law, N.Y.C. Administrative Code § 8-502(f), the costs of this suit and reasonable attorneys' fees and litigation expenses.

I.      Order Defendants City of New York and DHS to pay the individual named Plaintiffs such compensatory damages as may be awarded by the jury.

J.      Retain jurisdiction of this case until the Defendants have fully complied with the orders of this Court, and there is a reasonable assurance that the Defendants will continue to comply in the future.

K.      Certify this action as a class action on behalf of the proposed Class and appoint

Plaintiffs as representative of the Class.

L.      Award such other and further relief as the Court deems just and proper.

### REQUEST FOR JURY TRIAL

Plaintiffs hereby demand a jury trial of all issues triable.


Dated:  August 3, 2016

New York, New York


By: */s/ Judith Goldiner*
Judith Goldiner,
Attorney-in-Charge
Civil Practice – Law Reform Unit
Joshua Goldfein
Beth Hofmeister
Kathryn Kliff
Kenneth Stephens

THE LEGAL AID SOCIETY
199 Water Street, 3d Floor
New York, New York 10038
Telephone (212) 577-3300

*Attorneys for Plaintiffs*

By: */s/ Paul B. Carberry*
Paul B. Carberry
Evelyn A. Fanneron

WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036
Tel. +1 (212) 819-8200
Fax. +1 (212) 354-8113

*Attorneys for Plaintiffs*