UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SANDRA BUTLER; RICKY GIBSON; O.BRIEN MORRIS; RICHARD EMMETT; ROSELLE DIAZ; KEVIN FAISON; SHANIQUA JACKSON; CENTER FOR INDE,PENDENCE OF THE DISABLED, NEW YORK AND COALITION FOR THE HOMELESS, individually and on behalf of all others similarly situated,

           Plaintiffs,

- against –

CITY OF NEW YORK, THE NEW YORK CITY DEPARTMENT OF HOMELESS SERVICES and STEVEN BANKS, as Commissioner of the New York City Department of Homeless Services,

           Defendants.

**ATTORNEY DECLARATION IN SUPPORT OF COURT APPROVAL OF THE PROPOSED STIPULATION AND ORDER OF PARTIAL SETTLEMENT**

15-CV-3783 (RWS) (JLC)

I, Beth C. Hofmeister, an attorney admitted in the United States District Court for the Southern District of New York, hereby declare as true under penalty of perjury, pursuant to 28 U.S.C. § 1746, that:

**Introduction**

1. I, Beth C. Hofmeister, am an attorney at The Legal Aid Society, and one of the counsel of record for plaintiffs herein. I am fully familiar with the facts in this case.

2. I make this declaration pursuant to Rule 23(c) of the Federal Rules of Civil Procedure in support of the proposed Stipulation and Order of Settlement ("Settlement").

3. The Settlement is fair, adequate and reasonable and protects the interests of the class members.

1

**History of the Litigation**

4. On May 15, 2015, named plaintiffs commenced this action alleging that the City of New York and Gilbert Taylor, the Commissioner of the New York City Department of Homeless Services ("DHS"), had failed to reasonably accommodate disabilities in the provision of shelter for plaintiffs Sandra Butler and Ricky Gibson.

5. On or about August 3, 2016, plaintiffs filed an amended complaint on consent, converting the matter into a class action and adding five additional named plaintiffs, as well as Center for Independence of the Disabled, New York and Coalition for the Homeless as two institutional plaintiffs. Plaintiffs also substituted the current Commissioner of DHS, Steven Banks, as a defendant, and added DHS as a defendant. The amended complaint alleges that defendants failed to provide reasonable accommodations and accessible shelter facilities sufficient to meet the needs of the class members, discriminated against shelter residents and applicants based on their disabilities, and so violated federal, state, and city law.

6. On October 20, 2016, the Court certified the following class by Court-order stipulation and upon agreement of the parties:

> All individuals with a disability within the meaning of the Americans with Disabilities Act who presently reside in the DHS Shelter System or who, since May 14, 2012, have sought or received, in the future will seek or receive, shelter or shelter-related services in the DHS Shelter System, whose disability may affect their ability to meaningfully access shelter or shelter-related services, and who are not otherwise covered under the Consent Decree and Judgment in United States of America v. City of New York, 15-cv-5986 (RJM)(JO).

7. Since the initial filing the parties conducted extensive, arms-length negotiations and came to an agreement to settle plaintiffs' action.

2

8. On May 15, 2017, the Settlement, signed by all parties, was submitted to the Court to become effective upon Court approval.

**Terms of the Settlement**

9. The Settlement protects important rights and interests of the class members and substantially fulfills plaintiffs' litigation objectives.

10. Under the terms of the Settlement, defendants agree to provide reasonable accommodations ("RAs") on an "individualized basis to class members in a manner that provides for meaningful access to shelter or shelter-related services, except where doing so would fundamentally alter the nature of the DHS Shelter System and/or shelter-related services." Settlement ¶ 21.

11. Defendants agree to notify "shelter applicants, DHS clients, and people seeking information about shelter" about their right for an RA and how to request RAs. Notification can include, without limitation: oral communication, intake forms, brochures, handbooks, letters, and posters in waiting rooms and lobbies. Settlement ¶ 23.

12. Defendants will establish and implement an interactive RA process, and will consider RA requests on an individualized basis. Where a disability is not apparent or known to defendants and documentation is required to verify that a class member has a disability and/or that the accommodation sought is reasonably related to that disability, defendants will offer to assist the class member in obtaining such documentation and make best efforts to obtain such information that may already be in DHS's possession or in other databases accessible to DHS. Settlement ¶¶ 25, 28-31.

13. In consultation with plaintiff's counsel, defendants will develop and incorporate into its intake procedures a process to identify shelter applicants with

3

disabilities who may need RAs and who do not self-identify as having a disability or as requiring an RA. During the eligibility assessment, defendants will also consider whether a class member's disability would render a housing resource inaccessible and therefore not available. Settlement ¶ 39, 60.

