UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- x

SANDRA BUTLER; RICKY GIBSON;
O'BRIEN MORRIS; RICHARD EMMETT;
ROSELLE DIAZ; KEVIN FAISON;
SHANIQUA JACKSON; CENTER FOR
INDEPENDENCE OF THE DISABLED, NEW
YORK AND COALITION FOR THE
HOMELESS,

STIPULATION OF
SETTLEMENT

15-CV-3783 (RWS) (JLC)

Plaintiffs,
for themselves and on behalf of all others
similarly situated,

-against-

CITY OF NEW YORK, THE NEW YORK
CITY DEPARTMENT OF HOMELESS
SERVICES and STEVEN BANKS, as
Commissioner of the New York City Department
of Homeless Services,

Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1-13-17

-------------------------------------------------------------- x

## INTRODUCTION

**WHEREAS,** Plaintiffs Sandra Butler and Ricky Gibson commenced

this action against New York City and the prior Commissioner of the Department

of Homeless Services, Gilbert Taylor, (herein "City Defendants") by filing a

complaint on or about May 15, 2015 alleging, *inter alia*, that the New York City

1

Department of Homeless Services ("DHS") had failed to reasonably accommodate plaintiffs' disabilities in the provision of shelter;

**WHEREAS**, the City of New York and Gilbert Taylor filed an answer to the complaint on or about January 20, 2016;

**WHEREAS**, on consent, Plaintiffs filed an Amended Complaint on or about August 3, 2016 in which they substituted the current Commissioner of DHS, Steven Banks, as a Defendant, added DHS as a Defendant, and converted the action into a class action;

**WHEREAS**, the Amended Complaint alleges, *inter alia*, that DHS has failed while providing homeless services to provide reasonable accommodations for the disabilities of the class members and that DHS has failed to provide accessible shelter facilities sufficient to meet the needs of the class members;

**WHEREAS**, the Amended Complaint alleges that Defendants violated federal, state and city law by failing to address the needs of people with disabilities in its homeless shelter program pursuant to Title II of the Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act of 1973, due process under the United States and New York State Constitutions, the New York State and City civil rights statutes and regulations, administrative directive 15-

2

ADM-06 issued by the Office of Temporary and Disability Assistance, and the

New York State Social Services Law and regulations;

**WHEREAS**, by stipulation so ordered by this Court on October 20,

2016, the Court certified a class as follows:

> All individuals with a disability within the meaning of the Americans
> with Disabilities Act, who presently reside in the DHS Shelter System
> or who, since May 14, 2012, have sought or received, or, in the future
> will seek or receive, shelter or shelter-related services in the DHS
> Shelter System, whose disability may affect their ability to
> meaningfully access shelter or shelter-related services, and who are
> not otherwise covered under the Consent Decree and Judgment in
> United States of America v. City of New York, 15-cv-5986
> (RRM)(JO).

**WHEREAS**, the Parties desire to resolve the issues raised in this

litigation without further proceedings;

**WHEREAS**, the Parties desire to settle this action on terms and

conditions just and fair to all Parties;

**WHEREAS**, the Parties have conducted extensive, arms-length

negotiations to resolve the issues in this action, and have resolved those issues as

specified in this Stipulation and Order of Settlement (this "Stipulation");

NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED, by

and between the Parties, through their attorneys, as follows:

3

## DEFINITIONS

1. "Accessible Shelter" means a facility or portions therein that meets the requirements set forth in the ADA, and its implementing regulations, including, where applicable, 28 C.F.R. 35.151 (e) (the 2010 ADA Standards for Accessible Design, subsection on "social services center establishment").

2. "Architectural Remediation" or "Structural Remediation" means changes to the site to ensure accessibility as defined by the ADA standards for physical accessibility of public/governmental services and programs as specified in paragraph 1 above and paragraph 16 below.

3. The Client Assistance and Rehousing Enterprise System ("CARES") is a web-based case management and vacancy control system DHS currently utilizes to track DHS clients from intake and shelter placement through their return to the community.

4. "Class Member" means any individual who falls within the class definition as set forth below.

5. "DHS Shelter System" means any facility operated or contracted by the New York City Department of Homeless Services ("DHS"), including, but not limited to, intake centers for persons seeking shelter, all facilities providing shelter to homeless persons that are directly operated by DHS or that DHS operates through contracts, and all social service programs provided by DHS or its Vendors to homeless persons seeking shelter, receiving shelter, or departing from such shelters, including, outreach to street homeless, drop-in centers and safe haven beds. For purposes of this Stipulation, the term "DHS Shelter System" shall have the same meaning and apply equally to the extent that any other City agency or Vendor of the City of New York assumes responsibilities or operational control of a facility or social service program currently operated or contracted by the New York City Department of Homeless Services.

6. "Disability" means a physical or mental impairment that substantially limits one or more of the major life activities of such individual; a record of such an impairment; or being regarded as having such an impairment. 28 C.F.R. § 35.104. This term incorporates by reference the terms "physical or mental impairment" and "major life activities" as defined by 28 C.F.R. § 35.104.

4

7. "Effective Communication" means communication with people who have disabilities that is as effective as communication with others. See 28 C.F.R. § 35.160.

8. "Effective Date" shall mean the date on which all of the following have occurred: (a) this Stipulation is so-ordered and entered by the Court; (b) the Court enters an Order and Final Judgment in this action following notice to the Class, the Fairness Hearing, and compliance with the notice provision of the Class Action Fairness Act, 28 U.S.C. § 1715; and (c) the Judgment becomes final. Final, with respect to the Judgment, means that no further judicial review, whether by appeal, mandamus, rehearing, or writ of certiorari remains available in any judicial forum. Plaintiffs' rights to enforce the terms of the Judgment shall commence upon the Effective Date.

9. "Fair Hearing" means an administrative hearing conducted by the New York State Office of Temporary and Disability Assistance ("OTDA").

10. "Plaintiffs' counsel" means The Legal Aid Society when used in reference to an ongoing or future obligation.

11. "Reasonable Accommodation" ("RA") means any reasonable change or reasonable adjustment to DHS' policies, practices or procedures that enables a Class Member to avoid discrimination on the basis of disability and affords qualified individuals with meaningful access to the benefits and services provided by DHS.

12. "Reasonable Modification" means a structural change to an existing DHS shelter or facility in order to afford shelter residents with disabilities full use and enjoyment.

13. "Shelter Applicant" means a person applying to receive shelter or shelter-related services from DHS.

14. "Shelter Resident" means a person living at or placed in the DHS Shelter System for any period of time, including overnight stays. This term has the same meaning as "DHS client" in this document.

15. "Shelter-related Services" means any services provided by DHS or any DHS Vendor that are related to a request or need for shelter.

5

16. "Standards" means guidelines of accessibility, where applicable, as defined in the 2010 ADA Standards for Accessible Design, 28 C.F.R. § 35.151, and 36 C.F.R. § 1191, Appendices B and D.

17. "Vendor" means an entity that, through contractual, licensing, or other arrangements, provides shelter or shelter-related services (including outreach to street homeless) on behalf of DHS, DHS clients or DHS prospective clients. For purposes of this Stipulation, neither plaintiffs Center for Independence of the Disabled, New York nor Coalition for the Homeless is a "Vendor" of DHS.

## CLASS DEFINITION

18. The plaintiff class is defined pursuant to Rule 23(B)(2) Fed. R. Civ. P. as follows:

> All individuals with a disability within the meaning of the Americans with Disabilities Act, who presently reside in the DHS Shelter System or who, since May 14, 2012, have sought or received, or, in the future will seek or receive, shelter or shelter-related services in the DHS Shelter System, whose disability may affect their ability to meaningfully access shelter or shelter-related services, and who are not otherwise covered under the Consent Decree and Judgment in United States of America v. City of New York, 15-cv-5986 (RRM)(JO).

