UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

SANDRA BUTLER; RICKY GIBSON;
O'BRIEN MORRIS; RICHARD EMMETT;
ROSELLE DIAZ; KEVIN FAISON;
SHANIQUA JACKSON; CENTER FOR
INDEPENDENCE OF THE DISABLED, NEW
YORK AND COALITION FOR THE
HOMELESS,

Case No. 15-CV-3783

Plaintiffs,

for themselves and on behalf of all others
similarly situated

- against -

CITY OF NEW YORK, THE NEW YORK
CITY DEPARTMENT OF HOMELESS
SERVICES and STEVEN BANKS, as
Commissioner of the New York City Department of
Homeless Services,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION, AND TO ENFORCE THE STIPULATION OF SETTLEMENT

THE LEGAL AID SOCIETY
199 Water Street
New York, NY 10038
Tel: (212) 577-3300
Fax: (212) 809-1574

JENNER & BLOCK LLP
919 Third Ave.
New York, NY 10022
Tel:  (212) 891-1600

*Counsel for Plaintiffs*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................1

STATEMENT OF FACTS ..............................................................................................3

I.      *BUTLER* STIPULATION OF SETTLEMENT ......................................................3

II.     DHS SHELTER SYSTEM AND DE-DENSIFICATION HOTEL PROGRAM...............5

III.    *FISHER V. CITY OF NEW YORK* AND THE INTERIM GUIDELINES ........................8

IV.     THE ONGOING COVID-19 PANDEMIC ..........................................................10

V.      RETURN TO CONGREGATE SHELTER ...........................................................10

        A.      DHS Distributes Deficient Notices..........................................................11

        B.      Rushed and Chaotic Moves Back to Congregate Shelter without Sufficient
                Notice or Procedure ..........................................................................13

        C.      Discrimination against Certain Disabilities and Improper Documentation
                Requirements ....................................................................................18

        D.      Failure to Screen or Make Individualized Determinations. ...................19

ARGUMENT ...............................................................................................................21

I.      MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY
        INJUNCTION ..........................................................................................21

        A.      Legal Standard .................................................................................22

        B.      Plaintiffs Will Suffer Irreparable Harm ................................................22

        C.      Plaintiffs Are Likely To Succeed On The Merits ..................................27

        D.      Granting the TRO and Preliminary Relief Is in the Public Interest.......30

        E.      Bond Is Not Required .......................................................................30

II.     MOTION FOR ENFORCEMENT OF THE STIPULATION OF SETTLEMENT .........31

CONCLUSION............................................................................................................34

## **TABLE OF AUTHORITIES**

**CASES**

*Agudath Israel of America v. Cuomo*, 983 F.3d 620 (2d Cir. 2020).............................30

*Basank v. Decker*, 449 F. Supp. 3d 205 (S.D.N.Y. 2020) .....................................22, 25

*Benihana Inc. v. Benihana of Tokyo LLC*, 784 F.3d 887 (2d Cir. 2015)......................33

*Blumenthal v. Merrill Lynch, Pierce, Fenner, & Smith, Inc.* 910 F.2d 1049 (2d
    Cir. 1990) .................................................................................................................33

*California ex rel. Van De Kamp v. Tahoe Regional Planning Agency*, 766 F.2d
    1319 (9th Cir. 1985)..................................................................................................31

*Connecticut Department of Environment Protection v. OSHA*, 356 F. 3d 226 (2d
    Cir. 2004) .................................................................................................................22

*Corning Inc. v. PicVue Electronics, Ltd.*, 365 F.3d 156 (2d Cir. 2004) ......................31

*Doctor's Associates v. Stuart*, 85 F.3d 975 (2d Cir.1996)............................................31

*Duvall v. Hogan*, 2021 WL 2042295 (D. Md. May 21, 2021) ......................................33

*Erving v. Virginia Squires Basketball Club*, 349 F. Supp. 716 (E.D.N.Y. 1972),
    *aff'd*, 468 F.2d 1064 (2d Cir. 1972)........................................................................33

*Fair Housing Justice Center, Inc. v. Cuomo*, 2018 WL 4565152 (S.D.N.Y. Sept.
    24, 2018) ...................................................................................................................24

*Ferreyra v. Decker*, 456 F. Supp. 3d 538 (S.D.N.Y. 2020)..........................................30

*Hendrickson v. United States*, 791 F.3d 354 (2d Cir. 2015)....................................31, 32

*Innovative Health Systems, Inc. v. City of White Plains*, 117 F.3d 37 (2d Cir.
    1997) .........................................................................................................................24

*Johnson Controls, Inc. v. A.P.T. Critical Systems*, 323 F.Supp.2d 525 (S.D.N.Y.
    2004) .........................................................................................................................31

*Jolly v. Coughlin*, 76 F.3d 468 (2d Cir. 1996) .............................................................24

*Kamerling v. Massanari*, 295 F.3d 206 (2d Cir. 2002)................................................22

*L.V.M. v. Lloyd*, 318 F. Supp. 3d 601 (S.D.N.Y. 2018)...............................................30

*Liddy v. Cisneros*, 823 F. Supp. 164 (S.D.N.Y. 1999) ................................................26

*Mays v. Dart*, 453 F. Supp. 3d 1074 (N.D. Ill 2020) ...................................................26

*Roso-Lino Beverage Distributors, Inc. v. Coca-Cola Bottling Co. of New York*, 749 F.2d 124 (2d Cir. 1984)........................................................................................33

*Schiavone Construction Co. v. New York City Transit Authority*, 593 F. Supp. 1257 (S.D.N.Y.1984) ...................................................................................................22

*Shapiro v. Cadman Towers, Inc.*, 51 F. 3d 328 (2d Cir. 1995)....................................26

*Streeteasy, Inc. v. Chertok*, 752 F.3d 298 (2d Cir. 2014) ...........................................32

*Venezuela Arias v. Decker*, __ F. Supp. 3d __, 2020 WL 1847986 (S.D.N.Y. Apr. 10, 2020) ....................................................................................................................24

*Wilson v. Williams*, 455 F. Supp. 3d 467 (N.D. Ohio 2020), *vacated on other grounds*, 961 F.3d 829 (6th Cir. 2020) ......................................................................25

## STATUTES

18 NYCRR 491.15(b) ....................................................................................................11

## OTHER AUTHORITIES

Emily Anthes, *The Delta Variant: What Scientists Know*, N.Y. Times (June 22, 2021) ...........................................................................................................................10

Rich Bockmann, *NYC Hotels See 80% Dive in Occupancy*, Real Deal (Apr. 1, 2020), https://therealdeal.com/2020/04/01/nyc-hotels-see-80-dive-in-occupancy/ .................................................................................................................... 7

David Brand, *Thousands Being Sent Back to Homeless Shelters in Return to Pre-Pandemic Status Quo*, City Limits (June 28, 2021) https://citylimits.org/2021/ 06/28/hundreds-of-new-yorkers-sent-back-to-homeless-shelters-in-return-to-status-quo/ ....................................................................................................................10

Centers for Disease Control and Prevention, *COVID-19 Guidance for Shared or Congregate Housing* (updated Dec. 31, 2020), https://www.cdc.gov/corona virus/2019-ncov/community/shared-congregate-house/guidance-shared-congregate-housing.html.............................................................................................9

Centers for Disease Control and Prevention, *People with Certain Medical Conditions* (updated May 13, 2021), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html ........................6

Centers for Disease Control and Prevention, *Scientific Brief: SARS-CoV-2 Transmission* (updated May 7, 2021), https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/sars-cov-2-transmission.html......................................7

Coalition for the Homeless, *New York City Homeless Municipal Shelter Population, 1983-Present*, https://www.coalitionforthehomeless.org/facts-about-homelessness/ ........................................................................................................6

*Coronavirus in the U.S.: Latest Map and Case Count*, N.Y. Times, https://www.nytimes.com/interactive/2021/us/covid-cases.html (accessed June 29, 2021) .........6

Fed. R. Civ. P. Rule 65 ....................................................................................................1

David Leonhardt, *Red America's Covid Problem*, N.Y. Times (June 28, 2021)...........10

Akash Mehta, *Mayor Bill De Blasio Says New York City Can't Afford Hotel Rooms For the Homeless – But FEMA Could Actually Foot The Bill*, The Intercept (May 1, 2020), https://theintercept.com/2020/05/01/coronavirus-new-york-city-homeless-fema/ .......................................................................................7

Office of Temporary & Disability Assistance, *Interim Guidance for Operators of Congregate Facilities Providing Shelter to Individuals Who are Homeless* (June 16, 2021), https://otda.ny.gov/COVID-19/Congregate-Homeless-Shelter-Guidance.pdf ......................................................................................9

Press Release, Federal Emergency Management Agency, *FEMA Programs Helping People from Coast to Coast* (Apr. 20, 2020), https://www.fema.gov/news-release/20200727/fema-programs-helping-people-coast-coast.......................................7

Respondents' Memo. of Law in Supp. of Mot. to Dismiss, *Fisher v. City of New York*, No. 452069/2020 (N.Y. Sup. Ct.), Doc. No. 53 ...............................................9

Valeria Ricciulli, *25 Men Lock Themselves in Hotel Rooms, Refusing Transfer to Homeless Shelter*, Curbed (July 2, 2021), https://www.curbed.com/2021/07/homeless-shelters-hotels-nyc-four-points.html..........................................................17

Giselle Routhier, *State of the Homeless 2021 Report*, Coalition for the Homeless (Apr. 2021) https://www.coalitionforthehomeless.org/wp-content/uploads/2021/04/StateOfTheHomeless2021.pdf....................................................................6

The White House, *Memorandum to Extend Federal Support to Governors' Use of the National Guard to Respond to COVID-19 and to Increase Reimbursement and Other Assistance Provided to States* (Jan. 21, 2021), https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/21/extend-federal-support-to-governors-use-of-national-guard-to-respond-to-covid-19-and-to-increase-reimbursement-and-other-assistance-provided-to-states/...........................................7

Plaintiffs' counsel respectfully submits this memorandum of law in support of their motion, under Fed. R. Civ. P. Rule 65, for a temporary restraining order and preliminary injunction against Defendants City of New York, the New York City Department of Homeless Services ("DHS"), and the Commissioner of DHS.

