15 CV 3783 (VEC)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SANDRA BUTLER et al.,

Plaintiffs,

-against-

CITY OF NEW YORK, THE NEW YORK CITY
DEPARTMENT OF HOMELESS SERVICES and
STEVEN BANKS, as Commissioner of the New York
City Department of Social Services,

Defendants.

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER, AND TO ENFORCE THE STIPULATION OF SETTLEMENT

*GEORGIA M. PESTANA*
*Acting Corporation Counsel of the City of New York*
*Attorney for Defendants*
*100 Church Street*
New York, N.Y. 10007

*Of Counsel:*
*Sharon Sprayregen, Carolyn Kruk*
*Tel:  (212) 356-*0873

# TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................. 1

STATEMENT OF FACTS ....................................................................................... 2

    A.   The City's Mandate to Shelter Homeless New Yorkers ................................. 2

    B.   The *Butler* Stipulation of Settlement and DHS's Reasonable Accommodation Process. 3

    C.   COVID -RAs and Recent Enhancements to the RA Process ........................... 6

    D.   DHS's Efforts to Reduce the Density of its Single Adult Shelter Population and Effective Multiprong Strategy for Minimizing the Effect of COVID-19 on the DHS Shelter System ................................................................................. 6

    E.   Denial of Plaintiff Coalition for the Homeless' State Court Motion for a Preliminary Injunction to Require Single Occupancy Hotel Rooms for Homeless Single Adults, Including Disabled Homeless Single Adults ................................. 7

    F.   New York City and The DHS Shelter System Currently have Low Numbers of COVID Cases and Low Positivity Rates ................................................... 7

    G.   DHS Prepares to Return to Congregate Shelter and New OTDA Guidance .................. 9

    H.   Clients Whose Shelter is Closing Receive Multiple Notices, and Those Scheduled to Return to Congregate are Given another Opportunity to Request an RA ..................... 10

    I.   DHS Interviews the Client and Reviews the Files of Each Client Scheduled to Move to Congregate Shelter, and Screens the Client Again after the Move has been Completed ................................................................................. 11

    J.   Recent Requests for Medical Documentation in Support of Requests for COVID-RAs in Accordance with DHS Policy ......................................................... 12

    K.   DHS Granted Single or Double Rooms to Almost All the Individuals Plaintiffs' Counsel and Other Organizations Brought to its Attention ................................. 12

ARGUMENT ................................................................................................. 13

  I.   THE MOTION FOR A TEMPORARY RESTRAINING ORDER SHOULD BE DENIED 13

    A.   Legal Standard ............................................................................... 13

    B.   Plaintiffs Are Not Likely To Succeed on the Merits ..................................... 13

    C.   Plaintiffs Will Not Suffer Irreparable Harm .............................................. 18

    D.   Granting the TRO is not in the public interest ............................................ 18

  II.  The Motion for the Enforcement of the Stipulation of Settlement Should be Denied Because Plaintiffs' Counsel Did Not Comply with the Enforcement Protocol in The Stiplulation of Settlement ................................................................... 19

CONCLUSION ............................................................................................... 20

## **PRELIMINARY STATEMENT**

As the COVID-19 pandemic hit New York City, the New York City Department of Homeless Services ("DHS") took extraordinary steps to radically transform its single adult congregate shelter system that has operated for nearly 40 years in accordance with the State court *Callahan* Consent Decree[1] to address the threat of the COVID virus.  These steps included reducing the density in congregate shelters by relocating approximately 10,000 single adults to more than 60 commercial hotels ("density hotels") in an eight-week period.

The current situation has dramatically different. On June 24, 2021, the Governor lifted the State of emergency; most businesses and schools are now allowed to be open in New York City; New York City and DHS have made significant progress in combatting the virus, including low positivity rates; and DHS's oversight agency, the New York State Office of Temporary and Disability Assistance, has removed almost all restrictions it had placed on the operation of congregate shelter.  Accordingly, DHS is returning single homeless adults to congregate settings—but, significantly, is providing reasonable accommodations (RAs) to clients with disabilities, including granting single or doble occupancy hotel rooms to clients' whose disabilities put them at an elevated risk of a poor outcome from COVID.