14. Defendants agree to respond promptly to all requests for an RA by class members. Settlement ¶ 27.

15. Pending a final determination in response to a request for an RA, defendants agree to provisionally grant RA requests where DHS determines that the denial of the RA is reasonably likely to cause serious harm to a class member with a disability, except where doing so would fundamentally alter the nature of the DHS shelter system and/or shelter-related services. Settlement ¶ 34.

16. Defendants will maintain a record of every RA that has been requested or granted, in additional to denials and appeals, so that if a class member changes shelters or leaves and re-enters shelter, this information will be readily available to staff involved in provided services to the class member. Settlement ¶ 36, 44.

17. Defendants additionally agree to not make any adverse determination regarding shelter benefits as a result of the request for an RA or where the individual's actual or perceived failure to comply relates to a disability requiring an accommodation. Settlement ¶ 26, 35.

18. The Settlement also provides that defendants will issue a written notice each time it grants or denies an RA request, and a notice of denial will include an explanation of DHS' determination, a list of documents reviewed when assessing the RA

4

request, and instructions on how to appeal the adverse determination within DHS and the Office of Temporary and Disability Assistance ("OTDA"). Settlement ¶ 40.

19. Defendants must also confer with a class member should defendants conclude that an RA is no longer reasonable or necessary. Class members will be provided with a written notice at least two weeks before the RA is terminated, and, should the class member appeal defendants' determination prior to the effective date, defendants will continue to provide the RA pending the outcome of the appeals process. Settlement ¶ 41.

20. Defendants will also develop safeguards to prevent unnecessary interruptions to services when class members are absent from their shelter due to hospitalizations or other related institutional placements. These safeguards may also include resuming previously grants RAs or providing new RAs. Settlement ¶ 61.

21. Parties will confer on the extensive staff training that will occur for defendants' staff whose regular job responsibilities might require them to interact with class members. Defendants will also develop a means by which to assess the efficacy of said trainings. Settlement ¶ 62-64.

22. In light of the complexity and scope of the settlement, and the likely need for some capital expenditures for facility modifications or related construction, the parties have agreed to a long-term, phased implementation, which will begin with an initial assessment of the class member population and physical shelter stock, the hiring of internal and external experts who will participate in this assessment and survey, and the creation of an initial remediation plan. Defendants have agreed to allow plaintiffs to

5

participate and object in all stages of this initial survey and planning. Settlement ¶ 45, 47-59, 88.

23. The parties will develop a joint protocol for monitoring the settlement, which will include an informal relief mechanisms to address individual cases as they arise. Defendants will share aggregated data with plaintiffs, allow plaintiffs access to facilities and logbooks as needed. Settlement ¶ 65-69, 75.

**Discovery**

24. Through extensive informal discovery, the ongoing involvement of the institutional plaintiffs, Coalition for the Homeless and Center for Independence for the Disabled, New York, and direct contacts between the institutional plaintiffs and class counsel with the defendants in more than two-hundred individual cases of class members during the course of the negotiations, plaintiffs had sufficient information to evaluate the merits of the class claims and the defenses available to the defendants to assess the overall adequacy of the settlement. See, e.g. *In re Bear Stearns Companies, Inc. Sec., Derivative, and ERISA Litig.*, 909 F Supp 2d 259, 267 (SDNY 2012).

**Negotiations**

25. The negotiations were conducted at arm's length by capable and experienced attorneys for approximately two years through several stages, reducing the disputes to ever-narrower grounds.

26. The parties negotiated over complex issues including, but not limited to, the nature of the defendants' obligations, the process and timeline by which the entire system would be evaluated and remediated, plaintiffs' involvement in revamping

6

policies, practices, and trainings, and the appropriate methods for monitoring compliance with the Settlement.

### The Settlement Should be Approved

27. The Settlement meets the general standards by which class action settlements are evaluated by the Second Circuit. *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (1974). In *Wal-Mart Stores, Inc. v. VISA USA, Inc.*, 396 F.3d 96, 116-117 (2nd Cir. 2005), the Court stated:

> A court may approve a class action settlement if it is "fair adequate, and reasonable, and not a product of collusion." A court determines a settlement's fairness by looking at both the settlement's terms and the negotiating process leading to the settlement. A "presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's length negotiations between experienced, capable counsel after meaningful discovery." We are mindful of the "strong judicial policy in favor of settlements, particularly in the class action context."