## STATEMENT OF AGREEMENT

19. All claims for injunctive or declaratory relief related to disability-based discrimination that were or could have been asserted by Class Members against City Defendants in the above-referenced action, along with all claims for damages that were or could have been asserted by the named Plaintiffs against the City Defendants in the above-referenced action, are hereby dismissed, with prejudice, and without costs, expenses, or fees, other than with respect to the relief specified below in this Stipulation.

20. In exchange for dismissal of this action with prejudice as provided in paragraph 19 hereof, the City Defendants agree to the following:

I.   REASONABLE ACCOMMODATION PROVISIONS

6

21. DHS will provide Reasonable Accommodations on an individualized basis to Class Members in a manner that provides for meaningful access to shelter or shelter-related services, except where doing so would fundamentally alter the nature of the DHS Shelter System and/or shelter-related services.

22. Non Discrimination. DHS will not discriminate against Class Members applying for or in receipt of shelter or shelter-related services, or their family members or others accompanying a Shelter Applicant who has disabilities. DHS shall provide such individuals Reasonable Accommodations where necessary to facilitate meaningful access to the DHS Shelter System, including services and programs.

23. Communications. In its forms, signage and other communications, DHS will notify Shelter Applicants, DHS clients, and people seeking information about shelter about their right to be granted RAs and how to request RAs, including relevant contact information. Forms of notice will be sufficient to provide actual notice to disabled Shelter Applicants and DHS clients and may include, without limitation, oral communication, information in intake forms, brochures, handbooks, letters, and posters in waiting rooms and lobbies. Notices will conform to DHS' Language Access Plan, Executive Order 120, and Local Law 73 of 2003, and will include information about how to request RAs and provide relevant contact information. DHS will provide templates of said forms, signage and other communication to Plaintiffs' counsel for their review and written comment. DHS will also identify for Plaintiffs' counsel the vendors who will produce the materials identified above in alternative formats.

24. DHS will provide effective communication. All materials for Shelter Applicants and Class Members will be made available upon request by a Class Member, or when otherwise needed as a Reasonable Accommodation, in alternate and/or accessible formats, with primary consideration given to the requester's preferred format, though DHS has the ultimate discretion to choose and implement effective accommodations.

25. RA Process. The DHS RA process will be interactive, and DHS will consider RA requests on an individualized basis. A DHS Client will not be

7

required to specify any particular words or language to request an RA or to have an RA granted. If more than one accommodation is available to meet the need of the individual making the request, DHS will give primary consideration to the individual's preference, though DHS has the ultimate discretion to select and offer an accommodation that is appropriate and effective for both the Class Member and DHS.

26. DHS staff will not make any adverse determination regarding shelter benefits in cases in which the Shelter Applicant or DHS client's actual or perceived failure to comply relates to a disability requiring an accommodation that has not been provided. In the event that an accommodation has been previously provided, the client may request and the Agency shall consider the need for an additional or alternative accommodation prior to making an adverse determination.

27. Time for Response. DHS will respond to all requests for an RA by a Class Member as promptly as possible and within a reasonable and appropriate time frame. The reasonable and appropriate time frame for a disposition concerning any particular request will take into account all relevant factors, including the nature of the Class Member's disability and the effect of failing to immediately provide the RA on the Class Member's ability to meaningfully access and benefit from relevant shelter services. Such time frames will also take into account that a Class Member may need to seek information from outside sources, their ability to do so (including the fact that they may need time to address basic needs during the application process), and whether they may need assistance with the process. Where an RA request relates to urgent matters that impact a Class Member's ability to meaningfully access shelter and shelter services, the time taken by DHS to respond shall not be so long as to by itself rise to the level of a denial of meaningful access to such services. Provisional grants of RAs provided pending a final determination will be available in accordance with the terms described in paragraph 34 below.

28. Disability-Related Information. DHS will require disability-related information from Class Members requesting an RA only where such information is needed to verify that the Class Member has a disability and/or

8

that the accommodation sought is reasonably related to that disability. DHS will not require such documentation when the disability and need for the accommodation sought is known or apparent to DHS shelter or intake staff. If the Class Member's disability is apparent or otherwise known to DHS shelter or intake staff, but the need for the accommodation is not apparent, DHS' request for information will be limited to assessing the disability-related need for the requested accommodation.

29. When requesting disability-related information, DHS staff will also (a) ascertain whether there is existing information in DHS' possession that may suffice to grant the requested accommodation, and (b) make best efforts to determine whether there is existing information in HRA's possession which may suffice to grant the requested accommodation. Simultaneous with any request for disability-related information from a Class Member requesting an RA, and with the Class Member's consent, to the extent feasible, DHS will make best efforts to determine whether there is likely existing information in other databases that DHS can access through inter-agency agreements or other means that may support the request for the accommodation, and if so, DHS will make best efforts to obtain such information. To the extent that DHS obtains relevant disability information as described in (a) and (b) above, DHS will inform the Class Member so as to avoid unnecessary duplicative documentation.

30. In those instances in which DHS deems it necessary to request disability-related information to support a request for an RA, such disability-related information should ordinarily be sufficient if it is prepared by an appropriate professional, such as a doctor or other medical professional, social worker, rehabilitation counselor, service provider or other reliable and relevant source. In most cases, said disability-related information necessary to verify the need for the RA can be provided by the Class Member himself or herself, and need not be obtained directly from the appropriate professional or reliable source. In most cases, detailed medical records or extensive disability-related information is not necessary for such inquiry.

31. In cases where disability-related information is necessary because a disability is not apparent or because the requested RA does not appear to be

9

related to a disability, DHS will offer to assist the Class Member in obtaining said documentation, so long as the Class Member grants DHS an appropriate release to provide such assistance.

32. Unless additional disclosure is required by law or the Class Member's consent is provided, DHS will only share a Class Member's medical information submitted in support of an RA request with staff who require access to the information to make or assess a decision to grant or deny a Reasonable Accommodation request.

33. The RA request decision process will be limited to information relevant to evaluate an RA.

34. Provisional RAs. Where a non-trivial amount of time may pass between a Class Member's request for an RA and DHS' determination of that request, such as in instances where DHS requires that the Class Member provide documentation supporting the RA request and such documentation is not immediately available to the Class Member, DHS should confer with the Class Member and consider providing temporary measures in advance of its formal determination. If the Class Member asks to confer, DHS must promptly confer with the Class Member. DHS shall provisionally grant RA requests where DHS determines that the denial of the RA is reasonably likely to cause serious harm to a Class Member with a disability, except where doing so would fundamentally alter the nature of the DHS Shelter System and/or shelter-related services.

35. Non-Retaliation. DHS will not retaliate or otherwise make any adverse determination regarding shelter eligibility or benefits as a result of a Class Member's request for an RA.

36. CARES Database. RAs requiring ongoing accommodations that have been requested or granted will be entered into CARES or an equivalent database accessible to relevant staff interacting with the Class Member to ensure that any granted RAs follow the Class Member. RA requests that are pending or have been granted will be visible in CARES or an equivalent database for

10

anyone accessing that Class Member's case record in a manner that is readily apparent.

37.  Animals. Service animals must be permitted as required by law. "Therapy animals" or "comfort animals" will be permitted upon request, if their provision constitutes an RA.