## PRELIMINARY STATEMENT

Presently, thousands of class members subject to the Stipulation of Settlement in this case (the "Stipulation") live in single- or double-occupancy rooms in New York City hotels, where they have been sheltering during the COVID-19 pandemic.  Many of the class members have disabilities that put them at higher risk of severe consequences if they were to contract SARS-CoV-2, the virus causing COVID-19, and many have physical and mental disabilities that present risk of harm if they were to return to congregate shelter, or otherwise make living in congregate shelter untenable.  Defendants placed thousands of individuals in these hotel rooms, pursuant to— as they conceded in separate litigation—the Reasonable Accommodation (RA) process developed pursuant to the Stipulation.  These actions saved lives, allowing the class members to safely socially distance in their hotel rooms to minimize the risks from COVID-19, and for many, provided a necessary shelter accommodation for their other disabilities.

Now, in an abrupt shift, Defendants are moving the class members out of hotel rooms and back into congregate shelters.  But rather than proceeding in an orderly, deliberate manner in which they can give each class member the notice and the individualized consideration required by the Stipulation to determine whether their disability requires that they remain in a hotel room or be transferred to another site that can accommodate their disability, Defendants are recklessly rushing the process.  In violation of the Stipulation, Defendants are following political pressure to shut down the hotel program and move approximately 8,000 residents in a few weeks' time.  The results have not only been chaotic but also potentially dangerous for class members.  As described herein,

numerous class members have been told they are being transferred abruptly without knowledge of their right to a reasonable accommodation.  Shelter residents with significant, obvious disabilities have been moved or threatened with moves to sites that are not accessible to them.  Class members have been told that *no* RAs will be granted for mental health issues, including individuals with paranoid schizophrenia or severe PTSD whose condition will worsen in congregate shelter.  Many individuals have already been transferred to congregate shelter, where they remain without having received proper consideration for an accommodation, despite serious physical and mental health disabilities that make their living situation untenable.  Moreover, for many of these class members who remain at high risk of severe consequences from COVID-19, living in close quarters with a relatively unvaccinated population, which, at a time when the City's rate of COVID-19 occurrence is again increasing, creates the risk of a new super-spreader event.

Plaintiffs seek urgent relief from this Court to protect class members from this unduly rushed process that stands in clear violation of the Stipulation.  Plaintiffs easily satisfy each requirement for a temporary restraining order and preliminary injunction.  They have shown a likelihood of success based on the Defendants' violations of the Stipulation, including, among many others, a failure to "provide Reasonable Accommodations on an individualized basis to Class Members in a manner that provides meaningful access to shelter or shelter-related services" and to provide notice "at least two (2) weeks before terminating" an accommodation, and by discriminating against those "applying for or in receipt of shelter or shelter-related services." *See* ECF No. 67 ¶¶ 21, 22, 41.  They are facing irreparable harm in the form of the violations of their constitutional rights as incorporated into the Stipulation, and the risk of imminent psychological, emotional, and physical harm of living in a congregate setting that will worsen their disabilities and/or put them at heightened risk of severe consequences from COVID-19.  Further, it is in the

public interest to correct the defects in Defendants' process so that they abide by the Stipulation, avoid undue harm to the class members, and decrease the risk of the spread of COVID-19.

For the reasons argued in this motion, Plaintiffs request that the Court temporarily enjoin and restrain Defendants from involuntarily moving any class member from a density hotel until Defendants can demonstrate that they are able to provide the notice and make the individualized determinations required by the Stipulation.

## STATEMENT OF FACTS

### I.   *BUTLER* STIPULATION OF SETTLEMENT

Plaintiffs Sandra Butler and Ricky Gibson commenced this action on May 15, 2015, asserting that DHS failed to reasonably accommodate their disabilities in the provision of shelter. ECF No. 1.  Plaintiffs filed an Amended Class Action Complaint on August 3, 2016, alleging that DHS failed to provide reasonable accommodations for the disabilities of class members in the provision of homeless services and failed to provide accessible shelter facilities sufficient to meet the needs of the class members.  ECF No. 28.  On October 20, 2016, the Court certified the Plaintiffs' class to include "[a]ll individuals with a disability within the meaning of the Americans with Disabilities Act, who presently reside in the DHS Shelter System or who . . . have sought or received, or, in the future will seek or receive, shelter or shelter-related services in the DHS Shelter System, whose disability may affect their ability to meaningfully access shelter or shelter-related services . . . ."  ECF No. 67 at 3.

On May 15, 2017, the Parties entered into a Stipulation of Settlement, and in November 2017, the Court approved the Stipulation after conducting a fairness hearing.[1]  Under the

---

[1] After the fairness hearing, the Court "So Ordered" the Stipulation by Order dated November 9, 2017, and on November 20, 2017, "So Ordered" the First Amendment to the Stipulation of Settlement correcting two typographical errors.  ECF Nos. 67, 70.  On October 1, 2018, the Court "So Ordered" a

Stipulation, Defendant DHS is required to "provide Reasonable Accommodations on an individualized basis to Class Members in a manner that provides meaningful access to shelter or shelter-related services . . . ."  ECF No. 67 ¶ 21.  DHS is prohibited from discriminating against members of the Plaintiffs' class "applying for or in receipt of shelter or shelter-related services" and must "provide such individuals Reasonable Accommodations where necessary to facilitate meaningful access" to DHS's shelter system.  *Id.* ¶ 22.  The Stipulation also mandates the DHS RA process to be interactive and requires DHS to "consider RA requests on an individualized basis."  *Id.* ¶ 25.  The RA process does not require the applicant to use any particular format or language.  *Id.*  In addition, DHS must provide Class Members with at least two weeks' notice of any revocation of an approved RA.  *Id.* ¶ 41.  DHS must also provide to Plaintiffs' counsel for their review any written comment templates of forms, signage, and any other communications notifying people about the right to be granted RAs and how to request RAs.  *Id.* ¶ 23.

The Stipulation requires DHS to respond to RA requests "as promptly as possible and within a reasonable and appropriate time frame," which takes into account "all relevant factors, including the nature of the Class Member's disability and the effect of failing to immediately provide the RA on the Class Member's ability to meaningfully access and benefit from relevant shelter services."  *Id.* ¶ 27.  The Stipulation also provides that "[i]n most cases, detailed medical records or extensive disability-related information is not necessary" for DHS's RA determination inquiry.  *Id.* ¶ 30.

In instances in which "a non-trivial amount of time may pass" between the RA request and DHS's determination of that request, the Stipulation provides that "DHS should confer with the Class Member and consider providing temporary measures in advance of its formal

---

Stipulation of Settlement and Order of Dismissal of Individual Damage Claims, which incorporated the Stipulation by reference.  ECF No. 73.

determination." *Id.* ¶ 34.  If the Class Member asks to confer, DHS is required to "promptly confer with the Class Member." *Id.*  DHS must "provisionally grant RA requests where . . . the denial of the RA is reasonably likely to cause serious harm to a Class Member with a disability . . . ." *Id.*

In the event DHS concludes that an RA is no longer reasonable or necessary, DHS must offer to confer with the relevant Class Member "to discuss the continuing need for the accommodation." *Id.* ¶ 41.  Thereafter, if DHS determines that the accommodation is no longer appropriate, DHS must provide the Class Member with at least two weeks' notice of its determination, the reason for its determination, and a list of any documents DHS relied upon to reach its determination.  *Id.*

The Stipulation of Settlement provides that the Court retains "jurisdiction over this matter for the purpose of enforcement of the terms of this Stipulation" during the "Effective Period." *Id.* ¶ 72.  The "Effective Period" commenced on December 7, 2017, and will continue for at least five years.  *See id.*  Pursuant to the terms of the Stipulation of Settlement, "Plaintiffs' counsel may move this Court for an order enforcing the provisions of [the] Stipulation." *Id.* ¶ 77.  Specifically, "Defendants' failures or omissions to comply with the provisions of [the] Stipulation" that are "sufficiently significant or recurring as to be systemic" can form the basis of a motion for enforcement of the Stipulation.  *See id.* ¶ 73.