As of July 9, 2021, 3,685 of the almost 9,000 clients have been moved from hotels that closed to congregate shelter or other hotels, and approximately 800 clients–over one fifth of the clients' who have moved—have been granted provisional or approved reasonable accommodations and been placed in alternative non-congregate locations.  Plaintiffs' counsel

---

[1] *Callahan v. Carey*, "Final Judgment by Consent," Index No. 42582/79 (Sup. Ct., N.Y. County August 26, 1981).

and other organizations brought approximately 88 people to DHS's attention in declarations filed in support of Plaintiffs' motion, almost all of which were promptly addressed by assigning 71 of them to single or double rooms, and all but 2 of the remaining 17 either declined to submit documents (14 cases ) or withdrew their request (1).  Only two were denied accommodations, and DHS has agreed to look further into these cases. Based on these numbers alone, it is clear that DHS is identifying and addressing reasonable accommodation needs. Moreover, DHS is providing two notices to clients who are scheduled to move – one was sent to all clients in May, and the other is provided either 5 days or 48 hours in advance of the move, depending on whether the client is scheduled to move to a congregate setting or another hotel.  These notices are in addition to the posters and flyers that DHS has distributes in the normal course of operations advising clients about the opportunity to request RAs, and the fact that clients are asked about their RA needs at intake.  Additionally, prior to the transfers, not-for-profit and DHS shelter staff are directed to speak directly with clients scheduled to move to congregate shelter about their RA needs, as well as closely review their case files to assess whether the client's needs will be met.  As an additional precautions, staff also screen the clients who have recently moved back to congregate shelter.  Given the notices, screenings, and numerous accommodations brought to DHS's attention and granted, Plaintiffs' motion for a temporary restraining order should be denied—especially when the return to shelter is approximately half way complete and continued federal funding for the hotel program is uncertain at best. Additionally, Plaintiffs' motion for enforcement of the Stipulation of Settlement should be denied, as Plaintiffs have not complied with the Stipulation's required 30-day notice provision.

## **STATEMENT OF FACTS**

### **A.  The City's Mandate to Shelter Homeless New Yorkers**

2

In New York City, families and individuals experiencing homelessness have a right to shelter. That right is protected by State law, including a court order and consent decree.[2] Since the inception of DHS's shelter system and its development in compliance with the 1981 State court Callahan Consent Decree, congregate shelters for single adults have been the norm. Declaration of Molly Park, dated July 12, 2021 ("Park Decl.") ¶ 15.  For single adults, these shelters include shared dorm rooms, eating areas, bathrooms, and programming space. *Id.* ¶ 16[3] DHS' single adult system currently serves just over 16,600 individuals. *Id.* ¶ 15.

## B. The *Butler* Stipulation of Settlement and DHS's Reasonable Accommodation Process

Through the Court-approved Stipulation of Settlement (the "Stipulation") in this case, DHS entered into a settlement with a class of all individuals with a disability who reside in the DHS shelter system. ECF No. 67.[4]  The Stipulation, which was signed on May 15, 2017, resolved all claims alleging that the New York City Department of Homeless Services failed to reasonably accommodate current and future clients with disabilities in the provision of shelter.  *See id*.

No provision in the Settlement precludes the use of congregate shelter, nor does it require that DHS grant single rooms as reasonable accommodations.  Defendants are required to provide reasonable accommodations such that shelter clients have meaningful access to the shelter

---

[2] *Id.*  Provisions of the Consent Decree were held applicable to homeless women in *Eldredge v. Koch*, 118 Misc. 2d 163 (Sup. Ct., N.Y. County 1982), *aff'd*, 98 A.D.2d 675 (1st Dep't 1983).

[3] Before the pandemic, a minority of clients – largely those who were employed – were sheltered in largely double-occupied rooms in commercial hotels pre-COVID, and, in addition, some congregate shelters have a small number of single and double rooms for those who need Reasonable Accommodations.

[4] The class is defined as "[a]ll individuals with a disability within the meaning of the Americans with Disabilities Act, who presently reside in the DHS shelter system or . . . in the future will seek or receive shelter or shelter-related services in the DHS shelter system, whose disability may affect their ability to meaningfully access shelter or shelter-related services." Stipulation at ¶ 18.

program and services and determinations regarding accommodations must be individualized. Stipulation ¶¶ 21, 22.

On September 29, 2020, DHS implemented an updated reasonable accommodation ("RA") process titled "DHS PB-2020-012 Interim Reasonable Accommodation Request Process" (the "RA Procedure"), attached to the Park Declaration as Exhibit A, which codifies the provisions in the Stipulation, and provides a standard good faith interactive framework. Park Decl. ¶ ¶ 30, 32. Consistent with the Stipulation, the RA Procedure was published only after receiving comments from The Legal Aid and adopting many of their recommendations. *Id*. ¶31.  In accordance with Stipulation and the RA Procedure, all shelter clients are afforded an opportunity to request a RA, and each RA request is considered on an individualized basis. *Id*. ¶¶ 29, 33. DHS does not require clients to utilize specific words or complete any form to request an RA. *Id*. ¶34

Clients are advised of the process to apply for a reasonable accommodation on multiple occasions. *Id*. ¶ 33. Clients are asked about RA needs at intake and may request RAs at any point in their shelter stay from their case manager or shelter director. DHS posts posters and distributes flyers using plain language to inform clients of their right to request and receive RAs. *Id*.