28. It is clear that the terms of the Settlement are fair, adequate and reasonable based on the factors set forth in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir 1974), and affirmed in *Wal-Mart Stores, Inc., v. VISA, USA*, 396 F.3d 96, 117-118 (2d Cir., 2005); *Frank v. Eastman Kodak Co.*, 228 F.R.D. 174, 184 (W.D.N.Y. 2005), and *McReynolds v. Richards-Cantave*, 588 F.3d 790, 804 (2nd Cir. 2009). The factors are: (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceeding and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in

7

light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

29.   Application of the relevant factors to the present case demonstrates that the Settlement should be approved.

30.   First, given the scope and complexity of the law involved, the cost of continuing litigation would be considerable. A trial in this matter would require significant evidence about the shelter system in New York City and the manner in which the City responds to tens of thousands of class members. Considerable time and financial resources would have been consumed by a number of experts needed to describe the current shelter system, as well as how this system either was or was not meeting its legal standards under the various disability discrimination laws. Indeed, the legal nuances associated with litigating disability discrimination claims under the various City, State, and Federal laws would likely require extensive briefing and motion practice. Although plaintiffs view the likelihood of ultimate success on their claims as high, the Settlement avoids the always present litigation risks associated with class action litigation. And, perhaps most importantly for class members, the Settlement allows for implementation of the injunctive relief to begin immediately, eliminating the time and costs associated with extensive motion practice, a potential trial and appeal.

31.   As to the reaction of the class members, upon information and belief from defendants' counsel, by August 1, 2017, defendants displayed notices of the Settlement in English and Spanish in all public waiting areas at all DHS offices and all waiting areas of all DHS shelter locations. The notice was written in plain English and included a Legal Aid phone number, email address, and mailing address for class members to reach out

8

with questions and comments about the Settlement, or to request a copy of the complete settlement agreement. Moreover, the settlement agreement appeared on the websites of The Legal Aid Society, Center for Independence of the Disabled, New York, and DHS. Plaintiffs' counsel also distributed the settlement agreement to other legal service providers, including over city and state-wide email listservs, to share information to the advocacy and provider community at large.

32. Plaintiffs' counsel responded to each of the 37 voicemail messages that were left by class members, including those to which no actual message was left, but for which we had a record of the caller's number. Staff of The Legal Aid Society spoke with approximately 28 class members, and left messages for everyone else who had an answering machine. We also received 3 emails and 0 letters in response to the Settlement notice.

33. There was no negative reaction reported from class members. Some class members asked about the case in general; some expressed gratitude; some had questions about whether they could recover individually from defendants. In response to requests, we mailed out 11 copies and emailed out 3 copies of the Proposed Settlement.

34. Third, as to the stage of the proceedings, formal and informal discovery was obtained over a two-year period since the initial filing. The parties engaged in extensive, arms-length negotiations, for almost two full years during which parties regularly shared information, which resulted in a comprehensive agreement.

35. Next, in terms of evaluating the risk of establishing liability and damages, the Settlement removes the need for any continued litigation in this matter. The Settlement also provides the relief plaintiffs sought more quickly than would have been

realized had the class action litigation continued or continued on a case-by-case basis. Obtaining injunctive relief through a settlement so that thousands of New Yorkers experiencing homelessness will have meaningful access to their shelters and RAs to facilitate that access was of primary importance since the initial filing over two years ago.

36. Considering the sixth factor, although the risks of maintaining the class action through the trial are likely not present in this matter, at any time a motion could be made to change or decertify the class, thereby adding to the litigation timeline and lack of access to the proposed relief in this proposed settlement agreement.

37. Finally, in terms of the defendants' ability to withstand a greater judgment and its range of reasonableness, the vast impact of the settlement on almost every aspect of the shelter system and the services therein demonstrates defendants' significant commitment to making the shelter system more accessible to every resident. The injunctive relief proposed in the Settlement will better serve class members at almost every stage of their involvement with the shelter system and will require significant effort, time, and financial investment by defendants to assess and modify various aspects of the shelter system. Negotiations will continue with respect to the named plaintiffs' damages claims, but this will not impact implementation of the injunctive relief on behalf of the class. Additionally, the parties have reserved all issues with respect to plaintiffs' entitlement to attorney's fees for the parties to negotiate when and if the Settlement is approved, with recourse to motion practice if the parties are unable to come to agreement. Settlement ¶ 89. In sum, the scope of class-wide injunctive relief is completely insulated from any negotiations or decisions that might be made with respect

to either attorney's fees or the named plaintiffs' individual damages claims, permitting the Court to assess fully the fairness of the settlement to the plaintiff class.

Wherefore, plaintiffs respectfully request that this Court enter an order approving the Stipulation and Order of Partial Settlement.

_____
Beth C. Hofmeister

Dated: New York, NY.
September 6, 2017