38.  Integrated Setting. DHS will provide shelter and shelter-related services in the most integrated setting appropriate to the needs of people with disabilities, unless, in accordance with federal law, doing so would fundamentally alter the nature of the DHS Shelter System or the services it provides. Nothing in this Settlement shall be construed as requiring Defendants to ensure that DHS grants an RA request where Defendants can demonstrate that doing so will result in a fundamental alteration to the nature of the DHS Shelter System and/or shelter-related services, an undue financial and administrative burden on Defendants, or a direct threat to the health or safety of others.

39.  Intake Procedures. In consultation with Plaintiffs' counsel, DHS will develop and incorporate into its intake procedures a process to identify Shelter Applicants with disabilities who may need an RA to meaningfully access shelter or shelter-related services and who do not self-identify as having a disability or as requiring an RA. DHS will provide a copy of this process to Plaintiffs' counsel before it is finalized; Plaintiffs' counsel shall review and provide written comment on the process within three (3) weeks; and DHS will consider in good faith any such written comments before finalizing the process.

40.  Appeal of Adverse Decision. Any Shelter Applicant or DHS client may appeal DHS' adverse determination concerning the outcome of their RA request within DHS. Reasons for appeal will include that the RA request was denied; that an alternative RA DHS provides or offers to provide in response to the request does not appropriately accommodate the disability; that an unreasonable amount of time has passed without a decision; or that the RA has not been implemented as determined.

11

       a.     DHS will issue a written Final Notice of Determination each time it grants an RA request or denies an RA request. For purposes of this paragraph, denial includes a determination that provides for no RA or an RA differing from the one requested, alters one that was previously provided, or terminates a previously provided RA. This Notice will comply with federal, state and city laws, and except where DHS grants an RA request, will include (i) an explanation of DHS' determination; (ii) a list of any document(s) reviewed in assessing the RA request; (iii) instructions on how to appeal DHS' determination within DHS, including information on how a Shelter Applicant or DHS client can obtain assistance in the appeals process from outside organizations; and (iv) information on how to contact the OTDA about fair hearings.

       b.     Where a Class Member requests the immediate grant of an RA, if DHS does not grant the RA as requested immediately or provisionally, DHS will provide the Class Member information on the next steps in the RA process, including their rights to appeal within DHS.

       c.     The appeals process will be interactive.

41.   Withdrawal of Accommodation.   Should DHS conclude that an RA previously provided to a Class Member is no longer reasonable or necessary, DHS will offer to confer with such Class Member to discuss the continuing need for the accommodation. Following this discussion or offer to confer, if DHS determines that the accommodation is no longer appropriate, DHS will provide such Class Member with notice of its determination, the reason for its determination, and a list of any documents DHS relied upon in reaching the determination, subject to the requirements in paragraph 40 above at least two (2) weeks before terminating the provision of the RA, and an opportunity to appeal the withdrawal of, or change in, the previously afforded accommodation within DHS. Should such Class Member appeal DHS' determination prior to the effective date of the termination, DHS will continue to provide the RA pending the outcome of the DHS administrative

appeal process. Nothing contained herein shall limit a Class Member's right to challenge the determination outside of DHS and seek any appropriate relief.

42. Menu. Shelter and intake staff will have access to a non-exclusive "menu" of possible available RAs, but the menu will make clear that other RAs can and should be granted and implemented where determined to be appropriate and effective. A list of menu items appears below. The list is intended to provide guidance to DHS staff on the types of RAs Class Members may require to have meaningful access to shelter and/or shelter-related services. The menu DHS provides to shelter and intake staff will not be required to mirror the menu included at paragraph 43 verbatim; however, DHS will make a good faith effort to incorporate all types of RAs listed in paragraph 43 in the actual menu. Any substantive modification to the menu will be presented to Plaintiffs' counsel before it is finalized; Plaintiffs' counsel shall review and provide written comment on the proposed modifications within three (3) weeks; and DHS will consider in good faith any such written comments before finalizing the modification to the menu.

43. Menu Items List. A non-exclusive list of examples of RAs that may be provided by shelter or intake staff on site, when appropriate, are:

   a. General Access

      i. Accessible transportation to and between shelters and to shelter-related appointments;

      ii. Permitting use or provision of air conditioning;

      iii. Accessible bathroom and sleeping accommodations;

      iv. Providing access to electrical outlets for operating and charging disability-related equipment;

      v. Providing refrigeration for medication;

      vi. Providing cooking facilities to accommodate disability-related dietary needs;

   b. Help with Paperwork/ Documentation/ Case Support

      i.     Help filling out applications for shelter, housing or other benefits (including referrals to organizations that provide disability specific supports);

      ii.    Help gathering documents to establish eligibility or establish the need for a specific accommodation;

      iii.   Help making clinical appointments to establish the need for a specific accommodation;

      iv.   Assistance with housing search, including escort;

      v.    Providing additional explanations of rules or forms;

      vi.   Allowing a Class Member to bring someone to appointments to help them (e.g. an advocate, family member or community resource);

      vii.   Help with reading DHS benefit and housing-related notices and forms;

      viii.  Help with accessing appropriate specialized therapeutic or durable medical equipment (e.g., shower chair; wedges);

c.    Timeliness and Flexibility

      i.     Expedited access to and placement in shelter;

      ii.    Flexible scheduling in the administration of appointments, including accommodating paratransit-related delays;

      iii.   Limiting waiting time on site for appointments;

      iv.   Scheduling appointments so that they do not conflict with medical appointments, rehabilitation or therapy;

      v.    Combining shelter-related appointments to reduce travel, where feasible;

      vi.   Rescheduling appointments when a disability prevents attendance;

      vii.   Giving more time to submit documents or complete Independent Living Plan ("ILP") tasks;

        viii.   Modifying specific shelter rules and responsibilities;

d.   Communication

        i.   Communication by email or, if available, text;

        ii.   Provision of DHS notices or forms in alternative formats like Braille, large print or audio upon request;

        iii.   Videophone access, ASL interpreter, etc.[1];

e.   Miscellaneous

        i.   Allowing a Class Member to bring a Therapy Animal or Comfort Animal into shelter;

        ii.   Accommodating disability-related dietary needs;

        iii.   Allowing an applicant or recipient to bring a personal care attendant into shelter.

44.   **Record of Reasonable Accommodations.** The DHS RA tracking system shall be maintained in such a way so that any RAs requested or granted to a Class Member, as well as any denial or appeal, will be accessible to staff from all shelters, so that if the Class Member changes shelters or leaves and re-enters shelter, this information will be readily available to staff involved in providing services to the Class Member. The tracking system will be designed and maintained so that the dates on which any request was made, denied, granted, or appealed can be easily identified.

---

[1] Shelter Applicants and/or DHS clients who are deaf or hard of hearing, for whom services such as videophone access and ASL interpreters would be applicable, are covered by the Consent Decree and Judgment in United States of America v. City of New York, 15-cv-5986 (RRM)(JO), and are accordingly not Class Members here when the sole basis of their class membership would be a disability covered under that Consent Decree. Individuals with other additional qualifying disabilities are Class Members entitled to the protections of this Stipulation with respect to issues related to those disabilities. Regardless, the parties have included these services in the Menu Items List for completeness.

## II.    PHASED IMPLEMENTATION

45.    The City Defendants will collaborate in good faith with any outside expert(s) and consultant(s) retained by the City Defendants for purposes of effectuating this Stipulation.

46.    The City Defendants will make available resources sufficient to effectuate the terms of this Stipulation. This provision shall not be construed as a waiver of or limitation upon the City Defendants' right to assert any legal defenses related to undue burden.