## II.     DHS SHELTER SYSTEM AND DE-DENSIFICATION HOTEL PROGRAM

In March 2020, the novel coronavirus SARS-CoV-2, which causes the COVID-19 disease, upended life in New York City and since then has posed a grave threat to the City's most vulnerable

populations.  In total, more than 600,000 people in the United States have died as a result of contracting SARS-CoV-2, including more than 53,000 in New York.[2]

Prior to the outbreak of the COVID-19 pandemic, the City was already experiencing record homelessness among single adults, and near-record homelessness among families.  In January 2020, New York City shelters held nearly 63,000 people—including over 21,000 adults in families, over 21,000 children, and over 19,000 single adults—all at or close to record highs.[3]  A vastly disproportionate number of individuals in shelter have disabilities—nearly *70 percent* of all single adults.[4]  Many of those disabilities limit their mobility and capacity to socially distance, and other disabilities—such as asthma, diabetes, and heart conditions, among others—increase their risk for more serious complications from COVID-19.[5]

As the City faced the onset of the pandemic, individuals in shelter lived in close quarters, sharing sleeping dorms, bathrooms, eating areas, and recreational spaces with other unrelated individuals, often dozens of others, posing a particular risk to this already vulnerable population. SARS-CoV-2 is spread through contact or close, interpersonal interactions and through airborne or aerosol transmission, with the virus potentially lingering in the air for hours infecting people

---

[2] *Coronavirus in the U.S.: Latest Map and Case Count*, N.Y. Times, https://www.nytimes.com/interactive/2021/us/covid-cases.html (accessed June 29, 2021).

[3] *See* Coalition for the Homeless, *New York City Homeless Municipal Shelter Population, 1983-Present*, https://www.coalitionforthehomeless.org/facts-about-homelessness/.

[4] Pursuant to the Stipulation, DHS was required to conduct a population analysis to estimate the rate and types of disabilities among people in shelter.  In November 2019, DHS reported that 68 percent of single adults in shelters were living with some kind of disability.  *See* Giselle Routhier, *State of the Homeless 2021 Report*, Coalition for the Homeless 15 (Apr. 2021) https://www.coalitionforthehomeless.org/wp-content/uploads/2021/04/StateOfTheHomeless2021.pdf.

[5] *See*  Centers for Disease Control and Prevention, *People with Certain Medical Conditions* (updated May 13, 2021), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.

who are more than six feet away.[6]  Many congregate shelters are housed in older buildings, with poor HVAC or ventilation systems, particularly in sleeping areas and bathrooms.

Given the heightened dangers to this population, FEMA announced that it would reimburse at least 75 percent of costs incurred by state and local governments in moving populations in congregate housing, such as homeless shelters, into hotel rooms.[7]  In light of the widespread vacancies,[8] hotel rooms became a widely available option for individuals in congregate shelter to be able to remain socially distant.  These hotel rooms provided an effective setting for homeless individuals to socially distance and remain safe over the course of the pandemic.

Even with the commitment from FEMA to reimburse the costs, DHS initially resisted moving significant numbers of people from congregate shelters into hotel rooms.  As the pandemic worsened, DHS eventually agreed to transfer more people from congregate shelters to hotel rooms.[9]  By late June 2020, the City had moved approximately 8,700 single adults into hotels— referred to as "de-densification" hotels—that contracted with the City to provide shelter for homeless individuals in the face of widespread vacancies due to the pandemic.  Declaration of

---

[6] Centers for Disease Control and Prevention, *Scientific Brief: SARS-CoV-2 Transmission* (updated May 7, 2021), https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/sars-cov-2-transmission.html.

[7] Press Release, Federal Emergency Management Agency, *FEMA Programs Helping People from Coast to Coast* (Apr. 20, 2020), https://www.fema.gov/news-release/20200727/fema-programs-helping-people-coast-coast. In January 2021, President Biden released an Executive Order announcing that FEMA would be reimbursing for 100% of permissible costs pursuant to this program.  *See* The White House, *Memorandum to Extend Federal Support to Governors' Use of the National Guard to Respond to COVID-19 and to Increase Reimbursement and Other Assistance Provided to States* (Jan. 21, 2021), https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/21/extend-federal-support-to-governors-use-of-national-guard-to-respond-to-covid-19-and-to-increase-reimbursement-and-other-assistance-provided-to-states/.

[8] Rich Bockmann, *NYC Hotels See 80% Dive in Occupancy*, Real Deal (Apr. 1, 2020), https://therealdeal.com/2020/04/01/nyc-hotels-see-80-dive-in-occupancy/.

[9] *See* Akash Mehta, *Mayor Bill De Blasio Says New York City Can't Afford Hotel Rooms For the Homeless – But FEMA Could Actually Foot The Bill*, The Intercept (May 1, 2020), https://theintercept.com/2020/05/01/coronavirus-new-york-city-homeless-fema/.

Deborah Diamant ("Diamant Decl.") ¶¶ 3–4.  In so doing, the City reduced the population living in congregate shelter from nearly 14,000 single adults to approximately 5,500.  *Id.*  However, many of those 5,500 single adults remaining in congregate shelters in late 2020 also had disabilities that put them at higher risk of severe consequences from COVID-19 and there were no plans to provide hotel rooms to the remaining shelter residents at increased risk to COVID-19.  *Id.* Further, DHS had no guidelines regarding which single adults would receive a hotel placement in a single or double hotel room, leaving some at higher risk to COVID in congregate shelter, and some with no disability in single hotel placements.

### III.   *FISHER V. CITY OF NEW YORK* AND THE INTERIM GUIDELINES

On October 28, 2020, Coalition for the Homeless and six individual named plaintiffs still living in congregate settings or double hotel rooms filed a hybrid Article 78 petition and class action lawsuit alleging statutory and constitutional claims against the City in New York Supreme Court seeking to require the City to place additional homeless individuals in single hotel rooms to mitigate the risk of harm from the COVID-19 pandemic. *See Fisher v. City of New York*, No. 452069/2020 (N.Y. Sup. Ct.).  Several of the individual plaintiffs had disabilities that placed them at higher risk of severe consequences from COVID-19, and, after filing, received hotel room placements. The plaintiffs in *Fisher* also complained that over seven months into the pandemic, and six months after the City had begun moving people into hotel rooms, the City still had not announced any standard pursuant to which it was making hotel placement decisions.

The *Fisher* petition argued that a key element of combatting the virus, particularly among those who remain unvaccinated or have underlying health issues, is physical distancing.  The Centers for Disease Control and Prevention's (CDC) guidance for shared or congregate housing recommends individuals maintain at least six feet of distance from each other and wear a mask in

any shared spaces, at least for individuals who are not fully vaccinated.[10]  Allowing individuals to physically distance is especially critical for vulnerable populations, as New York State recognized in its prior guidance for congregate facilities, requiring that staff and residents in common areas must wear face coverings "when in common areas of the facility or whenever they are within 6 feet of others except when eating or drinking."[11]

Shortly after the *Fisher* petition was filed, arguably as a result of the lawsuit, DHS released interim guidelines that would govern its individualized determinations regarding who would receive hotel placements (the "Interim Guidelines") as an accommodation to heightened risk factors.  DHS first announced the Interim Guidelines in November 2020, and then began implementing them in December 2020.  In the *Fisher* lawsuit, DHS challenged the Plaintiffs' ability to bring suit under Article 78 and the NYS Constitution, stating that any claims regarding the accommodations provided to homeless New Yorkers as a result of heightened risk factors should be raised under the Stipulation in this action.[12]  Further, DHS stated in its filings in *Fisher,* and in the Interim Guidelines themselves, that the Interim Guidelines "are an enhancement of the Interim Reasonable Accommodation Procedure developed in the *Butler v. City of New York* settlement," Interim Guidelines at 1.[13]

---

[10] *See* Centers for Disease Control and Prevention, *COVID-19 Guidance for Shared or Congregate Housing* (updated Dec. 31, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/shared-congregate-house/guidance-shared-congregate-housing.html.

[11] Office of Temporary & Disability Assistance, *Interim Guidance for Operators of Congregate Facilities Providing Shelter to Individuals Who are Homeless* at 4 (June 16, 2021), https://otda.ny.gov/COVID-19/Congregate-Homeless-Shelter-Guidance.pdf.

[12] *See*, *e.g.*, Respondents' Memo. of Law in Supp. of Mot. to Dismiss at 6, *Fisher v. City of New York*, No. 452069/2020 (N.Y. Sup. Ct. 2020), Doc. No. 53 (arguing that petitioners should raise their claims regarding hotel placements pursuant to the *Butler* Stipulation).