When RA requests are based on underlying medical conditions that are obvious and apparent, DHS does not require documentation.  *See* Stipulation, ¶ 28; RA Procedure. Park Decl. ¶ 36. In contrast, when a client requests an RA based on a disability that is not obvious or apparent, or already known to DHS or not-for-profit shelter staff, consistent with the Stipulation, the RA Procedure directs staff to ask the client to provide any disability-related information, including any medical documentation, that supports the need for the requested RA.  *See* Stipulation, ¶ 28; RA Procedure; Park Decl. ¶ 37.

Even if facility staff determines that a client must submit disability-related information to DHS for review, facility staff are required to provisionally fulfill or offer the requested RA before a full review of their supporting documentation in any instance where (1) DHS expects a nontrivial amount of time to pass before rendering a final determination, and (2) facility staff determines that not providing the requested RA will likely cause the client serious harm.  RA Procedure. Park Decl. ¶ 38. Consistent with the policy agreed to with plaintiffs' counsel, clients are required to produce supporting documentation and must do so within 10 days, and if they do not their request is administratively denied. DHS will grant clients more time to produce documentation when they indicate a reason for being unable to meet the time frame such as being unable to see their doctor.  RA Procedure. Park Decl. ¶ 39.

In all cases, after making a preliminary determination of whether to provide the RA on a provisional basis, DHS staff submit the client's RA request and any disability-related information, including medical documentation, to DSS's Customized Assistance Services Unit's Office of Reasonable Accommodations ("CAS ORA")[5] which is responsible for reviewing the RA requests and any documentation submitted in support of the client's request. Park Decl. ¶ 40. CAS ORA uses their clinical expertise to make recommendations to DHS staff which DSH staff must implement unless DHS is incapable of providing the RA.  CAS ORA staff includes registered nurses and licensed social workers. CAS's executive staff includes a medical doctor, who provides expertise on complex cases. *Id*. ¶ 41.

The Stipulation also includes provisions for the resolution of any dispute that might arise where class counsel believes that the City failed to comply with the provisions of the

[5] In 2017, the City of New York integrated the New York City Human Resources Administration and Department of Homeless Services under the joint management structure of the New York City Department of Social Services.

Stipulation. *See* Stipulation ¶ 76 (setting forth requirements for notice and a requirement to meet and confer before filing any motion for enforcement).

### C.  COVID -RAs and Recent Enhancements to the RA Process

In addition to this established process, in December 2020, DHS issued Interim Guidelines (the "COVID Interim Guidelines") to specifically address the COVID emergency. *See* Park Decl. ¶42. These guidelines addressed individuals who had conditions identified by the Center for Disease Control as placing them at risk for a poor outcome if they contracted COVID-19. *See id.*. Using the guidelines, DHS and providers screened the single adult population to determine whether an individual should go into a single or double hotel room or a de-densified congregate shelter.  *See id*.

### D.  DHS's Efforts to Reduce the Density of its Single Adult Shelter Population and Effective Multiprong Strategy for Minimizing the Effect of COVID-19 on the DHS Shelter System

On March 7, 2020, the Governor of New York declared a state of emergency for the entire state to address the threat that COVID-19 poses to the health and welfare of New York residents. Park Decl. ¶ 20. In response to the pandemic, to allow for greater social distancing, over an 8-week period, DHS relocated approximately 10,000 shelter clients into more than 60 hotels. *Id.* ¶ 25.

In addition to density reduction, DHS has implemented many other measures to mitigate the transmission of the COVID-19 virus.  These measures include (i) designating isolation and quarantine sites for shelter clients who test positive for COVID-19 or show COVID-19 symptoms, respectively; (ii) proactive COVID-19 testing for clients at all single adult shelters; (iii) mandating testing for all individuals seeking to enter the DHS shelter system or,

alternatively, a  quarantine; and(iv) facilitating and encouraging clients to get vaccinated.  These measures are ongoing.

**E.  Denial of Plaintiff Coalition for the Homeless' State Court Motion for a Preliminary Injunction to Require Single Occupancy Hotel Rooms for Homeless Single Adults, Including Disabled Homeless Single Adults**

The Coalition for the Homeless along with six individually named petitioners represented by the Legal Aid Society brought a hybrid State court Article 78 and plenary action seeking a preliminary injunction requiring that DHS provide every homeless single adult with a private hotel room because of the COVID-19 emergency. *Fisher v. City of New York*, Index No: 452069-2020 (N.Y. Sup. Ct., Jan 25, 2021). In the alternative, the petitioners requested the same relief to all disabled homeless single adults, or those at a heightened risk of an adverse outcome from COVID-19. *Id*.