47.    Director of Disability Affairs. DHS will post and hire for the position of DHS Director of Disability Affairs. The Director of Disability Affairs, who will have expertise regarding Title II requirements, will himself/herself or through a qualified designee:

   a.    Collaborate with DHS program areas to assess, develop and review policies and procedures and coordinate with program areas to improve service delivery for Class Members so that they have meaningful access to shelter programs;

   b.    Assess, develop and review training curricula and advise DHS staff on accommodating Class Members;

   c.    Perform regular scheduled and unscheduled visits to shelters and intake offices to inspect the logs pertaining to the provision of RAs and interviews with Class Members;

   d.    Assess the needs of DHS facilities and programs, and review DHS client case records and relevant reports;

   e.    Work with DHS program areas to develop and implement corrective action plans for any deficiencies in the provision of RAs discovered during visits to shelters and intake offices and reviews of logs;

   f.    Work with DHS program areas to develop systems to document and retain records of complaints made pursuant to the federal, state, and local disability laws, as well as those related to the City Defendants' oversight activities in this regard;

   g.    Work with DHS program areas and legal staff to develop and

16

implement contract language to require Vendors to establish and maintain compliance with federal, state and local disability laws;

h.     Periodically meet with Vendors, shelter providers and appropriate community partners to review for systemic problems; and

i.     Work with DHS program areas and legal staff to assess and, if necessary, modify DHS forms, notices, practices, policies and procedures to ensure compliance with appropriate legal standards regarding accessibility.

48.   Access and Functional Needs Coordinators ("AFNCs"). Following the hiring of the DHS Director of Disability Affairs, DHS shall identify, or hire, staff to serve as Access and Functional Needs Coordinators ("AFNCs"). There will be at least one AFNC assigned to each intake office and assessment shelter. DHS will determine the placement of additional AFNCs based on the population analysis set forth below at Paragraph 50, and pursuant to a set of factors DHS will develop. DHS will share these factors with Plaintiffs' counsel before the factors are finalized; Plaintiffs' counsel shall review and provide written comments to City Defendants' counsel on the proposed factors within three (3) weeks of receipt; and DHS will consider any such written comments from Plaintiffs' counsel in good faith before finalizing the factors. The AFNCs will oversee accessibility-related concerns and programs; act as a liaison between Class Members and the Director of Disability Affairs, Housing Emergency Referral Operation ("HERO")/ Intake, Vacancy & Control, ("IVC"), and/or the DHS Medical Director; and be empowered to resolve disputes relating to requests for RAs onsite, whenever possible. DHS will implement a mechanism to ensure that the functions of the AFNC can be performed remotely and during hours when AFNCs are not on site or are otherwise unavailable. DHS will endeavor to set the schedules of the AFNC based upon when their presence would be of most use to Class Members. DHS shall ensure AFNC coverage for every shelter in the DHS Shelter System.

49.   Assessment of Existing Procedures. DHS' Director of Disability Affairs, in conjunction with other qualified DHS and City employees and any outside expert(s) whom the Director of Disability Affairs or DHS/City staff seek to consult, shall assess, and if necessary, propose to modify, existing DHS forms, policies and procedures to ensure compliance with appropriate legal standards regarding accessibility.     Beginning on the Effective Date,

17

proposed modifications to procedures and to any forms given to Class Members will be provided to Plaintiffs' counsel in advance of their modification for review and comment on a rolling basis. Plaintiffs' counsel shall review and provide written comments to City Defendants' counsel within three (3) weeks; and DHS will consider any such written comments in good faith. DHS shall implement any such modifications within a reasonable time thereafter.

50.   Population Analysis.

a.   The City Defendants will conduct an initial baseline population analysis reviewing available data and publicly available information to assess the current and anticipated population characteristics related to the disabilities of Class Members. Publicly available information sources will include, but not be limited to, studies or analyses that provide information about the number of low-income New Yorkers with disabilities by the U.S. Census Bureau, the Department of Housing and Urban Development ("HUD"), and the New York Department of City Planning ("DCP") and the Social Security Administration ("SSA"). The City Defendants will also take into consideration relevant data sources provided by Plaintiffs' counsel in assessing the population as well as relevant analyses that may have been performed by other City agencies for the purposes of planning to meet the needs of people with disabilities. The City Defendants will share the methodology for determining DHS' current and anticipated need for shelter for individuals with disabilities with Plaintiffs' counsel for their review and written comment; Plaintiffs' counsel shall review and provide written comments within three (3) weeks of receipt; and DHS will consider in good faith any such written comments. DHS will refine the methodology and update its projections for the anticipated need for accessible shelter based on actual experience as additional data is made available, no less than every two (2) years during the duration of this Stipulation, unless otherwise agreed to by the Parties.

b.   The City Defendants will provide the results of the population analysis to Plaintiffs' counsel for their review and written comment, and DHS will consider in good faith any such written comments. This analysis will inform the work of the consultant(s)

(described in paragraph 51), capacity planning, and other decisions with respect to the implementation of this Settlement.

51. Independent Consultant and Architectural Analysis of DHS Shelters.

   a. Within two (2) months of the Effective Date, unless otherwise agreed to by the Parties, DHS shall identify and take steps to retain an independent consultant (or consultants) to conduct a phased survey of selected shelters, facilities, or portions therein of the DHS Shelter System to identify barriers to physical and program access, including in the path of travel from the entranceway of the shelter or facility. The object of the survey is to identify for each shelter, facility, or portion therein surveyed, specific remediation with cost estimates. (see paragraph 51(b)(vii)). From the results of the survey, and with the assistance of the consultant(s), DHS will develop a remediation plan. (see paragraph 51(c)).

      i. Any consultant(s) retained to perform work pursuant to this paragraph to assess the physical accessibility of DHS shelters and facilities shall be a qualified individual or firm with substantial experience in architectural accessibility and program access for people with disabilities pursuant to the standards in Title II of ADA and Rehabilitation Act and implementing regulations. Defendants will consult with Plaintiffs' counsel as to the specific individual(s) or firm(s) being considered prior to making any offers for services. Based on the results of the survey, DHS will create an inventory of shelters noting their accessible features and barriers as described in paragraph 55 below.

   b. Survey of selected DHS Facilities. The scope and phased implementation of the initial phase of the survey is set forth below.

      i. The initial phase of the survey shall include an assessment by the consultant(s) of the physical premises of intake facilities for families with children, adult families, adult singles, and assessment shelters, as well as additional shelters selected by DHS.

      ii. The additional shelters selected by DHS for inclusion in the initial phase of the survey will at a minimum include all

shelters identified as accessible or potentially accessible by DHS. The criteria for selection of additional shelters to be surveyed in the initial phase of the survey may include, but will not be limited to: (1) shelters built or substantially altered after 1992; (2) shelters to ensure geographic distribution of accessible capacity; (3) proximity to accessible public transportation; (4) shelters with large capacity; and (5) shelters that are likely to continue to be used in the long term. DHS will provide the criteria for selection of the proposed additional shelters to be surveyed in the initial phase of the survey to Plaintiffs' counsel for their review and written comment; Plaintiffs' counsel shall review and provide written comment within three (3) weeks of receipt; and DHS will consider in good faith any such written comments.

iii.    The number of facilities and units surveyed during the initial phase of the survey will be sufficient to provide meaningful access to shelter and shelter-related services for the size of the population identified in the population analysis described in paragraph 50 above, to avoid segregation and to provide meaningful access to the range of shelters and shelter services and programs across the DHS Shelter System. The City Defendants will continue to survey sufficient shelters to meet the projected needs for the population identified in the population analysis (see paragraph 50).

iv.    The initial phase of the survey shall be conducted in accordance with the guidance provided in relevant sections of the existing United States Department of Justice ("DOJ") Toolkit and other relevant tools produced by the DOJ, as applicable. The consultant(s) shall share any survey forms with plaintiffs prior to finalizing; and consider any suggested edits to survey that are provided within ten (10) days before finalizing.