[13] *See* Declaration of Gabriela Torres-Lorenzotti ("Torres-Lorenzotti Decl.") Ex. 1 (Interim Guidelines). Interim Guidelines announced criteria for which individuals would be eligible for single and double hotel rooms, based on the CDC guidance on which conditions lead to a heightened risk of severe consequences

## IV.        THE ONGOING COVID-19 PANDEMIC

Notwithstanding improvements in COVID-19 case and death rates following vaccination efforts,  COVID-19 remains a serious concern.  The rate of infection is increasing in New York City and continues to rise sharply in communities with lower levels of vaccination—in part due to a new strain (the Delta variant) of the virus that emerged in the country this spring and is more contagious than its predecessors.[14]  The Delta variant poses a new health threat that may transmit effectively even among vaccinated individuals.[15]  A significantly higher percentage of shelter residents than the City's overall population are unvaccinated.  Declaration of Helen Strom ("Strom Decl.") ¶ 14.[16]  Furthermore, many shelter residents are immunocompromised, and the vaccine will be less effective for them.  *Id.*  COVID-19 thus continues to pose a substantial risk of harm for shelter residents.

## V.        RETURN TO CONGREGATE SHELTER

Even though DHS's clients remain at significant risk of serious health issues or death due to COVID-19, and have other disabilities for which they require a placement other than congregate shelter, Defendants recently began hastily transferring clients from de-densification hotels back to congregate shelter without adhering either to the protocols outlined in the Stipulation, which requires, among other things, Defendants to provide Reasonable Accommodations (RAs) to people

---

from COVID-19.  For example, the guidelines state that individuals with conditions such as cancer, chronic kidney disease, certain heart conditions, and COPD should be placed in single hotel rooms, whereas individuals with asthma, diabetes, a BMI over 30, or neurologic conditions, among others, should be placed from congregate shelter into double hotel rooms.  Interim Guidelines at 2–5.

[14] David Leonhardt, *Red America's Covid Problem*, N.Y. Times (June 28, 2021).

[15] Emily Anthes, *The Delta Variant: What Scientists Know*, N.Y. Times (June 22, 2021).

[16] *See also* David Brand, *Thousands Being Sent Back to Homeless Shelters in Return to Pre-Pandemic Status Quo*, City Limits (June 28, 2021), https://citylimits.org/2021/06/28/hundreds-of-new-yorkers-sent-back-to-homeless-shelters-in-return-to-status-quo/ (noting four shelter providers indicating vaccination rates were at most 30 percent of their clientele, and a fifth was close to 50 percent)

who need them (ECF No. 67 ¶ 21); not discriminate against people with disabilities in its shelter programs (*id.* ¶ 22); have an interactive, individualized process to request an RA that does not require the use of any particular format (*id.* ¶ 25); decide RAs soon enough for them to be meaningful (*id.* ¶ 27); in "most cases" not require additional documentation (*id.* ¶ 30); grant RA requests provisionally if necessary to prevent serious harm (*id.* ¶ 34); and provide two weeks' notice of discontinuance of a provided RA (*id.* ¶ 41); or to New York State Office of Temporary and Disability Assistance (OTDA) regulations, which require 48 hours' notice prior to moving a resident to another shelter location.[17]   In the process, Defendants have failed to appropriately provide members of the Plaintiffs class with reasonable accommodations pursuant to the Stipulation.

### A.      DHS Distributes Deficient Notices

In early June 2021, DHS began to serve de-densification hotel residents who had provisional RAs a notice giving them 10 days to submit documentation to support their need for the accommodation or to sign a HIPAA form permitting their care provider to release medical information to DHS.  Torres-Lorenzotti Decl. ¶ 5, Ex. 3.  Along with this notice DHS distributed a form entitled "COVID PLACEMENT REQUEST, Clinician Assessment Form (DHS-XX2284)," which asks the treatment provider of a client requesting an RA pursuant to the Interim Guidelines to document the client's disability.  *Id.* ¶ 6, Ex. 4.  The form is dated May 5, 2021, and was never provided to Plaintiffs' counsel in the *Butler* or *Fisher* actions.  DHS did not create or distribute any instructions to staff about how to use this form.

On June 17, 2021, DHS distributed a transfer notice letter (the "Initial Notice Letter") to clients at seven shelters that were scheduled to be moved by June 25, including at least two that

---

[17] 18 NYCRR 491.15(b).

primarily serve individuals living with mental health diagnoses. *Id.* ¶ 7, Ex. 5. The letter stated that everyone was being returned to congregate shelter, and it did not say anything indicating that people with a disability requiring a less dense setting would not be moved back to the congregate site. *See* Strom Decl. ¶ 9. The letter did not provide the two weeks' notice required by the Stipulation or the 48 hours' notice required by OTDA regulations.

On June 21, DHS provided Coalition through counsel with drafts of three new transfer notice letters to clients regarding moves from de-densification hotels that it intended to use going forward. The first (the "First Revised Notice") was addressed to "All Clients with an approved reasonable accommodation." Torres-Lorenzotti Decl. ¶ 8, Ex. 6. The form was not addressed with the client's name or other identifying information. *Id.* The First Revised Notice told clients to disregard the Initial Notice Letter, which had given them a date and place of relocation, and that the clients would not be going back to congregate shelter but would instead be transferred "to a different location where [their] accommodation can be met." *Id.* The notice also provided that the clients would receive 48 hours' notice of the move. *Id.*

The second notice (the "Second Revised Notice") was also addressed to "All Clients with an approved reasonable accommodation," and was apparently intended for clients who did not receive the Initial Notice Letter. *Id.* Ex. 7. The Second Revised Notice had the same defects as the First Revised Notice.

The third notice (the "Third Revised Notice") was addressed to "All Clients of _____ Shelter," with the subject, "Notification of Increased Shelter Capacity." *Id.* ¶ 8, Ex. 8. The Third Revised Notice was not addressed to any individual. It made no reference to any process for seeking or obtaining an RA, but instead generally informed the clients that "DHS is planning to

end the temporary use of COVID-period commercial hotels and move back to congregate shelters," and that "[i]n the next week more clients will be returning to your shelter location."

Many residents were understandably confused after receiving several notices with conflicting information. *See, e.g.*, Strom Decl. ¶ 32 (NT received three different notices at around the same time – one advising him he was moving back to congregate shelter, an RA notice stating that he would not be moving back, and a transfer notice that he would be transferred to a location "to be determined").[18]

Even after it began distributing the revised notices, DHS continued to distribute the Initial Notice Letter, which erroneously stated that everyone was being returned to congregate shelter and did not indicate that people with a disability would not be moved back to the congregate site. Torres-Lorenzotti Decl. ¶ 9. All hotel residents with approved RAs were told that they would be sent back to congregate sites without reference to their rights under the Stipulation.

> **B.      Rushed and Chaotic Moves Back to Congregate Shelter without Sufficient Notice or Procedure**

Between June 22 and July 6, 2021, DHS moved over one thousand shelter residents from de-densification hotels to congregate shelters. Torres-Lorenzotti Decl. ¶ 14. Many of these residents were moved without the two weeks' notice required under the Stipulation; with less than the 48-hours' notice required under OTDA regulations; despite the fact that they had an approved or pending RA; and/or despite the fact that they had a disability which made transfer to a congregate site inappropriate for them under the agency's own standards. *See, e.g.*, Diamant Decl. ¶¶ 19, 25, 28.

---

[18] Because this motion reveals sensitive information of class members including their medical diagnoses, their names, hotels, and shelters at which they reside have been anonymized to protect their privacy. Information regarding the class members will be made available to Defendants and the Court.

For example, at least eight residents were moved from Hotel F to congregate shelter on or about June 29, 2021, even though they had approved RAs and were in fact provided notices prior to the move stating that they would not be going back to congregate shelter because they had an approved reasonable accommodation for a single or double room. *Id.* ¶¶ 28, 39-40 [NH], 63 [SM], 65 [WB], 66 [EG].[19]   KS, who suffers from depression and PTSD, and was scheduled for hip surgery in the near future, was moved on June 24, 2021, to a congregate shelter that does not accommodate her disabilities despite being granted a provisional RA.   Strom Decl. ¶ 25; *see also id.* ¶ 26 (EM was transferred back to congregate shelter on June 29 despite having a provisional RA).   Some hotel residents told the Urban Justice Center's Safety Net Project ("SNP") staff that they did not receive any notice prior to their moves and were told verbally that they had to leave their hotel.   Strom Decl. ¶ 15; *see also id.* ¶¶ 34-35 (describing two men who were set to be transferred without notice)"

PM, who uses a wheelchair, was transferred on June 22, 2021, from an accessible de-densification hotel to a DHS congregate shelter with no accessible showers or bathrooms. Diamant Decl. ¶ 45.   Another resident was moved to a congregate shelter despite having severe respiratory illness.   *Id.* ¶ 25.