On January 25, 2021, the New York Supreme Court denied the petitioners' motion for a preliminary injunction.  NYSCEF Doc. No. 49. After evaluating DHS's multipronged approach, the court reasoned that the petitioners failed to offer "competent medical, or unrebutted statistical, evidence that 'congregate (i.e., group) shelter significantly, or even noticeably, raises the risk of contracting Covid-19." *Id*.  Notably, the Court declined to order DHS to provide single occupancy hotel rooms to disabled homeless adults.

**F.  New York City and The DHS Shelter System Currently have Low Numbers of COVID Cases and Low Positivity Rates**

Governor Cuomo lifted the state of emergency on June 24, 2021 due to New York's "dramatic progress against COVID-19" including declining hospitalization and positivity

rates and the success in vaccination rates. [6]  Most businesses and schools are now allowed to be open in New York City.[7]

The daily average of the percent of people who test positive in New York City was 1.15% on July 7 (7-day average). [8]  In contrast the City's positivity rate was much higher earlier in the pandemic; for example, it was 4.92% in early December,[9] reached a high of 9.76% in early January 2021,[10] and was 7% at the end of February 2021.[11]

Cases and deaths have also declined significantly from almost 7,000 confirmed and probable cases per day on January 6 to 232 confirmed and probable cases on July 6, 2021. Similarly, in the City deaths due to COVID have also significantly declined from over 50/day on January 6, 2021 to 4 on July 6, 2021.

**Confirmed and Probable Cases and Deaths in New York City by Month**

| | Confirmed and probable cases (7-day average)[12] | Confirmed and Deaths (7-day average) |
|---|---|---|
| January 6 | 6929 | 54 |
| February 6 | 4290 | 83 |
| March 6 | 3854 | 63 |
| April 6 | 3456 | 54 |
| May 7 | 1015 | 30 |
| June 6 | 240 | 9 |
| July 6 | 232 | 4 |

---

[6] https://www.governor.ny.gov/news/governor-cuomo-announces-new-york-ending-covid-19-state-disaster-emergency-june-24

[7] https://www1.nyc.gov/site/doh/covid/covid-19-businesses-and-facilities.page

[8] https://www1.nyc.gov/site/doh/covid/covid-19-goals.page#viz1607355501127 (last visited on July 11, 2021)

[9] *See* Fisher, Index No. 452069-2020, NYSCEF Doc. No. 32 (Respondents' Memorandum of Law in Opposition to Petitioners' Request for a Preliminary injunction) at 17 (citing  DOHMH, "Public Health Milestones", available at: https://www1.nyc.gov/site/doh/covid/covid-19-goals.page#viz1600178832899 , which was last visited Dec. 9, 2020, and is no longer available).

[10] *See COVID-19: Data,* "Trends: Molecular Testing Citywide and by Age," New York City Dep't of Health & Mental Hygiene, https://www1.nyc.gov/site/doh/covid/covid-19-data.page#test  (last visited March 30, 2021).

[11] *Id.*

[12] All data in the table is available at https://www1.nyc.gov/site/doh/covid/covid-19-data-trends.page (last visited July 11).

Cases and positivity rates in the DHS Shelter system are also remarkably low. As of July 10, 2021, the last date for which data is available, there were four positive cases of COVID-19 in the DHS single adult shelter system, of which one was detected by DHS's testing program at intake prior to shelter entry.  Park Decl. ¶ 75. The positivity rate for the most recently completed round of testing, which ended on June 25, was 0.06%. *Id.*

### G.  DHS Prepares to Return to Congregate Shelter and New OTDA Guidance

On May 19, 2021, DHS Administrator Joslyn Carter, sent a communication to all DHS providers apprising them that DHS was developing a plan for the return to congregate shelter.  *See* Park Decl. ¶ 46, Exhibit B ("May 19 Letter to Providers").   This letter specifically directed providers "to assess each of your clients to determine if they are appropriate to return to a congregate setting at this time, including whether they may need any reasonable accommodations as part of this process." *Id.*

Also on May 19, 2021, Administrator Carter also sent a letter to clients to prepare them for the return to congregate shelter from the temporary relocation hotels. Park Decl. ¶ 47, Exhibit C ("May 19 Letter to Clients"). This letter was shared in advance with counsel for Plaintiffs for review and comment, and DHS accepted most of their comments.  Park Decl. ¶48. Among other things, this letter specifically informs clients:

> If you have a disability or medical condition that you think we should keep in mind when making decisions about your shelter assignment, ask your case manager about applying for a reasonable accommodation (RA).

May 19 Letter to Clients.

On June 9, 2021, DSS Commissioner Steven Banks and DHS Administrator Joslyn Carter met with the DHS shelter providers to discuss preparations for a return to congregate shelter once State OTDA authorized DHS to do so.  Park Decl ¶ 49.