v.    The consultant(s)' surveys of individual facilities will be provided promptly to Plaintiffs' counsel on a rolling basis.

vi.    In limited circumstances, in individual facilities or areas of facilities, the initial phase of the survey may be conducted by qualified, appropriately credentialed City employees who shall

20

use the same standards, survey instrument, and methods employed by the outside consultant(s), and any resulting survey will be provided promptly to Plaintiffs' counsel on a rolling basis .

vii. In performing the initial phase of the survey, the consultant(s) will:

1. Identify conditions that do not conform with the Standards as defined in paragraph 16 above;

2. Identify the steps that are necessary in order to bring the shelters, facilities, or portions therein into compliance with the Standards, including, where applicable, proposals that may present alternative options to make any particular space accessible, such as the removal of architectural barriers and programmatic changes;

3. Identify, where appropriate, short-term and long-term actions necessary to make any particular space accessible;

4. Develop a timetable for achieving such modifications necessary to meet the Standards; and

5. Identify projected costs of such remediations.

c. Initial Remediation Plan. Using the results of the initial population analysis and the initial phase of the survey described in paragraphs 50 & 50(b) above, DHS shall, in consultation with the consultant(s), and other qualified City employees, prepare an initial remediation plan ("Initial Remediation Plan"). The Initial Remediation Plan will describe the steps necessary to ensure that the DHS Shelter System will have sufficient accessible capacity to provide meaningful access to shelter, shelter-related services and programs to Class Members to satisfy the requirements of Title II.

i. The Initial Remediation Plan and any Additional Remediation Plans shall not include steps that would fundamentally alter the nature of the DHS Shelter System and/or shelter-related services but will:

21

1.  Identify which shelters and/or units therein can be made accessible and will provide accessible capacity in the long term;

2.  Specify the required physical modifications of the interior of a facility beginning from the means of entry into the facility, including where applicable, proposals that may present alternative options, which may include programmatic options, to make any particular space accessible;

3.  Include, where appropriate, a list of short-term and long-term actions necessary to make any particular space accessible;

4.  Include a timeline with annual benchmarks and cost projections for the remediation of the shelters, facilities, or portions therein, pursuant to which, DHS will create sufficient capacity, as determined by the population analysis described in paragraph 50 to reasonably accommodate and provide meaningful access to all Class Members requiring accessible shelter within five (5) years of the Effective Date;

5.  Include surveys and may incorporate by reference any prepared reports on barriers identified; and

6.  Include a determination of the appropriate level of reserve accessible capacity DHS will maintain.

ii.  In determining which shelters can and will be made accessible, the Initial Remediation Plan will consider and include, among other things, the size and long-term viability of the shelter.

iii.  In determining where to situate accessible shelters, the Initial Remediation Plan will include the geographic distribution of shelters to ensure that persons throughout New York City with disabilities have meaningful access to shelter such that the locations of accessible shelters are generally equivalent to the locations of inaccessible shelters with regard to proximity to accessible public transportation and non-shelter services, such

22

as medical care, that are frequently used by Class Members.

iv.  In developing the Initial Remediation Plan, DHS will prioritize the remediation of facilities that it expects will be available for use by the City in the long term.

v.  The Initial Remediation Plan shall not rely on any measures that do not comply with Title II of the ADA and the New York State and New York City human rights laws.

vi.  A draft of the Initial Remediation Plan will be provided to Plaintiffs' counsel before it is finalized. To the extent that sections of the Initial Remediation Plan addressing particular locations are completed in advance of the full document, the City may provide such sections to Plaintiffs' counsel. Plaintiffs' counsel shall review and provide written comments on the draft plan or any section thereof within three (3) weeks of receipt, and DHS will consider in good faith and respond to any such written comments before the Initial Remediation Plan is finalized.  Should Plaintiffs' counsel reasonably require more time to fully review and comment on the draft Initial Remediation Plan, the City Defendants will not unreasonably deny such a request.

vii.  Remediation of facilities shall be implemented in accordance with the terms and timeline set forth in the Initial Remediation Plan as described in paragraph 51(c)(i) above, except that, as parts of the Initial Remediation Plan are completed and reviewed by Plaintiffs' counsel pursuant to 50(c)(vi) above, the City may begin remedial work prior to completion of the full Initial Remediation Plan.

viii.  DHS will report on progress with implementing the Initial Remediation Plan to Plaintiffs' counsel on a triannual basis.

ix.  Any non-trivial deviation from the timeline of remediation described in paragraph 51(c)(i)(4) above will be cause for a conference with Plaintiffs' counsel on the cause of the delays and what specific remedial action will be taken to prevent further delays. New timelines will be provided to Plaintiffs' counsel before they are finalized; Plaintiffs' counsel shall

23

> review and provide written comment within three (3) weeks;
> and DHS will consider in good faith any such written
> comments before finalizing the new timelines.

d. Additional Remediation Plans. To the extent that the capacity and/or
geographic distribution of accessible shelter units identified in the
Initial Remediation Plan does not ensure DHS the ability to
effectively provide meaningful access to Class Members on a timely
basis, DHS shall prepare an additional remediation plan ("Additional
Remediation Plan"). The steps for any Additional Remediation Plan
will be the same as those described for the initial phase of the survey
and the Initial Remediation Plan in paragraphs 51(b) and 51(c) above.

   i. The purpose of any Additional Remediation Plan shall
   be for:

      a. Remediation of identified barriers to physical
      accessibility at certain currently-existing facilities in the
      DHS Shelter System not already assessed in the Initial
      Remediation Plan; and

      b. Meeting anticipated needs (see paragraph 50) that cannot
      be met within the current DHS Shelter System on a
      timely basis and for ongoing maintenance of all
      accessible features, including any plans for medical or
      social respite programs that may be co-located with
      shelter facilities, and a determination of the appropriate
      level of reserve accessible capacity DHS will maintain.

   ii. As with the Initial Remediation Plan, a draft of any Additional
   Remediation Plan will be provided to Plaintiffs' counsel before
   it is finalized. Plaintiffs' counsel shall review and provide
   written comment on the draft Additional Remediation Plan
   within three (3) weeks, and DHS will consider in good faith and
   respond to any such written comments before the Additional
   Remediation Plan is finalized. Should Plaintiffs' counsel
   reasonably require more time to fully review and provide
   written comment on the Additional Remediation Plan, the City
   Defendants will not unreasonably deny such a request.

e. Non-Surveyed Facilities.

24

      i.     To the extent there are shelter facilities within the DHS Shelter System that DHS does not intend to survey or remediate, DHS will provide a list of such facilities and briefly identify the reasons for not remediating such facilities to Plaintiffs' counsel before the list is finalized; Plaintiffs' counsel shall review and provide written comment on the list within three (3) weeks; and DHS will consider in good faith any such written comments before finalizing the list.

52.   Consultation Concerning the Plans. Unless otherwise agreed to by the parties, within thirty (30) days of the provision of the final versions of both the Initial Remediation Plan and, if undertaken, any Additional Remediation Plan, DHS will make the consultant(s) and their surveys available to Plaintiffs' counsel in a meeting to discuss the Remediation Plan and address Plaintiffs' counsel's questions and concerns. Plaintiffs' counsel will make good faith efforts to provide DHS with Plaintiffs' counsel's questions and comments concerning the Remediation Plan in advance of the meeting. DHS will respond in writing within a reasonable time to any reasonable request by Plaintiffs' counsel for information that is raised at or before the meeting that is not addressed to Plaintiffs' counsel's satisfaction at the meeting. Within thirty (30) days of the meeting referred to above, Plaintiffs' counsel will present in writing any comments or suggestions they have concerning the adequacy of the Remediation Plan(s). DHS will respond to such comments or suggestions within twenty (20) days in writing, addressing Plaintiffs' counsel's comments and the reasons why any suggestions made by Plaintiffs' counsel were or were not accepted.