CW, who previously submitted a request for an RA with documentation of his PTSD, hypertension, and sleep apnea for which he uses a CPAP machine, returned to his de-densification hotel on June 18, 2021, at 10:00 p.m. and was informed that he needed to immediately pack his belongings and leave that night.   *See* Strom Decl. ¶ 32.   He was given no written notice or

---

[19] For some—though not all—residents described in this brief and in the accompanying Declarations, Defendants ultimately provided them with compliant accommodations.   However, those results generally came about only after extensive advocacy from three non-profit organizations—Legal Aid Society, Coalition, and the Urban Justice Center, and after considerable delays and violations of the Stipulation. Notwithstanding the results of this advocacy for certain clients, deficiencies in Defendants' moves of shelter residents remain systemic and ongoing.

explanation, only a MetroCard and the address for a Holiday Inn in the Bronx where he was expected to travel with all of his belongings that night.  *Id.*  When he arrived, the staff was not aware of his placement there, did not have his information in their system, and did not have any single rooms available.  *Id.*  On June 19, CW submitted an RA request for a single-occupancy room, which was provisionally granted, but CW was placed in a single room at a congregate site on Wards Island with fresh urine on the floor, a urine-stained mattress, and no air conditioning or ventilation, which has caused aggravation of his sleep apnea.  *Id.*  He has not been able to sleep in the heat and has been experiencing difficulties breathing.  CW submitted an RA request for air conditioning on June 23, 2021, and submitted further medical documentation in support of this on July 2.  He has received no response to this request to date.  *Id.*

EK, whose medical conditions include chronic bronchitis, COPD, asthma, bronchial asthma, and obesity, was transferred from a de-densification hotel to a congregate shelter on June 25, 2021, despite her pending RA request, which she had submitted more than 48 hours before the scheduled move.  Diamant Decl. ¶ 60.  AW, who reports having diagnoses of hypertension, diabetes, and an enlarged prostate, was moved to congregate Shelter S despite a pending RA request.  *Id.* ¶ 72.  AC, who suffers from chronic severe asthma, severe depression and anxiety, has limited mobility from two hip replacements and pelvic surgery was moved to a congregate site notwithstanding his need for a single-room placement.  Torres-Lorenzotti Decl. ¶ 15(h)

GJ, who has several obvious and apparent disabilities resulting from recent multiple heart attacks, strokes, kidney disease, and a back broken in three places, was transferred from the hospital to the congregate Shelter G on or about June 29, 2021.  Diamant Decl. ¶ 62.  HZ, who also has an obvious and apparent mobility disability in that she uses a manual wheelchair, was transferred from a de-densification hotel to a congregate shelter that is located on a hill with a

significant slope that HZ cannot safely navigate in her wheelchair.  *Id.* ¶ 67.  AM suffers from schizophrenia, high blood pressure, asthma, depression and arthritis.  She was granted a provisional RA for a de-densification hotel placement by DHS.  Strom Decl. ¶ 24.  However, in advance of the closure of the de-densification hotel she was residing in, she was given ten days to submit medical documentation to support it.  DHS contacted AM's doctor prior to the move and confirmed the information would be provided, but DHS insisted she would be moved to a room shared with nine other women.  *Id.*  Only after repeated insistence from UJC was AM granted a provisional, and later a permanent, RA for a single-occupancy room.  *Id.*

NS, who has been diagnosed with anxiety and depression, was forced to return to congregate shelter—the same shelter where she was attacked by her  roommate in February 2020, which exacerbated her symptoms—despite having submitted an RA request, together with documentation from her physician that she requires a private room for her mental health conditions.  Torres-Lorenzotti Decl. ¶ 15(g).  As detailed in a letter submitted to DHS by her physician, "returning to the shelter will result in serious physical and mental complications" and "Patient is extremely anxious about having to share a room with another person. A private room is medically necessary to stabilize the mental health of the patient as well as aide in her treatment. The lack of a private room could potentially harm the patient's condition by increasing her symptoms, such as depression, high levels of anxiety, lack of sleep, fear, as well as hallucinations."  *Id.*  The physician's letter also noted that, "These symptoms have decreased since [NS] has been living in a single occupant hotel room."  *Id.*

AG, who suffers from asthma, is an active smoker, has several hernias, wears two knee braces and uses a cane because he suffers extreme pain in his knees while walking, was forced to move to a congregate site on June 26, 2021, without advanced notice and in disregard of the

medical documentation he provided.  *Id.* ¶ 15(b).  AG was not even provided transportation or assistance in moving to the congregate site despite his mobility impairments.  *Id.*  The congregate site does not accommodate his disabilities, which require placement in a double occupancy room and on the first floor or in a unit with a functioning elevator.  *Id.*

JSB, who has been diagnosed with COPD, asthma, hyperlipidemia, and Vitamin D deficiency, requires placement in a single-occupancy room due to his conditions.  Torres-Lorenzotti Decl. ¶ 15(a).  Despite these conditions, which increase his risk of severe illness or death if he were to contract COVID-19, JSB was moved to a congregate shelter on June 22, 2021.  *Id.*  Even after DHS granted JSB an RA for a single room, JSB was placed in a unit with a congregate bathroom on the other side of the building from where JSB's room is located, which does not accommodate his disabilities, including his COVID-19 risk factor conditions and the metal rod in his leg that makes it extremely difficult to walk.  *Id.*

In some cases, residents who had approved RAs were told that their RAs had been rescinded without the required notice and procedures under the Stipulation.  *Cf.* Valeria Ricciulli, *25 Men Lock Themselves in Hotel Rooms, Refusing Transfer to Homeless Shelter*, Curbed (July 2, 2021)*,* https://www.curbed.com/2021/07/homeless-shelters-hotels-nyc-four-points.html (Resident Anthony Campbell, who has severe asthma, reported that he was given "ten minutes' notice that we are being moved to a location that we don't know").  For example, DHS granted AS an RA for a single occupancy room in February 2021 due to multiple diagnoses.  Diamant Decl. ¶ 46.  On June 23, 2021, AS received a notice stating that his RA had been granted only provisionally, and that he had one day to provide paperwork supporting the RA.  *Id.*  He subsequently received a generic notice stating that he indeed had an approved RA and should ignore the first notice.  *Id.*  On June 30, 2021, AS received a notice stating that his RA had been rescinded and that he would

be moved from his de-densification hotel to congregate Shelter N imminently.  *Id.* ¶ 47.  DHS moved the residents from the hotel to the shelter at noon on July 1, 2021; AS paid for his own cab fare to the shelter.  *See id.* ¶¶ 50–51.  Only after AS arrived at the congregate shelter did DHS provide AS with the address for his new hotel placement.  *Id.* ¶ 51.

Some shelter residents were notified erroneously that they would be transferred back to congregate shelter even though they had valid, approved RAs.  Torres-Lorenzotti Decl. ¶ 15(c); Strom ¶ 27 [PT].  One such resident, TJB, was forced to leave the shelter system temporarily because all residents in her de-densification hotel were moved back to congregate shelter, which would not offer TJB the reasonable accommodation that she had been approved for.   Torres-Lorenzotti Decl. ¶ 15(c).

### C.   Discrimination against Certain Disabilities and Improper Documentation Requirements

Significantly, some residents were told by shelter providers that DHS does not approve RAs for mental health diagnoses.  *See* Strom Decl. ¶¶ 13, 26, 29 (MK).  Shelter staff in at least three sites told residents that they were not allowed to request a reasonable accommodation for mental health issues.  *Id.* ¶ 13.   One resident, MT, who is diagnosed with PTSD was told by her case manager not to request an RA because she would not qualify.  Diamant Decl. ¶ 12(d).  Another resident, AS, was told by the shelter provider of his de-densification hotel to board the bus to transfer him to a congregate shelter and that DHS would not approve an RA for his mental health condition "or else they would have to approve everyone for an RA," even though he had been approved for a provisional RA.  Strom Decl. ¶ 26; *see also id.* ¶ 29 (MK was told by shelter staff that mental health conditions could not be considered as part of the RA).

In some cases, DHS failed to grant RAs because the residents had not provided extensive documentation.  *See, e.g.*, Strom Decl. ¶ 32 (MV's case manager told him he would be moving

back to congregate shelter unless he could complete a clinical assessment with his physician before July 6).

Some RAs were erroneously denied for lack of medical documentation despite the fact that the clients had submitted documentation from their health care providers. *E.g.,* Diamant Decl. ¶ 25. For example, Coalition met one client whose RA request was verbally denied for lack of medical documentation, despite having submitted documentation from her health care provider to her case manager. *Id.*

In some cases, residents had submitted RA requests to their case managers well in advance of their scheduled moves but the shelter staff never submitted the requests for processing. *E.g.,* *id.* ¶¶ 43, 52, 56. For example, IM had submitted an RA request a month before learning on June 30, 2021, that his case manager never submitted his RA request. *Id.* ¶ 43. Some of these residents were moved to congregate shelters. *See, e.g.,* *id.* ¶¶ 52, 58. DB had provided her case manager with a letter from her doctor in support of her RA request that she submitted while she was at Hotel C. *Id.* ¶ 52. DB was moved to Congregate Shelter D after she was denied due to lack of documentation, later learning that her case manager gave the letter to her supervisor who did not submit it to DHS for review. *Id.*

### D. Failure to Screen or Make Individualized Determinations.

Many shelter residents were also not screened for RAs at all. For example, JB, who has been diagnosed with unspecified bipolar disorder, anxiety, depression, and hypertension, and is a current smoker, was not screened for these conditions when she entered shelter in March 2021 and was placed in congregate shelter where she shares a room with six other individuals. Torres-Lorenzotti Decl. ¶ 15(d); *see also, e.g. id.* ¶ 15(h) (AC was not screened by shelter staff before he was transferred from a de-densification hotel to a congregate shelter).