On June, 16, 2021, OTDA issued updated NYS OTDA guidance on the operations of congregate shelters. This guidance rescinded most restrictions on congregate shelters and indicated that jurisdictions no longer needed to submit a specific return to shelter plan. Park Decl ¶ 58, Exhibit D ("OTDA June Guidance").

On June 17, DHS shelter providers were informed that DHS would move forward with its return to shelter plan, and they were provided with a copy of the OTDA guidance.  Park Decl. ¶ 51.

**H.  Clients Whose Shelter is Closing Receive Multiple Notices, and Those Scheduled to Return to Congregate are Given another Opportunity to Request an RA**

In addition to the May 19  Letter from Administrator Carter to clients discussed above, clients whose temporary hotel used as shelter during the COIVD emergency will be closing receive a notice either five days or 48 hours in advance of the closing. Clients who are scheduled to return to congregate shelter receive a notice 5 days in advance of the move.  Park Decl ¶ 58, Exhibit F ("5-day Notice Letter"). This notice explicitly states that clients "can request a reasonable accommodation through [their] case manager," giving clients another chance to request an RA, and lists the shelter to which the client will be moving.  *Id*. Shelter Staff are directed to record delivery of these notices in a log. Park Decl ¶ 58.

Clients who are not returning to congregate shelters because they have a reasonable accommodation receive the 48-notice in accordance with DHS policy and OTDA regulations. Park Decl ¶ 59, Exhibit G ("48-Hour Notice Letter"). This notice is addressed to the client individually. Service of this notice is also recorded by shelter staff in a log. Park Decl ¶ 59. Consistent with well-established DHS policy and practice and OTDA regulations that only provide for post-transfer State fair hearings, this notice, like any other such transfer notice, does not specify

the location to which the client will be transferred because that location may not be known 48 hours in advance. *Id*. [13]

## I.   DHS Interviews the Client and Reviews the Files of Each Client Scheduled to Move to Congregate Shelter, and Screens the Client Again after the Move has been Completed

The week before a relocation is scheduled, the not-for-profit provider for the hotel receives two rosters of clients, one listing those with approved or provisional RAs and the other listing clients scheduled to move to congregate shelter.  Park Decl. ¶ 62.

Not-for-profit shelter staff are specifically directed to speak individually with each client scheduled to move to congregate shelter to determine what, if any, accommodation needs they have so they can be accommodated in the congregate shelter, or if necessary, so an alternate placement can be explored. Shelter staff are directed to make a case note in CARES, the DHS system of record, detailing the result of this discussion.  Park Decl. ¶ 63.

In addition, a DHS program administrator and the shelter director review the roster to ensure that each client's needs will be met. Park Decl. ¶ 64. The final review is a highly detailed analysis of all clients scheduled to move to congregate shelter. *Id*. For example, staff are directed to search for medical documentation, review CARES, and assess case notes. *Id*.

Finally, as an additional measure, in response to the concerns of plaintiffs' counsel, for clients who have already moved back to congregate shelter, case managers at those sites have been instructed to determine if the client has any obvious or apparent RA needs or

---

[13] Though DHS sent a June 17 letter discussing a return to congregate to all clients in density reduction hotels scheduled to move soon thereafter, including those with RAs who would not be returning to congregate shelter, DHS promptly issued a clarification telling clients with RA's to disregard the initial letter and that they would be receiving an official transfer notice (the "48-hour Notice Letter") prior to their move. Park Decl ¶¶ 52-53. DSS General Counsel Martha Calhoun also responded to class counsel's concerns and clarified the process going forward. *Id*. ¶54.

wishes to make an RA request. Case managers at congregate shelters where clients are scheduled to move will be similarly instructed. Park Decl. ¶ 65.

### J. Recent Requests for Medical Documentation in Support of Requests for COVID-RAs in Accordance with DHS Policy

During the peak of the COVID emergency, DHS providers screened clients using the interim COVID guidelines and, in the interest of making quick determinations during the pandemic, DHS did not require clients in density hotels to provide documentation supporting their RA requests for COVID related RAs. Park Decl. ¶ 67. Now, consistent with the protocol and standard documentation requests developed under the Stipulation, DHS is requesting documentation to support RA requests, as well as the provisionally granted requests pursuant to the interim COVID guidelines. *Id*. That is, pursuant to the RA Procedure, clients have 10 days to provide medical documentation in support of RA requests for conditions that are not obvious and apparent.  *See* RA Procedure, at p. 4. DHS has communicated to class counsel that extensions will be granted if the client requests an extension of time to gather the documentation.