53.   Objections. Plaintiffs' counsel shall not raise with the Court any objections to the sufficiency of the population analysis, any surveys, the Initial Remediation Plan, or any Additional Remediation Plan without following the meet and confer procedures outlined in paragraph 76 below.    For purposes of this paragraph, the sufficiency of the Initial Remediation Plan and the Additional Remediation Plan shall mean whether such plans adequately assess and timely address any current or reasonably anticipated denial of Class Members' right to access the DHS Shelter System and shelter-related services.

54.   Timing. The initial phase of the survey and the Initial Remediation Plan shall be completed as soon as practicable following the hiring of the consultant(s), but not more than sixteen (16) months from the Effective Date, unless otherwise agreed to by the Parties. DHS shall notify Plaintiffs' counsel

promptly if the consultant(s) indicates that such a time frame cannot be met, including the reasons for any delay and not meeting the time frame, and propose a schedule under which a subsection of facilities can be surveyed and an interim Initial Remediation Plan prepared so that work can proceed.

55. Database of Accessible Facilities. City Defendants, with guidance from the consultant(s), will develop a database of information regarding the accessible features of facilities and individual units in the DHS Shelter System. A non-exclusive list of the accessible facilities shall include, without limitation, accessibility of building entryways and upper floors; cooling/heating features; as well as accessibility to common areas (including areas for counseling and programs; medical facilities or offices; cafeteria; offices, communal bathrooms, lockers, and laundry), as well as accessible private areas (including private bathrooms; lockers; laundry; cooking facilities, if any; and beds). The database will be used by DHS staff when determining locations for provision of shelter and services for Class Members.

56. New Facilities. The parties acknowledge that in order to comply with the mandated right to shelter, DHS may be required to quickly open new capacity and must have the flexibility to do so. When opening a new facility such as a shelter or office serving clients, DHS will survey the site, using a survey instrument described in paragraph 51(b)(iv-v) above, to determine whether the site contains barriers to meaningful access for people with disabilities. If any such barriers are found, DHS will determine whether remediation is viable and appropriate to meet the capacity required to provide accessible shelter and determine a schedule for remediation if necessary to provide meaningful access.

57. For any new shelter facility, DHS will enter the information regarding accessibility into the database described above at paragraph 55. To the extent that, in order to meet its legal obligations to provide shelter, DHS must open shelters that are not accessible, it will ensure that doing so maintains the accessibility of the system as a whole.

58. Facility log books.

　　　　i. DHS will retain information obtained from individual facilities related to the provision of RAs, which will include:

　　　　　　a. Each request for an RA;

b. The specific RA provided by the shelter;

c. The justification provided for the particular RA granted if the RA deviates from the request;

d. The time and date the request is made;

e. The identity of the Class Member;

f. The name of the Shelter Staff responsible for receiving the request;

g. The name of the Shelter Staff responsible for the determination of the RA to be provided (if different from "f");

h. The time and date the RA was provided, or a statement that the RA was not provided and the basis for such determination;

i. An indication of what documentation the Class Member submitted along with the request for the RA, if any, and an indication of other documentation DHS relied on in making the RA determination; and

j. In the case of an accommodation request that was denied, whether any appeals were taken and, if so, the results of any such appeals;

ii. These logs shall be retained in accordance with the City Defendants' record retention policies;

iii. DHS will develop and maintain a central electronic repository of the information contained in the site logs.

59. Emergency Evacuation Plans. In addition to the above requirements, DHS shelters shall have an emergency evacuation plan that conforms to local law and code, as well as the ADA. DHS will also review and evaluate emergency evacuation plans for all shelters operated through contract with DHS in regard to whether such plans adequately provide for evacuation of all residents with disabilities, and DHS will provide such plans to Plaintiffs' counsel before they are finalized; Plaintiffs' counsel shall review and provide written comment on the plans within three (3) weeks; and DHS will consider in good faith any such written comments before finalizing the plans.

III.   ELIGIBILITY

60.   In conducting any assessment of a Class Member's eligibility for shelter, DHS will take the following actions:

   a.   Prior to finding that a particular housing resource is viable or available to a Shelter Applicant, DHS will make a disability inquiry as to whether a member of the applicant's family or a resident of the housing resource has a disability that would render the housing resource not viable as a housing resource for the applicant household. DHS will document this inquiry and the basis for its determination regarding the viability of the housing resource in the case record.

   b.   DHS will not find a Shelter Applicant ineligible for failure to cooperate with the investigation if DHS concludes that such non-cooperation or perceived non-cooperation is the result of a disability. Should DHS conclude that a Shelter Applicant's non-cooperation or perceived non-cooperation is the result of a disability, DHS will document this conclusion and the basis for this conclusion in the case record.

   c.   RAs in the shelter application and eligibility process will include, but not be limited to, accommodations regarding the submission of documentation necessary to verify the Shelter Applicant's housing history, where appropriate.

IV.   HOSPITALIZATIONS

61.   To the extent that a Class Member is absent from their assigned shelter due to a hospitalization or other institutional placement related to a disability, DHS will develop safeguards to protect against unnecessary interruptions of shelter services due to absences from shelter within six (6) months of the Effective Date. To the extent that an institution informs DHS prior to its discharge of a Class Member's forthcoming discharge, DHS will ensure that any shelter placement to which such individual is discharged is accessible and that previously afforded RAs, if still required, will be resumed or modified as required by changes in the Class Member's disability status.

V.   STAFF TRAINING

62.   DHS will provide training as described in paragraph 63 to all DHS employees whose regular job responsibilities include interaction with Shelter Applicants or DHS clients, including program administrators, shelter directors, and shelter staff. DHS will further ensure that all Vendor and contract shelter employees whose regular job responsibilities include interaction with Shelter Applicants or DHS clients also receive this training, as well as new hires, who shall be trained within a reasonable time of their start date. Prior to provisions of this training, DHS will provide Plaintiffs' counsel with a draft of all training materials for review. Within three (3) weeks of receiving such training materials, Plaintiffs' counsel may provide DHS with comments, concerns, or recommended modifications regarding the training materials. DHS will consider in good faith any such written comments before finalizing the training materials. DHS will further ensure that all such employees receive refresher training on these procedures at least once every two (2) years after receiving the initial training. Should deficiencies in staff performance or shelter performance be identified, a plan for remediation will be put in place, including but not limited to additional training.

63.   The training will include at least the following:

   a.   Explanation of federal, state and city law regarding disability rights as they pertain to the scope of work of DHS;

   b.   Explanation of DHS policies and procedures related to implementation of disability rights;

   c.   Specific guidance as to what each group of trainees is expected to do to be in compliance with this Stipulation in their day-to-day work;

   d.   A practical component where trainees must apply their learning to scenarios that occur in their daily work; and

   e.   Ongoing technical assistance publications and guidance.

64.   DHS will develop methods to assess the efficacy of this training through quality assurance and program integrity and appropriate action plans where necessary. DHS will provide the assessment methods to Plaintiffs' counsel for review and written comment, and DHS will consider in good faith any such comments written comments. Where remediation is proposed, DHS will provide the remediation plan to Plaintiffs' counsel before it is finalized; Plaintiffs' counsel shall review and provide written comment on the plan

within three (3) weeks; and DHS will consider in good faith any such written comments before finalizing the plan.

## VI. MONITORING

65. The parties will jointly develop a protocol for Plaintiffs' counsel and authorized shelter monitors to monitor DHS' compliance with the terms of this Stipulation ("Monitoring Protocol") within three (3) months of the Effective Date, which shall be submitted to the Court and deemed incorporated into this Stipulation.