19

Many residents were not even aware of their right to request a reasonable accommodation. *See* Strom Decl. ¶ 21 ("None of the six [residents] . . . knew what an RA was and none of them knew that they could submit medical documentation of their needs if they thought they could not return to congregate shelter."); *see also id.* ¶ 26 ("None of the staff or caseworkers have mentioned reasonable accommodations to [EM] and he had no idea what it was and that there was any way to avoid returning to congregate shelter . . . ."); *id.* ¶ 30 (MC was not aware of ability to request an RA as of the day prior to a scheduled move); Diamant Decl. ¶ 15(g) (LM had not been informed about how to request an RA by shelter staff); *id.* ¶¶ 18, 23 (many residents at Hotel O and Hotel E "did not know how to request an RA"). Several residents at Hotel O were being moved out on June 22, 2021, who did not know how to request an RA. Diamant Decl. ¶ 18. Many were told by shelter staff that "everyone is going back to congregate" regardless of their conditions. Strom Decl. ¶ 11.

Even when shelter residents knew of their right to request a reasonable accommodation, they often were not given the opportunity to submit an RA request or were deterred from submitting one. *E.g.*, Diamant Decl. ¶ 24 (residents at Hotel Q said they wanted to submit RA requests but "could not because their case managers were not on site"); *see also id.* ¶ 69; Strom Decl. ¶ 13. For example, VP, who suffers from schizophrenia and post-traumatic stress disorder, sought out his case manager for an RA request but was unable to reach them. Strom Decl. ¶ 26. He also asked a site supervisor about requesting an RA but was told they had no knowledge of the process and that he had to move regardless of his needs. *Id*. DW, who suffers from asthma, diabetes, and high blood pressure, was also unable to reach his case manager to request a RA or help him with the process. *Id.* ¶ 27. LB, who has high blood pressure, asthma, severe COPD, a swollen prostate, arthritis, torn ligaments in his neck, back, and knees, and also suffers from

depression, bipolar, and schizoaffective disorders, asked his caseworker about submitting an RA request, and his caseworker did not report to work for the two days remaining before LB was scheduled to be moved. *Id.* ¶ 21. Shelter staff then approached LB and without any written notice or information on where he was being sent or departure time, told him he would have to leave on June 24. *Id.* Residents in at least three sites informed SNP staff that when the residents requested RAs, caseworkers told them that submitting an RA request would delay their applications for permanent housing programs and that they would need to "start all over again" with their housing search. *Id.* ¶ 13.

In many cases, shelter staff did not assess clients to determine whether they might have a disability requiring placement in a less dense setting beyond those listed in the Interim Guidelines, such a physical disability or medical condition requiring an ADA-compliant shower or bathroom, wheelchair accessibility, diet-compliant meals, or air conditioning due to heat sensitivities caused by medications, or a mental health condition preventing them from living safely in close proximity to others. *See* Diamant Decl. ¶ 14.

Despite notice of the ongoing harm caused by these ongoing violations of protections included in the Stipulation, *see, e.g.*, Strom Decl. ¶ 18, DHS continued transferring clients from de-densification hotels to congregate sites without the proper notice and in disregard of clients' disabilities and approved or pending RAs.

## ARGUMENT

### I.   MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Plaintiffs respectfully request that the Court issue a temporary restraining order and a preliminary injunction enjoining  Defendants from shutting down the density hotel program until they have sufficient capacity and time to ensure that class members are appropriately being

screened, provided the two weeks' notice required before any moves, and ultimately being provided shelter that accommodates their disabilities.  Plaintiffs easily satisfy the applicable standards for a temporary restraining order and preliminary injunction.

### A.    Legal Standard

To obtain a preliminary injunction in the Second Circuit, a party must establish that it will suffer irreparable harm and either (1) a likelihood of success on the merits of its case or (2) sufficiently serious questions going to the merits and a balance of the hardships tipping decidedly in its favor.  *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002).  The standards for a temporary restraining order are the same as those governing the granting of preliminary injunction. *See Schiavone Constr. Co. v. N.Y.C. Transit Auth.*, 593 F. Supp. 1257, 1260-61 (S.D.N.Y.1984).

As set forth below, Plaintiffs meet these standards.

### B.    Plaintiffs Will Suffer Irreparable Harm

Plaintiffs have established irreparable harm given the constitutional injuries at issue, along with the physical and mental harms that will result if DHS continues its density hotel moves.  The Second Circuit has "held that the alleged violation of a constitutional right triggers a finding of irreparable injury."  *Conn. Dep't of Env't Prot. v. OSHA*, 356 F.3d 226, 231 (2d Cir. 2004); *see also Basank v. Decker*, 449 F. Supp. 3d 205, 213 (S.D.N.Y. 2020) ("In the Second Circuit, it is well-settled that an alleged constitutional violation constitutes irreparable harm.").  This action was initially brought on both statutory (Title II of the Americans with Disabilities Act, among others) and constitutional grounds.  ECF No. 67 p. 2 ("the Amended Complaint alleges that Defendants violated . . . due process under the United States and New York State Constitutions").  As the Plaintiffs averred in the Amended Complaint, they have a protected property interest in their right to emergency shelter, and the Defendants' denial of that right and failure to provide reasonable accommodations violates Plaintiffs' due process rights.  ECF No. 28 ¶ 163, 165.

Plaintiffs' constitutional rights are squarely at issue, as Defendants are systematically moving shelter residents from their reasonable accommodations absent the requisite notice and in violation of the required process.  On a visit to Shelter G, the Coalition for the Homeless identified at least eight individuals who had been moved to the congregate site despite having approved RAs, and DHS has not responded to inquiries about these individuals.  Diamant Decl. ¶ 28.  Resident TJB was given just eight days' notice that she would be moved from a hotel back into congregate setting—despite her approved RA due to her increased health risks if she contracts COVID-19. Torres-Lorenzotti Decl. ¶ 15(c).  She ultimately left the shelter, rather than move to a congregate setting, and only returned when DHS reversed course and granted her housing suitable for her approved RA.  *Id.*   Residents MF and GC were both given notices of transfers to congregate settings with less than the required two weeks' notice, despite their approved RAs, and they were only allowed to stay in appropriate shelter after counsel intervened on their behalf.  *Id.* ¶ 15(e)-(f). Another resident was moved to a congregate facility after her RA request was denied orally, allegedly for lack of medical documentation, despite her having provided documentation from her health care provider.  Diamant Decl. ¶ 25.

Other individuals had their pending RA requests seemingly ignored as they were moved to congregate settings without a provisional RA.  JSB was told to provide additional documentation of his need for less-dense accommodations on June 10, and when he was unable to secure the documentation in time, was moved to congregate shelter on June 22, despite his use of a nebulizer to stabilize his breathing.  Torres-Lorenzotti Decl. ¶ 15(a).

Others still have had their provisional RAs ignored, as DHS rushes to move individuals. KS, who suffers from PTSD and is scheduled to have hip surgery soon, was granted a provisional RA on the evening of June 23, but was moved on June 24 to a congregate facility with no air

conditioning.  Strom Decl. ¶ 25.  Absent adherence to the approved reasonable accommodation policy, Defendants are denying shelter residents their constitutionally protected due process rights, and as such irreparable harm is established.

Furthermore, irreparable harm is established where Plaintiffs show irreparable harm to their "physical and mental health."  *Fair Hous. Just. Ctr., Inc. v. Cuomo*, 2018 WL 4565152, at *16 (S.D.N.Y. Sept. 24, 2018) (granting a preliminary injunction to Plaintiff who contested a move from her assisted-living apartment into a nursing home facility).

Physical harm is quintessentially irreparable.  *See, e.g.*, *Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 43 (2d Cir. 1997) (holding there was irreparable harm where a treatment facility for alcohol and drug abuse would have closed, leading to potential "death, illness, or disability"); *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) (holding that an inmate's showing of "sustained physical injuries from his prolonged confinement in his cell without exercise" supported a finding of irreparable harm).  Indeed, numerous courts have held that the risk of contracting COVID-19 specifically constitutes irreparable harm.  *See, e.g.*, *Venezuela Arias v. Decker*, __ F. Supp. 3d __, 2020 WL 1847986, at *3 (S.D.N.Y. April 10, 2020) (granting a TRO and noting "the extraordinary scope and severity of the COVID-19 health crisis is clear to everyone," and that "[t]he nature of detention facilities makes exposure and spread of the virus particularly harmful"); *Basank*, 449 F. Supp. 3d at 213 ("The risk that Petitioners will face a severe, and quite possibly fatal, infection if they remain in immigration detention constitutes irreparable harm warranting a TRO."); *Wilson v. Williams*, 455 F. Supp. 3d 467, 479 (N.D. Ohio 2020), *vacated on other grounds*, 961 F.3d 829 (6th Cir. 2020) ("It is true that some subclass members may not die if they contract the virus. However, it is more than mere speculation that the virus will

continue to spread and pose a danger to inmates if BOP does not increase its efforts to stop the spread.  Petitioners have therefore shown a risk for irreparable harm.").