### K. DHS Granted Single or Double Rooms to Almost All the Individuals Plaintiffs' Counsel and Other Organizations Brought to its Attention

In the context of DHS having granted over eight hundred (800) provisional or approved reasonable accommodations for non-congregate locations, the Declarations of Deborah Diamante, Helen Strom, and Gabriela Torres-Lorenzotti identified eighty-eight (88) DHS clients that DHS allegedly failed to accommodate.  Declaration of Conor Sheehan, dated July 12, 2021 ("Sheehan Decl."), ¶ 7. As of July 10, 2021, of these 88 individuals Plaintiffs' counsel and other organizations brought to DHS's attention, 71 of them were assigned to to single or double rooms, and all but 2 of the remaining 17 either declined to submit documents (14 cases ) or withdrew

their request (1).  Only two were denied accommodations, and DHS has agreed to look further

into these cases; however, one of these clients has since exited shelter. *Id*. ¶ 10.

**ARGUMENT**

### I.   THE MOTION FOR A TEMPORARY RESTRAINING ORDER SHOULD BE DENIED

#### A.  Legal Standard

"It is well established that in this Circuit the standard for an entry of a TRO is the

same as for a preliminary injunction." *E.g., Basank v. Decker*, 449 F. Supp. 3d 205, 210

(S.D.N.Y. Mar. 26, 2020).  Preliminary injunctive relief "is an extraordinary and drastic remedy,

one that should not be granted unless the movant, by a clear showing, carries the burden of

persuasion." *Moore v. Consol. Edison of N.Y., Inc.*, 409 F.3d 506, 510 (2d Cir. 2005). To satisfy

this burden, the moving party must show: "(1) irreparable harm; (2) either a likelihood of success

on the merits or both serious questions on the merits and a balance of hardships decidedly

favoring the moving party; and (3) that a preliminary injunction is in the public interest." *N. Am.

Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018).

Plaintiffs do not meet this high standard.

#### B.  Plaintiffs Are Not Likely To Succeed on the Merits

Plaintiffs allege that Defendants have failed to comply with paragraphs 21, 22, 25,

27, 30, 34, and 41 of the Stipulation. Pl. Mem. at 11, 27-30, 32.  As discussed below, that

allegation is, quite simply, not true, and Plaintiffs have failed to carry their burden of persuasion.

Most significantly, contrary to Plaintiffs' assertions, Defendants are providing

"Reasonable Accommodations (RAs) to people who need them" (Pl. Mem. at 11 citing ECF No.

67 ¶ 21), and are not discriminating "against people with disabilities in its shelter programs" (Pl.

Mem. at 11 citing ECF No. 67 ¶ 22).  As of July 9, 2021, 3,685 clients have been moved from

13

density hotels to congregate shelter or other hotels, and over 800 clients –over one fifth of clients who have moved —have been granted provisional or approved reasonable accommodations and been placed in alternative locations.  Plaintiffs' counsel and other organizations brought approximately 88 people to DHS's attention almost all of which were promptly addressed by granting single or double rooms to 71 clients; all but two of the remaining 17 either declined to submit documents (14 cases ) or withdrew their request (1 case), and DHS has agreed to look into these two cases further . Neither the antidiscrimination laws, nor the Stipulation require Defendants to provide "a perfect accommodation or the very accommodation most strongly preferred." *Noll v. IBM*, 787 F.3d 89, 95 (2d Cir. 2015); *see also McElwee v. Cnty. of Orange*, 700 F.3d 635, 641 (2d Cir. 2012) ("Although a[n] entity must make reasonable accommodations, it does not have to provide a disabled individual with every accommodation he requests or the accommodation of his choice.") (internal quotation marks omitted).  The numbers alone demonstrate that DHS is identifying and addressing Plaintiffs' reasonable accommodation needs.

Plaintiffs have also failed to carry their burden of persuasion on their more specific allegations. First, Plaintiffs allege that Defendants have "failed to screen for RAs" in violation of ECF No. 67 ¶ 21. Pl. Mem. at 27.  However, shelter providers screen clients both before they are scheduled to move to congregate shelters and again after the move has occurred. *See, supra*, Facts (I). Administrator Carter's May 19 letter directed to not-for-profit shelter providers to assess each client to determine whether it was appropriate they return to congregate shelter, including whether assessing whether each client might need an RA.  *See, supra*, Facts (G). Before the scheduled moves, not-for-profit providers receive a list of each client scheduled to move to congregate shelter, and staff are directed to speak with each of these clients and closely review each client's file, including assessing case notes and medical records.  *See, supra*,

Facts (I). After the moves, as an additional precaution, case managers at are instructed to determine if the client has any obvious or apparent RA needs or wishes to make an RA request. *Id*.