66. If DHS provides aggregated data as part of the Monitoring Protocol, Defendants will also provide to Plaintiffs' counsel an explanation of how and why the data is aggregated. The monitoring provided to Plaintiffs' counsel will include at least the following:

   a. All facility surveys identified in this Stipulation, and any changes thereto;

   b. All Remediation Plans developed pursuant to this Stipulation, and any changes thereto;

   c. Triannual reports on implementation of Remediation Plans developed pursuant to this Stipulation;

   d. Data regarding RA requests and determinations, which includes to the extent possible instances in which DHS provided an RA different from the one requested by the Class Member;

   e. Data regarding disability-related complaints or grievances related to DHS facility or program access not made through the RA process;

   f. Data regarding shelter transfers of clients pursuant to RA requests;

   g. Triannual reports of any corrective actions taken against facilities and staff that have improperly denied RAs or improperly failed to grant timely RAs, or retaliated against clients who requested RAs; and

   h. Any significant events, such as changes or proposed changes to the availability or use of DHS facilities serving Class Members, including facilities under the direction of DHS Vendors.

67. The Monitoring Protocol will be primarily based on data available through DHS systems.

68. Plaintiffs' counsel will have access, upon reasonable notice, to DHS facilities to inspect them for architectural barriers and limitations to program access, as well as any remediation work performed under the auspices of this Stipulation, and will provide DHS with data regarding any inspections they perform.

69. Plaintiffs' counsel will have access, upon reasonable notice, to information contained in DHS' log books described in paragraphs 58(ii) to 58(iii) above and upon a showing of reasonable need to a Class Member's individual records as described in paragraph 66(d).

70. In the event that the parties, after good faith negotiations, are unable to reach consensus on the Monitoring Protocol, the matter will be submitted to the Court for resolution.

VII. JURISDICTION AND ENFORCEMENT

71. The provisions of this Stipulation shall not take effect until the Effective Date.

72. The Court's jurisdiction over this matter for the purpose of enforcement of the terms of this Stipulation shall begin upon the Effective Date and end upon the termination of this Stipulation ("the Effective Period"). This Stipulation shall terminate five (5) years from the Effective Date, unless Plaintiffs' counsel moves for and is granted an extension pursuant to paragraph 78 of this Stipulation. When the Court's jurisdiction ends, all rights and claims arising under the provisions of this Stipulation shall terminate; the provisions of this Stipulation shall be deemed satisfied; and no further relief in this action shall be sought or granted.

73. In the event of a motion by Plaintiffs' counsel for enforcement based upon Defendants' alleged non-compliance with this Stipulation, Defendants shall be considered to be in compliance with the provisions of this Stipulation unless Plaintiffs' counsel establishes that Defendants' failures or omissions to comply with the provisions of this Stipulation were not minimal or isolated but were sufficiently significant or recurring as to be systemic. Non-systemic individual and isolated violations of this Stipulation shall not form a basis for a finding that Defendants have acted in contempt of this Stipulation or as a basis for a motion for enforcement.

31

74.  If at any stage of the implementation of this Stipulation where the City Defendants have provided a particular document to Plaintiffs' counsel for review and written comment, and the City Defendants reject Plaintiffs' counsel's comments to that document, and Defendants' failure to incorporate Plaintiffs' counsel's comments is not minimal, but is sufficiently significant as to constitute a systemic failure to comply with the provisions of the Stipulation, Plaintiffs may seek relief from the Court consistent with paragraph 76-77.

75.  The Parties will negotiate an informal relief mechanism for individual Class Members within three (3) months of the Effective Date.  Nothing in this Stipulation will preclude an individual from seeking a State administrative "fair hearing" and/or remedies under Article 78 of the New York Civil Practice Law and Rules, pursuing individual claims in appropriate forums, or making a civil rights complaint to any relevant body based upon a claim that is not released herein.

76.  During the Effective Period, if Plaintiffs' counsel believes that Defendants have failed to comply with the provisions of this Stipulation, as defined in paragraph 73 above, Plaintiffs' counsel shall notify Defendants' counsel in writing of the nature and specifics of the alleged failure to comply and shall specify the basis for such belief, including but not limited to any monitoring reports upon which such a belief is based.  Such written notice shall be provided at least thirty (30) days before any motion is made for enforcement of this Stipulation.  Unless otherwise resolved, the Parties' counsel shall meet within this thirty-day period following notice to Defendants' counsel in an attempt to arrive at a resolution of the alleged failure to comply.

77.  If no resolution is reached within thirty (30) days from the date of notice, and if the Parties have met pursuant to paragraph 76 above in an attempt to arrive at a resolution of the alleged failure to comply, Plaintiffs' counsel may move this Court for an order enforcing the provisions of this Stipulation.  No motion for enforcement shall be brought to remedy those violations that the Parties agree (a) have been cured or (b) will be cured within a specific time period pursuant to a plan agreed upon by the Parties.  In the event that the Parties agree to a plan to cure an alleged violation and Plaintiffs' counsel believes that the violation has still not been cured, Plaintiffs' counsel must provide at least ten (10) days' notice before any motion is made for enforcement of this Stipulation.

78. Plaintiffs' counsel may move this Court for an order extending the jurisdiction of the Court over this Stipulation and shall make any such motion no later than thirty (30) days before the scheduled termination of this Court's jurisdiction, unless another date is agreed upon by the Parties. The Court's jurisdiction shall only be extended over the provision(s) of this Stipulation with which the Court finds Defendants have failed to substantially comply with this Stipulation, as set out in paragraph 73 above, except that, if the Court determines that a provision or provisions with which Defendants have complied is/are interdependent with a provision or provisions with which Defendants have failed to comply, the Court shall also, in its discretion, extend its jurisdiction over the interdependent provision(s). The standard for measuring Defendants' compliance with the provisions of this Stipulation for the purposes of a motion to extend this Court's jurisdiction is that set out in paragraph 73 above.

79. Any such extension(s) of the jurisdiction of this Court shall be for a period of not more than one (1) year from the date that the Court's jurisdiction was otherwise scheduled to terminate, unless another date is agreed to by the Parties, except that the Court may extend its jurisdiction for a period greater than one (1) year for good cause shown, including, for example, where the extension is based upon a need to complete facility remediation, capital construction or facility procurement to meet the projected needs for the population identified in the population analysis described in paragraph 50.

80. Prior to the expiration of any period of extended jurisdiction (extended pursuant to paragraphs 78 through 79 of this Stipulation), Plaintiffs' counsel may move for enforcement consistent with the provisions set forth above (paragraph 77 of this Stipulation).

VIII.  GENERAL PROVISIONS

81. Nothing contained herein shall be deemed to be an admission by the Defendants or any officer or employee thereof, of any of named Plaintiffs' or Class Members' allegations or of named Plaintiffs' or Class Members' standing to pursue any relief, nor an admission by the Defendants that they have in any manner or way violated a named Plaintiffs' or a Class Members' rights, or the rights of any other person or entity, as defined in the constitutions, statutes, ordinances, rules, or regulations of the United States, the State of New York, or the City of New York or any other rules, regulations, or bylaws of any department, agency, or subdivision of the City

of New York, including but not limited to the New York City Department of Homeless Services.

82. This Stipulation shall not be admissible in any other litigation or settlement negotiation, except for enforcement of the provisions contained herein.

83. Nothing contained herein shall be deemed to constitute a policy or practice of the Defendants, including the City of New York or any of its agencies, unless explicitly identified herein as such.