Shelter residents with COVID-19 risk factors are at serious risk of physical harm if Defendants force their return to congregate shelter, and as the City conceded in its filings in *Fisher*, enhanced COVID-19 risk factors merit accommodations under *Butler*.  JSB, who has COPD and asthma, uses a nebulizer to stabilize his breathing, and his placement in a facility with a shared bathroom has created such a risk to his health that he has chosen not to spend the night in shelter since his transfer on June 27.  Torres-Lorenzotti Decl. ¶ 15(a).  AG was told to leave his single-occupancy hotel room for a congregate facility on June 26, despite his asthma.  *Id.* ¶ 15(b).  He also wears knee braces and uses a cane, which requires a facility with an operative elevator (or first-floor accommodations), and yet was transferred to a second-floor room in a facility with a broken elevator.  *Id.*  Despite proof of his asthma diagnosis, and being told by Legal Aid on at least four occasions that AG's congregate placement does not accommodate his needs, DHS has not provided AG with a provisional RA.  *Id.*  One resident was moved from a density hotel to the congregate Shelter D despite her severe respiratory illness that requires she constantly use an oxygen machine.  Diamant Decl. ¶ 25.  Shelter clients like these who are forced to move into shelters without regard for their medical needs thus face "a grave threat to their health and possibly their lives" and have "no adequate remedy at law."  *Mays v. Dart*, 453 F. Supp. 3d 1074, 1098 (N.D. Ill. 2020).

DHS's actions will irreparably harm Plaintiffs as a result of the emotional or psychological harm that has resulted from its slipshod method of returning clients to congregate settings, resulting in numerous moves and insufficient notice for many Plaintiffs.  A broad range of mental health concerns may constitute irreparable harms.  *See, e.g., Shapiro v. Cadman Towers, Inc.*, 51 F.3d

328, 332 (2d Cir. 1995) (affirming grant of preliminary injunction upon a showing of "risk of injury, infection, and humiliation" by a Plaintiff who sought a handicap parking spot to avoid urinating on herself); *Liddy v. Cisneros*, 823 F. Supp. 164, 174 (S.D.N.Y. 1993) (finding irreparable harm for Plaintiff who sought Section 8 housing opportunities closer to her medical providers to avoid "further deterioration of her physical and mental health").

For many shelter residents, DHS's moving of individuals to congregate facilities irrespective of the accommodations to which they are entitled, has already caused irreparable mental harm.  Resident NS's physician has documented that a private room is "medically necessary to stabilize the mental health of the patient," and that her depression, anxiety and hallucinations decreased while she was living in a single-occupancy hotel room.  Torres-Lorenzotti Decl. ¶ 15(g). Indeed, while in congregate shelter previously, her roommate assaulted her, requiring hospitalization, which exacerbated her anxiety and depression.  *Id.*  Yet her initial request for an accommodation to remain in a single-occupancy room was ignored, and she was transferred three days after submitting a second request, without having received any formal determination from DHS.  *Id.*  JB, who was not screened for an accommodation despite her bipolar disorder, anxiety, and depression, has been housed in a congregate facility that does not accommodate her mental health needs with respect to density and access to providers, despite her request for accommodation being approved.  *Id.* ¶ 15(d).  DHS's refusal to accommodate these individuals risks "further deterioration" of their mental health, and the same is true for all shelter residents whose mental health accommodations are not adequately screened for and recognized.  DHS's moves, absent adequate screening and proper notice, thus threaten to severely harm an untold number of class members.

### C.     Plaintiffs Are Likely To Succeed On The Merits

Defendants' implementation of the return to congregate shelter violates numerous provisions of the Stipulation of Settlement.  Accordingly, Plaintiffs are likely to succeed on the merits of their Motion for Enforcement of the Stipulation.

Defendants' failure to screen for RAs violates the mandate of Paragraph 21 of the Stipulation to "provide Reasonable Accommodations on an individualized basis to Class Members in a manner that provides meaningful access to shelter or shelter-related services . . . ."  *See* ECF No. 67 ¶ 21.  In many cases, Defendants flat out failed to screen for RAs.  *See supra* at 13–14, 19. In some cases, DHS did not inform residents about how to apply for an RA and did not give them any opportunity to submit an RA request.  *See supra* at 19–20.  Even when Defendants informed clients it was possible to seek an RA, they failed to inform clients that it was possible to seek an RA for a condition that was not considered in the Interim Guidelines, such as a physical disability or medical condition requiring a fully accessible shower or bathroom, wheelchair accessibility, diet-compliant meals, or air conditioning due to heat sensitivities caused by medications, or a mental health condition preventing them from living safely in a congregate setting.  *See supra* at 21.  They also failed to individually interview clients.  *See generally* Torres-Lonzotti Decl.; Strom Decl.; Diamant Decl.  This conduct violated Paragraph 25 of the Stipulation, which mandates the DHS RA process to be interactive and requires DHS to "consider RA requests on an individualized basis."   ECF No. 67 ¶ 25.

Defendants' failure to provide hundreds of shelter residents with reasonable accommodations violates Paragraph 22 of the Stipulation, which prohibits discrimination against members of the Plaintiffs' class "applying for or in receipt of shelter or shelter-related services" and requires Defendants to "provide such individuals Reasonable Accommodations where necessary to facilitate meaningful access" to DHS's shelter system.  *Id.* ¶ 22.  Defendants'

disregard of and discrimination against clients with mental health diagnoses—as when they inform clients that they may not request a reasonable accommodation for mental health issues, *see supra* at 16 (NS) & 18 (MT, AS, MK)—also violates Paragraph 22 of the Stipulation.

Further, Defendants' failure to assess RA requests where clients were unable to provide extensive documentation—*see supra* at 18–19—violates Paragraph 25 of the Stipulation, which provides that the RA process does not require the applicant to use any particular format or language.  ECF No. 67 ¶ 25.  It also runs contrary to Paragraph 30 of the Stipulation, which states that "[i]n most cases, detailed medical records or extensive disability-related information is not necessary" for DHS's RA determination inquiry.  *Id.* ¶ 30.  These procedural deficiencies effectively deny the benefits of the RA when Defendants transfer clients to a congregate site without assessing their needs— as occurred in many, many cases set forth above, *see supra* at 13–21—and violate Paragraph 27's requirement that DHS must respond to RA requests "as promptly as possible and within a reasonable and appropriate time frame" taking into account "all relevant factors, including . . . the effect of failing to immediately provide the RA on the Class Member's ability to meaningfully access and benefit from relevant shelter services."  *Id.* ¶ 27.

Paragraph 34 states that "DHS should confer with the Class Member and consider providing temporary measures in advance of its formal determination."  *Id.* ¶ 34.  And if the client asks to confer, DHS is required to "promptly confer with the Class Member."  *Id.*  Paragraph 34 further provides that DHS must "provisionally grant RA requests where . . . the denial of the RA is reasonably likely to cause serious harm to a Class Member with a disability . . . ."  *Id.*  For clients such as EK, AW, DB, EH, AM, *see supra* at 15, 19, DHS failed to confer and consider temporary measures, such as remaining at the de-densification hotel or transferring to another less dense site,

notwithstanding the reasonable likelihood that transferring to a congregate shelter would cause serious harm.

Paragraph 41 of the Stipulation states that in the event DHS concludes that an RA is no longer reasonable or necessary, DHS must offer to confer with the client "to discuss the continuing need for the accommodation."  ECF No. 67 ¶ 41.  After conferring, if DHS determines that the accommodation is no longer appropriate, DHS must provide the Class Member with at least two weeks' notice of its determination, the reason for such determination, and a list of any documents DHS relied upon to reach its conclusion.  *Id.*  DHS failed to comply with each of these requirements.  For example, although AS had an approved RA since February 2021, he was given only one days' notice on June 23, 2021, to provide paperwork supporting the RA, and was told on June 30, 2021, that his RA had been rescinded.  *See supra* at 17.  Defendants failed to confer with clients such as AS, failed to provide two weeks' notice, and failed to provide  clients with a reason for its determination, or the information it relied upon to reach its determination.  Many clients never received notice of their transfer—and thus that Defendants had revoked  their RA for single- or double-occupancy housing.  For example, eight residents of the Hotel F were moved to Congregate Shelter G even though they had approved RAs.  *See supra* at 13–14.  AM was also transferred to a congregate shelter even though she had previously been granted a provisional RA. *See supra* at 15–16.  DHS, therefore, systematically failed to follow the mandated procedures in the Stipulation and continues to do so.

DHS's failure to provide Plaintiffs' counsel the "COVID PLACEMENT REQUEST, Clinician Assessment Form (DHS-XX2284)," dated May 5, 2021, which asks the treatment provider of a client requesting an RA pursuant to the Interim Guidelines to document the client's disability, before it was distributed to clients violated Paragraph 23 of the Stipulation, which

requires DHS to provide to Plaintiffs' counsel for their review and written comment, templates of forms, signage, and any other communications notifying people about the right to be granted RAs and how to request RAs.  ECF No. 67 ¶ 23.