Second, Plaintiffs allege that Defendants "did not inform residents about how to apply for an RA and did not give them any opportunity to submit an RA request," and "failed to inform clients that it was possible to seek an RA for a condition that was not considered in the Interim Guidelines, such as a physical disability." Pl. Mem. at 27. However, DHS posts posters and distributes flyers informing clients using plain language of their right to request and receive RAs, and clients are also notified of the opportunity to apply for RAs at intake and through meetings with their caseworkers. *See, supra*, Facts (B); Park Decl. ¶66. Additionally, Administrator Carter's May 19 letter to clients stated, "If you have a disability or medical condition that you think we should keep in mind when making decisions about your shelter assignment, ask your case manager about applying for a reasonable accommodation (RA)." *See, supra*, Facts (G); May 19 Letter to Clients. This notice was not limited to medical conditions that put clients at a risk of a poor outcome from COVID. Further, clients who are scheduled to return to congregate shelter receive a notice 5 days in advance of the move that explicitly states, "You can request a reasonable accommodation through your case manager." *See, supra*, Facts (H); 5-Day Notice Letter. Finally—and significantly—the fact that over 700 clients who were not brought to DHS's attention by organizations requested RAs demonstrates that clients are informed and able to request RAs. Sheehan Decl. ¶¶ 7, 10.

Third, Plaintiffs allege that Defendants "failed to individually interview clients" Pl. Mem. at 27. The Stipulation does not require an individual interview prior to closing a density shelter – it requires individual <u>assessments</u> of RAs, which DHS conducts. *See, supra*,

Facts (I). Nonetheless, not-for-profit shelter staff are directed to speak with each client scheduled to move to congregate shelter, and go through their case files to ensure the clients' needs will me met.  *Id*. Additionally, clients  should meet with their case managers at least once every two weeks, if not more frequently, and have the ability to speak to program staff every day; thus, they have the opportunity for an individual interview, should they desire one. *See* Park Decl ¶ 66. Finally, the fact that DHS is provisionally granting almost all RA requests mitigates any need for an individual interview prior to the closing of the density shelter.

   Fourth, Plaintiffs allege that "Defendants' failure to assess RA requests where clients were unable to provide extensive documentation. . . violates Paragraph 25 of the Stipulation, which provides that the RA process does not require the applicant to use any particular format or language. . . [and] also runs contrary to Paragraph 30 of the Stipulation, which states that '[i]n most cases, detailed medical records or extensive disability-related information is not necessary' for DHS's RA determination inquiry." DHS is not violating these provisions, as it is not requiring any particular "format or language," and is only requiring medical documentation for conditions that are not obvious and apparent.

   Indeed, when medical conditions are not obvious and apparent the relevant provision of the Stipulation is Paragraph 28, entitled "Disability-Related Information"—a paragraph not cited by Plaintiffs.  That provision states that "DHS will require disability-related information from Class Members requesting an RA only where such information is needed to verify that the Class Member has a disability and/or that the accommodation sought is reasonably related to that disability." In fact, most conditions listed in COVID Interim Guidelines, such asthma, or hypertension, are not "obvious and apparent," and require medical information to

verify that the Class Member in fact has the condition.  Accordingly, any request for medical information does not violate the Stipulation.

During the peak of the COVID emergency, DHS did not require clients in density hotels to provide documentation supporting their requests for RAs pursuant to the COVID Interim Guidelines. *See, supra*, Facts (J). This lack of request for documentation was a deviation from the RA Procedure to the clients' benefit during the difficult months of the epidemic.  *Id*. Pursuant to the RA Procedure—which codifies the Stipulation and included class counsel's input—clients have 10 days to provide medical documentation in support of RA requests for conditions that are not obvious and apparent.  *See* RA Procedure, at p. 4.  Now, consistent with this protocol, DHS is requesting documentation to support RA requests, as well as the provisionally granted requests pursuant to the interim COVID guideline.  *See, supra*, Facts (J). DHS has communicated to class counsel that extensions will be granted if the client requests an extension of time to gather the documentation.  *Id*.

Fifth, Defendants are not in violation of paragraph 34, which requires that DHS "provisionally grant RA requests where . . . the denial of the RA is reasonably likely to cause serious harm to a Class Member with a disability . . . ." Pl. Mem. at 28. DHS had granted over 800 RAs or  provisional RAs out of the 3,685 who have been moved, and has declined only two of the requests of the 88 individuals Plaintiffs' counsel and other organizations brought to its attention for reasons other than failure to submit documentation.

Sixth, Defendants are not in violation of Paragraph 41, which requires two weeks' notice before terminating the provision of an RA because DHS is not at this time terminating COVID-related RAs that have been granted.  Most of the disputed cases concern provisionally granted RAs. If clients have neither provided the documentation that is required pursuant to the

Stipulation, nor requested an extension of time to provide that documentation, the RA expires, but the Declaration of Conor Sheehan makes clear how generous DHS has been in this regard. Sheehan Decl. ¶ 10.