84. Nothing in this Stipulation shall be deemed to diminish or limit any rights any individual receiving or seeking shelter services from DHS may have under any existing law or court order or limit the ability of that individual to seek redress from any court or agency, except for claims for injunctive relief brought by Class Members for disability-based discrimination in the City Shelter System that are the same or substantially similar to those that are addressed in this Stipulation of Settlement, which shall be precluded for claims arising before or during the duration of the agreement.

85. This Stipulation is enforceable only by the Court and by the Parties, and is binding upon the Parties, by and through their officials, agents, employees, assigns, and successors.

86. This Stipulation contains all the terms and conditions agreed upon by the Parties hereto, and no oral agreement entered into at any time nor any written agreement entered into prior to the execution of this Stipulation regarding the subject matter of the instant action shall be deemed to exist, or to bind the Parties hereto, or to vary the terms and conditions contained herein.

87. In the event of any change in federal statute or regulation or state statute or regulation that any Party believes changes his or her responsibilities pursuant to this Stipulation, such Party shall so notify all other Parties and the Parties shall attempt to come to an agreement as to any modifications of this Stipulation that are warranted by said changes in federal or state law. If, after thirty (30) days, the Parties have not been able to agree, the dispute shall be submitted to the Court by motion pursuant to Rule 60(b) of the Federal Rules of Civil Procedure by the Party seeking to modify the Stipulation. Thirty (30) days after filing such motion, the moving Party shall be permitted to implement the modification pending the Court's decision on the motion unless the Court has ordered a stay of such implementation

pending its decision or the Court permits the moving Party to implement earlier.

IX.  SUMMARY OF IMPLEMENTATION TIMELINE

88.  Pursuant to the above terms of this Stipulation, the Parties summarize the following timeline of certain items to be implemented. References to the deadlines provided for in this Stipulation are included, where applicable. All deadlines may be modified by agreement of the parties.

   a.  DHS will hire a Director of Disability Affairs (¶ 47): within three (3) months of the Effective Date;

   b.  DHS will develop a process at intake centers to identify Class Members who do not self-identify as having a disability or requiring an RA (¶ 39): within eight (8) months of the Effective Date; subject to review and comment by Plaintiffs' counsel;

   c.  DHS will ensure AFNC coverage for every DHS shelter (¶ 48): within eight (8) months of the Effective Date;

   d.  DHS will conduct a population analysis (¶ 50): within six (6) months of the Effective Date; methodology subject to review and comment by Plaintiffs' counsel;

   e.  DHS will take steps to retain an Independent Consultant(s) (¶ 51): within two (2) months of the Effective Date;

   f.  DHS will conduct an Initial Survey of DHS facilities (¶ 51(b)): within fourteen (14) months of the Effective Date; criteria of shelters selected for survey subject to review and comment by Plaintiffs' counsel;

   g.  DHS will create an Initial Remediation Plan (¶ 51(c)): within sixteen (16) months of the Effective Date; subject to review and comment by Plaintiffs' counsel prior to being finalized; subject additional review and comment of finalized report; subject to a meet and confer requirement; subject to written concerns from Plaintiffs' counsel and DHS' written response;

   h.  Remediation of facilities shall be implemented in accordance with the terms and the timeline set forth in the Initial Remediation Plan above (¶ 51(c)(i));

i. DHS will create sufficient capacity to reasonably accommodate and provide meaningful access to all Class Members requiring accessible shelter: within five (5) years of the Effective Date;

j. DHS will report on its progress with implementing the Initial Remediation Plan (¶ 51(c)(viii): triannual reporting;

k. Additional Remediation Plan(s) (¶ 51(d)) if conducted, shall be performed in the same manner as the Initial Remediation Plan;

l. DHS will provide a list of facilities that it does not anticipate surveying for the initial survey of selected DHS facilities or for the Additional Plan (¶ 51(e)): within one (1) year of the Effective Date;

m. DHS will develop a database of information regarding the accessible features of facilities and portions therein (¶ 55): within one (1) year of the Effective Date;

n. DHS will develop a RA tracking system (¶ 44): within eight (8) months of the Effective Date;

o. DHS will maintain facility log books and electronic repository for log book data (¶ 58): within eight (8) months of the Effective Date;

p. DHS will develop safeguards to protect against unnecessary interruptions of shelter services due to absences from shelter (¶ 61): within six (6) months of the Effective Date;

q. DHS will develop appropriate DHS staff training tools regarding reasonable accommodations (¶ 62): within one (1) year of the Effective Date; subject to review and comment by Plaintiffs' counsel;

r. DHS will implement a training program for DHS staff (¶ 62): within six (6) months of the completion of the training tools;

s. DHS will develop methods to assess the efficacy of DHS staff training (¶ 64): within one (1) year of the Effective Date; subject to review and comment by Plaintiffs' counsel;

t. The parties will develop a monitoring protocol (¶¶ 65-66): within three (3) months of the Effective Date;

u.   The parties will develop an informal relief mechanism for individual Class Members (¶ 75): within three (3) months of the Effective Date.

## X.   RELEASES

89.   Upon the Effective Date, the named Plaintiffs, Class Members and their heirs, administrators, representatives, attorneys, successors, and assigns, and each of them, hereby RELEASE and FOREVER DISCHARGE Defendants and their agencies, divisions, departments, officers, employees, and agents from – and are hereby FOREVER BARRED and PRECLUDED from prosecuting – any and all Settled Claims. Settled Claims are any and all claims that have been or could have been asserted in this Action by the named Plaintiffs, Class Members, or any of them against any of the released entities that arise out of, relate to, or are based upon the allegations, transactions, facts, matters or occurrences, representations or omissions involved, set forth, or referred to in the Amended Complaint; except that the Settled Claims do not include Reserved Claims. Reserved Claims are (a) claims to enforce this Stipulation; (b) claims by an individual Class Member that DHS failed to provide the individual Class Member with appropriate shelter which seek individual injunctive relief; and (c) money damages claims of the named Plaintiffs. The Parties agree to negotiate the money damages claims of the named Plaintiffs, and, if they are not able to resolve the money damages claims within thirty (30) days after the Effective Date, Counsel for Plaintiffs will propose a schedule to the Court to proceed on any remaining money damages claims.

## XI.   ATTORNEY'S FEES

90.   Defendants agree that Plaintiffs are entitled to counsel fees and costs as though they are prevailing parties and agree not to contest Plaintiffs' entitlement to seek fees and costs. The Parties agree to negotiate the amount of fees and costs incurred through the Effective Date, and, if they are not able to do so within ninety (90) days of the Effective Date, Class Counsel may submit an application for counsel fees and costs to the United States District Court for the Southern District of New York, to which Defendants shall have an opportunity to respond consistent with the Federal Rules of Civil Procedure and Local Rules of this Court.

Dated: New York, New York
       May 15, 2017

ZACHARY W. CARTER
CORPORATION COUNSEL OF THE CITY OF NEW YORK

By: _____

Thomas B. Roberts
James M. Dervin
100 Church Street
New York, NY 10007
(212) 356-0872
*Attorneys for the City Defendants*

THE LEGAL AID SOCIETY

By: _____

Judith Goldiner,
Attorney-in-Charge
Civil Practice – Law Reform Unit
Joshua Goldfein
Beth Hofmeister
Kathryn Kliff
Kenneth Stephens
199 Water Street
New York, New York 10038
(212) 577-3300
*Attorneys for the Plaintiffs*

WHITE & CASE LLP

By: _____

Paul B. Carberry
Evelyn A. Fanneron
1155 Avenue of the Americas
New York, New York 10036

*Attorneys for the Plaintiffs*

So Ordered: 11-9         , 2017

_____
Honorable Robert W. Sweet
United States District Judge

38