### D. Granting the TRO and Preliminary Relief Is in the Public Interest

This Court's granting of Plaintiffs' request for preliminary relief—putting a hold on Defendants' rushed process so that their compliance with the Stipulation is ensured—would be in the public interest.  It is well-settled that the public interest is served by preventing unlawful and unconstitutional conduct, particularly "when constitutional alternatives are available to achieve the same goal."  *Agudath Isr. of Am. v. Cuomo*, 983 F.3d 620, 637 (2d Cir. 2020); *see also L.V.M. v. Lloyd*, 318 F. Supp. 3d 601, 620 (S.D.N.Y. 2018) ("[T]his Court is hard-pressed to see how setting aside an unlawful practice could be against the public interest.").  Moreover, the public interest is served by avoiding undue harm to shelter residents, and minimizing risk of a recurrence of the spread of COVID-19.  *See, e.g.*, *Ferreyra v. Decker*, 456 F. Supp. 3d 538, 556 (S.D.N.Y. 2020) (holding that reducing populations in congregate living space—detention facility—is in public interest by reducing risk for "those within those facilities and for the community at large").

In this case, Defendants may still accomplish their goal of transitioning individuals back into congregate shelter following this Court's grant of relief; all Plaintiffs request is that they do so with sufficient time and deliberation in order to follow protocols set forth in the Stipulation.  No public interest is served by Defendants simply proclaiming that they finished all moves in the month of July, as opposed to a later date, particularly given the likelihood of federal reimbursement for much of the costs of the hotel rooms.

### E. Bond Is Not Required

Although Rule 65 ordinarily requires that a bond be posted in connection with the issuing of an injunction, the Second Circuit has held that "the District Court is vested with wide discretion

in the matter of security," and that it may be "proper for the court to require no bond where there has been no proof of likelihood of harm." *Doctor's Assocs. v. Stuart,* 85 F.3d 975, 985 (2d Cir. 1996); *accord Corning Inc. v. PicVue Elecs., Ltd.*, 365 F.3d 156, 158 (2d Cir. 2004); *see also Johnson Controls, Inc. v. A.P.T. Critical Sys.*, 323 F. Supp.2d 525, 541 (S.D.N.Y. 2004) ("in cases where the non-movant has not shown a likelihood of harm, the district court may properly set no bond").

Here, pausing the return to shelter is not likely to result in harm to Defendants given that much of Defendants' costs may be reimbursable by FEMA as long as the City provides adequate justification to support the continued need for non-congregate sheltering.  In any case, requiring a bond payment in this case "would effectively deny access to judicial review."  *California ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1325 (9th Cir. 1985).  Accordingly, the Court should dispense with the bond requirement.

## II.        MOTION FOR ENFORCEMENT OF THE STIPULATION OF SETTLEMENT

Plaintiffs seek to enforce the terms of the Stipulation of Settlement.  "[A] motion to enforce a settlement agreement is fundamentally 'a claim for breach of a contract, part of the consideration of which was dismissal of an earlier federal suit,' and therefore 'requires its own basis for jurisdiction.'"  *Hendrickson v. United States*, 791 F.3d 354, 358 (2d Cir. 2015).  A federal court is "a proper forum for litigating a breach of [a] settlement agreement" where the court "makes 'the parties' obligation to comply with the terms of the settlement agreement . . . part of the order of dismissal—either by separate provision (such as a provision retaining jurisdiction over the settlement agreement) or by incorporating the terms of the settlement agreement in the order.'"  *Streeteasy, Inc. v. Chertok*, 752 F.3d 298, 305 (2d Cir. 2014).  "In such cases the district court 'necessarily ma[kes] compliance with the terms of the settlement agreement a part of its order so

that a breach of the agreement would be a violation of the order,' and the district court may therefore enforce the settlement as an exercise of its ancillary jurisdiction to 'manage its proceedings, vindicate its authority, and effectuate its decrees.'" *Id.*

This Court has the authority to enforce the Stipulation of Settlement as an exercise of its ancillary jurisdiction because the Court "So Ordered" the Stipulation, the Court's order of dismissal incorporated the terms of Stipulation, and the Stipulation expressly provides that the Court retains "jurisdiction over this matter for the purpose of enforcement of the terms of this Stipulation" during the "Effective Period."  ECF No. 67 ¶ 72; *Hendrickson v. United States*, 791 F.3d 354, 358 (2d Cir. 2015).  The "Effective Period" commenced on December 17, 2017, and continues in force for at least five years.  *See* ECF No. ¶ 72.

In addition, the Stipulation provides that "Plaintiffs' counsel may move this Court for an order enforcing the provisions of [the] Stipulation" where, as here, "Defendants' failures or omissions to comply with the provisions of [the] Stipulation . . . were sufficiently significant or recurring as to be systemic."  *See* ECF No. 67 ¶¶ 73, 77.

As described above in Section VI.B., Defendants' actions and inaction constitute a failure to comply with paragraphs 21, 22, 25, 27, 30, 34, and 41 of the Stipulation.  Defendants' ongoing conduct is affecting thousands of members of the Plaintiffs class, and thus is sufficiently significant and recurring as to be systemic.

Plaintiffs' pursuit of this action before the stipulated notice period does not preclude Plaintiffs' requested relief.  The Stipulation provides that if Plaintiffs' counsel believes Defendants failed to comply with the Stipulation, they shall notify Defendants in writing at least thirty days before a motion for enforcement.  *Id.* ¶ 76.  However, preliminary actions may be brought to a court "to preserve the status quo." *Benihana Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 894-

95 (2d Cir. 2015); *see also Roso-Lino Beverage Distributors, Inc. v. Coca-Cola Bottling Co. of N.Y.*, 749 F.2d 124 (2d Cir. 1984) ("The fact that a dispute is to be arbitrated, however, does not absolve the court of its obligation to consider the merits of a requested preliminary injunction."); *Blumenthal v. Merrill Lynch, Pierce, Fenner, & Smith, Inc.* 910 F.2d 1049, 1053-54 (2d Cir. 1990) (finding that "a rule permitting a district court to preserve the meaningfulness of the arbitration through a preliminary injunction" would best "ensure that the parties get what they bargained for"); *Erving v. Virginia Squires Basketball Club*, 349 F. Supp. 716 (E.D.N.Y. 1972), aff'd 468 F.2d 1064 (2d Cir. 1972) ("Courts are not limited in their equity powers to the specific function of enforcing arbitration agreements but may exercise those powers required to preserve the status quo of the subject matter in controversy pending the enforcement of the arbitration provision.").

Furthermore, strict adherence to a notice requirement in advance of a motion to enforce a settlement would effectively leave shelter residents no remedy – the moves will nearly be complete by the end of the 30 day notice period and the irreparable harm will be done.  Further, Defendants are not prejudiced by an expedited hearing in this matter as they have had "had actual knowledge of plaintiffs' complaints" in adequate time. *Duvall v. Hogan*, 2021 WL 2042295, at *8-9 (D. Md. May 21, 2021).  Plaintiffs' counsel sent a formal notice to Defendants on June 22, just five days after first learning of DHS's plans to begin moving individuals to congregate shelters.  *See* Torres-Lorenzotti Decl. ¶ 16, Ex. 12.  Plaintiffs' counsel met with DHS on April 30 to discuss DHS's proposal to submit a plan for return to congregate shelter, and counsel relayed concerns about the process.  *Id.*  On May 18, DHS submitted a revised plan to the State for approval, but DHS refused to allow Plaintiffs' counsel to review the plan.  *Id.*  Furthermore, in the week after Plaintiffs submitted its June 22 notice of DHS' breach of the Stipulation, DHS moved hundreds of density hotel shelter residents to congregate sites or other hotels.  To require Plaintiffs to wait until July

22 to file this action, by which time Defendants' plans to re-densify their congregate shelters will

be nearly complete, would ensure the very harm Plaintiffs seek to prevent.

Plaintiffs propose that the instant Motion for Enforcement of the Stipulation of Settlement

be adjudicated at the end of the thirty-day notice period, after the Court ensures the status quo is

maintained through the temporary restraining order and preliminary injunction.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should award the relief requested in Plaintiff's Order

to Show Cause.

Dated: July 8, 2021                                Respectfully Submitted,
New York, New York

*/s/Joshua Goldfein*
Judith Goldiner
Joshua Goldfein
Beth Hofmeister
THE LEGAL AID SOCIETY
199 Water Street
New York, NY 10038
Tel: (212) 577-3300
Fax: (212) 809-1574
Email: JGoldfein@legal-aid.org

Dawn L. Smalls
Jacob D. Alderdice
Andrew C. Elliott
JENNER & BLOCK LLP
919 Third Ave., 38th Floor
New York, NY 10022
Telephone:  212-891-1600
Email: dsmalls@jenner.com

Ali I. Alsarraf
JENNER & BLOCK LLP
353 N. Clark St., 44th Floor
Chicago, IL 60654

*Counsel for Plaintiffs*