### C.  Plaintiffs Will Not Suffer Irreparable Harm

Defendants have now moved almost half of the clients out of density hotels – 3,685 of the almost 9,000 clients have been moved from hotels that closed to congregate shelter or other hotels.  Class counsel have been aware of the these moves from the outset.  Had there been a true risk of irreparable harm, counsel should have brought this action well before the half way point of the return plan.

Moreover due to the measures that DHS has taken—(1) the numerous notices, including the two notices clients received alerting them to the move and ability to request RAs, the opportunity to meet with case managers and request RAs, and posters notifying clients about the opportunity to request RAs; (2) the provider screens both before and after transfers; and (3) the granting of almost all RA requests—Plaintiffs will not suffer irreparable harm.

### D.  Granting the TRO is not in the public interest

Plaintiffs claim a TRO is in the public interest because it would "prevent []unlawful and unconstitutional conduct"—however, Defendants have not engaged in any unlawful or unconstitutional conduct.  As an initial matter Plaintiffs have not even alleged any unconstitutional conduct: in support of their argument, they are likely to succeed on the merits Plaintiffs focus exclusively on the alleged breaches of the Stipulation.  *See* Pl. Mem. at 27-30. Moreover, as discussed, Defendants are not in violation of the Stipulation.  *See, supra,* Point I.B.

Plaintiffs further argue that there is no harm to the City because the Federal Emergency Management Administration (FEMA) will likely continue cover the cost of housing

homeless single adults in hotel rooms, is wrong, as FEMA reimbursement is far from assured.

Once the Governor lifted the state of emergency on June 21, 2021, FEMA has made it clear that

they expect the City to expeditiously wind down the hotel program. *See* Declaration of

Christopher Blanco, dated July 12, 2021 ("Blanco Decl") ¶¶ 6,7. Continuing to operate the hotel

program in the absence of FEMA reimbursement would place a significant fiscal burden on the

City. The total cost to the City for maintaining these de-density sites once there is no federal

support for 9,000 individuals is approximately $43 million per month. Park Decl. ¶ 8.

Give the lack of unlawful or unconstitutional conduct, and the significant likely

impact upon the City, granting the TRO is not in the public interest.

## II.   THE MOTION FOR THE ENFORCEMENT OF THE STIPULATION OF SETTLEMENT SHOULD BE DENIED BECAUSE PLAINTIFFS' COUNSEL DID NOT COMPLY WITH THE ENFORCEMENT PROTOCOL IN THE STIPLUATION OF SETTLEMENT

The Stipulation explicitly sets forth a process for a motion to enforce the

Stipulation:

> Plaintiffs' counsel shall notify Defendants' counsel in writing of the nature and specifics of the alleged failure to comply and shall specify the basis for such belief, including but not limited to any monitoring reports upon which such a belief is based. Such written notice shall be provided at least thirty (30) days before any motion is made for enforcement of this Stipulation. Unless otherwise resolved, the Parties' counsel shall meet within this thirty-day period following notice to Defendants' counsel in an attempt to arrive at a resolution of the alleged failure to comply.

Stipulation ¶ 76.

Here, while counsel have had numerous discussions regarding the process of

moving clients from the temporary density reduction hotels to either congregate shelter or

alternative hotels, class counsel have not notified Defendants' counsel "in writing of the nature

and specifics of the alleged failure to comply and shall specify the basis for such belief."  Indeed,

19

Plaintiffs admit they have not complied with the notice provision, and simply argue that this provision should be ignored.  *See* Pl. Mem. at 32-33. Plaintiffs' motion to enforce the Stipulation must fail.

Moreover, while DHS is not perfect, it has made heroic efforts to notify and screen clients in advance of moves and has granted RA requests to almost one fifth of the clients who have moved.  This includes almost every request the organizations have bright to DHS's attention, as well as over 700 requests that clients—based on the numerous notices and screens have—requested on their own.  Accordingly, Defendants "failures or omissions" of compliance were not "sufficiently significant or recurring as to be systemic." Stipulation ¶ 73.

## CONCLUSION

For the foregoing reasons, the Court should deny all the relief requested in Plaintiffs' Order to Show Cause.

Dated:      New York, New York
           July 12, 2021

                    **GEORGIA M. PESTANA**
                    Acting Corporation Counsel of the City of New York
                    Attorney for Defendants
                    New York, NY  10007
                    t: (212) 356-0873
                    e: ssprayre@law.nyc.gov

            By:     s/ _____
                    Sharon Sprayregen
                    Carolyn Kruk
                    *Assistant Corporation Counsel*