UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

SANDRA BUTLER; RICKY GIBSON;
O'BRIEN MORRIS; RICHARD EMMETT;
ROSELLE DIAZ; KEVIN FAISON;
SHANIQUA JACKSON; CENTER FOR
INDEPENDENCE OF THE DISABLED, NEW         Case No. 15-CV-3783
YORK AND COALITION FOR THE
HOMELESS,

                              Plaintiffs,

          for themselves and on behalf of all others
                            similarly situated


                          - against -

CITY OF NEW YORK, THE NEW YORK
CITY DEPARTMENT OF HOMELESS
SERVICES and STEVEN BANKS, as
Commissioner of the New York City Department of
Homeless Services,

                        Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR EMERGENCY MOTION TO AMEND THE PRELIMINARY INJUNCTION

                    THE LEGAL AID SOCIETY
                    199 Water Street
                    New York, NY 10038
                    Tel: (212) 577-3300
                    Fax: (212) 809-1574

                    JENNER & BLOCK LLP
                    919 Third Ave.
                    New York, NY 10022
                    Tel:  (212) 891-1600

                    *Counsel for Plaintiffs*

## <u>TABLE OF CONTENTS</u>

**TABLE OF AUTHORITIES** ................................................................................................ ii

**PRELIMINARY STATEMENT** ........................................................................................... 1

**BACKGROUND** ....................................................................................................................... 4

I.      DEFENDANTS' INITIAL RUSHED MOVES BACK TO CONGREGATE SHELTER RESULTED IN VIOLATIONS OF THE STIPULATION OF SETTLEMENT. ............... 4

II.     THE COURT ENTERED A TEMPORARY RESTRAINING ORDER TO PREVENT FURTHER VIOLATIONS. ....................................................................................... 5

III.    DEFENDANTS HAVE VIOLATED THE PRELIMINARY INJUNCTION AND CONTINUE TO VIOLATE THE STIPULATION OF SETTLEMENT. .......................... 8

IV.    FOLLOWING AN EMERGENCY CONFERENCE, DEFENDANTS CONTINUED MOVING RESIDENTS IN VIOLATION OF THEIR OBLIGATIONS AND CONTRARY TO THEIR REPRESENTATIONS TO THE COURT ............................. 11

**ARGUMENT** ........................................................................................................................ 14

**A MODIFICATION OF THE PRELIMINARY INJUNCTION IS REQUIRED TO PREVENT DEFENDANTS' RECURRING VIOLATIONS.** ...................................... 14

**CONCLUSION** ..................................................................................................................... 18

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*A.V. by Versace, Inc. v. Gianni Versace, S.p.A.*,
   2002 WL 2012618 (S.D.N.Y. Sept. 3, 2002) ..................................................14, 18

*Advanced Access Content Sys. Licensing Adm'r, LLC v. Shen*,
   2015 WL 13840969 (S.D.N.Y. Mar. 16, 2015) ............................................14, 16

*Sierra Club v. U.S. Army Corps of Engineers*,
   732 F.2d 253 (2d Cir. 1984)......................................................................14

**Other Authorities**

Andy Newman, *New York Moves Homeless People form Hotels to Shelters as
   Virus Cases Rise,* N.Y. Times (July 26, 2021) ..................................................2, 10

Chris Sommerfeldt, *NYC Mayor de Blasio's ex-health czar says he'd put 'entire
   city' risk of COVID by booting homeless from hotels*, N.Y. Daily News (Jul.
   26, 2021) https://www.nydailynews.com/news/politics/new-york-elections-
   government/ny-de-blasio-ex-health-commissioner-dangerous-plan-homeless-
   hotels-20210726-ajitlcuzobednbrfoobt6p2ocy-story.html......................................17

Josephine Stratman and Leonard Greene, *Homeless, advocates decry move from
   Upper West Side hotel to Queens hotel with broken elevator*, N.Y. Daily News
   (Aug. 2, 2021), https://www.nydailynews.com/new-york/ny-homeless-hotels-
   shelter-20210803-q5tijniiqzdnzg7sx5txqgrfju-story.html ......................................13

*Judge pauses transfer of disabled homeless New Yorkers from hotels to shelters*,
   Eyewitness News ABC (Jul. 13, 2021) https://abc7ny.com/hotel-homeless-
   shelter-disabled-residents/10885512/ ..................................................................8

Fed. R. Civ. P. Rule 65 ..................................................................................1

Plaintiffs' counsel respectfully submits this memorandum of law in support of their emergency motion, under Fed. R. Civ. P. Rule 65, to amend the existing preliminary injunction against Defendants City of New York, the New York City Department of Homeless Services ("DHS"), and the Commissioner of DHS.

## PRELIMINARY STATEMENT

When Plaintiffs sought and obtained relief from this Court weeks ago, they presented the chaotic and systemically flawed process unfolding as Defendants rushed Class Members out of their density hotel placements into congregate shelters, without adequate notice and the individualized assessment required by the Stipulation of Settlement.  This Court recognized that the psychological, emotional, and physical harms Class Members faced as a result of these rushed moves were irreparable, and held that Plaintiffs had raised serious questions regarding Defendants' compliance with the Stipulation based on Plaintiffs' unrebutted evidence of widespread violations across several move dates and locations.  Accordingly, the Court reiterated the existing terms of the Stipulation and entered an order barring Defendants from moving any Class Member involuntarily unless the following two conditions are met: Defendants must (1) provide adequate notice seven days in advance of any moves; and (2) schedule a meeting with every Class Member at least five days prior to each move, with an agreed-upon script used to help ensure individualized assessment.  Plaintiffs notified Defendants of ongoing violations and identified sites where there were problems in implementation of the Stipulation's requirements. There was a hope that these conversations would be sufficient to resolve the issues identified without appealing to the Court again, and the parties jointly requested that this Court convert the Order to a preliminary injunction, which remains in force.

However, once Defendants resumed moving Class Members from density hotels to congregate shelters on Monday, July 26, 2021, Defendants demonstrated again their inability to

conduct the moves in compliance with the Stipulation and the Court's Order, rushing the moves and transferring Class Members at a pace at which they cannot ensure that the requirements of the Stipulation and the provisions of this Court's Order are met.  As detailed in declarations submitted with this motion, Defendants' rushed moves have resulted in numerous violations of the Preliminary Injunction and the Stipulation—leading to the same harms originally presented to and already recognized by this Court:

- MM, having not been provided a meeting five days prior to her scheduled move, was informed that she would be moved to a facility that did not have outlets where she could plug in her medical equipment (including an oxygen tank) overnight.

- SL, who has asthma, seizures, heart problems, PTSD, anxiety, depression, chest pains, and a sleeping disorder, never received a transfer notice nor an appointment slip to meet with a caseworker.

- LST, who uses an electric scooter and manages a respiratory illness with two different breathing machines, was moved on July 26 to another hotel whose accessible entrance was roped off, leaving her outside for an hour until someone came to open the door for her.  She was ultimately assigned a room that does not have an ADA-compliant bathroom, nor does it have a refrigerator where she can store her medications.

- CB, who has claustrophobia, depression, schizophrenia, and a blood condition requiring transfusions, was moved to a congregate shelter without having had a five-day meeting.

These violations of the Court's order that Defendants provide adequate seven-day notice and individualized five-day meetings are not isolated instances.[1]  They demonstrate that Defendants do not have the capacity to both rush through these move-outs *and* comply with the Preliminary Injunction and Stipulation.

On Friday, July 30, 2021, following days of Plaintiffs informing Defendants of the ongoing violations of the Stipulation and the Preliminary Injunction, Defendants agreed to pause the moves scheduled for Monday, August 2.  However, Plaintiffs then learned that Defendants still planned

---

[1] *See also* Andy Newman, *New York Moves Homeless People form Hotels to Shelters as Virus Cases Rise,* N.Y. Times (July 26, 2021) (describing individuals being moved without notice).

to move hundreds of clients over the following weekend, and raised with the Court that Plaintiffs planned to seek relief to halt the moves planned for the weekend.  At a hearing before the Court on the evening of Friday, July 30, Defendants made numerous representations to the Court and Plaintiffs about the moves it would make over the weekend – a number of which proved inaccurate:

- Many residents were moved to sites that could not accommodate their needs.

- Several individuals with physical disabilities were moved to a site where the elevator was not functioning, necessitating a second move.

- Some residents were sent to a site that did not have refrigerators, so residents who had certain dietary needs that were not met by the facility could not bring appropriate food. Others were brought to facilities that failed to accommodate their geographic needs, due to domestic violence situations or access to medical providers, in direct contradiction to the representations Defendants made to the Court.

After agreeing to pause moves on August 2 and 3, Defendants have told Plaintiffs they will now resume moves on Wednesday, August 4, without ensuring they have the appropriate safeguards in place to ensure that the ongoing violations of the Order and the Stipulation do not yet again occur with this latest round of moves.

Pursuant to well-established case law, where, as here, a defendant persists in violating a preliminary injunction, a modification of the injunction is appropriate.  Plaintiffs do not dispute Defendants' right to phase down the density hotel program.  However, Defendants cannot do so at the previous or current pace or until they increase their capacity so that they can meet with Class Members and provide the required notice.  Accordingly, Plaintiffs request that the Court immediately amend the Preliminary Injunction to halt all involuntary moves of Class Members out of density hotels until Defendants can establish and present to the Court a credible staffing and training plan and schedule that ensures that any future moves will be conducted in compliance with the Preliminary Injunction's and the Stipulation's requirements.

## BACKGROUND

I.   **DEFENDANTS' INITIAL RUSHED MOVES BACK TO CONGREGATE SHELTER RESULTED IN VIOLATIONS OF THE STIPULATION OF SETTLEMENT.**

As detailed in Plaintiffs' papers submitted in support of their motion for a temporary restraining order, Defendants' initial plan for phasing down the density hotel program indicated that the moves back to shelter may begin in August, and that after each set of moves, DHS would pause, evaluate the process, and make any necessary adjustments before the next set of moves. Second Declaration of Gabriela Torres-Lorenzotti, ECF No. 92 ¶¶ 7–9.  In April and May 2021, Plaintiffs urged a deliberate process in which all clients could be properly notified and assessed individually as to their needs before moving back to congregate shelter or a different appropriate placement.  *Id.* ¶¶ 10–12.  Yet in mid-June 2021, Mayor de Blasio began stating publicly that DHS would promptly return all residents to shelters, and the moves—and ensuing chaos and violations of the Stipulation—began soon after, not ceasing until Defendants agreed to pause the moves following Plaintiffs' motion for a TRO and preliminary injunction.  *Id.* ¶¶ 13–18.

On July 8, 2021, Plaintiffs filed a combined motion for a temporary restraining order, preliminary injunction, and for enforcement of the Stipulation.  *See* ECF No. 74.  In Plaintiffs' memoranda of law and in six declarations submitted with that motion, Plaintiffs described over one hundred separate examples of violations of the Stipulation that had occurred due to Defendants' rushed moves of Class Members back to congregate shelter.  *See, e.g.*, ECF No. 76 at 13–20 (summarizing examples and citing declarations); ECF No. 90 at 5-8 (same as to additional reply declarations). These violations included, among other examples, Class Members moved without prior notice, moved to locations without a place for them to sleep, being told that no accommodations were being granted for individuals with mental health disabilities, and inadequate placements made without individualized assessment—such as individuals in wheelchairs

transferred to locations without accessible bathrooms.  ECF No. 76 at 14.  These many examples presented by Plaintiffs—which were only representative examples, limited by the capacity of Plaintiffs and their non-profit partners to conduct intake and assessment of all of the calls for assistance they were receive—went largely unrebutted by Defendants.

## II.        THE COURT ENTERED A TEMPORARY RESTRAINING ORDER TO PREVENT FURTHER VIOLATIONS.

On July 13, 2021, the Honorable Gregory Woods, acting as Part I Judge, held a hearing on Plaintiffs' motion for a temporary restraining order and granted Plaintiffs' motion at the end of the hearing.

Judge Woods held that Plaintiffs "succeeded in showing irreparable harm" to Plaintiffs' physical and mental health would occur absent injunctive relief.  Hr'g Tr. 47:12-15.  According to Judge Woods, Plaintiffs established that "[t]ransfers to settings that would exacerbate existing health conditions gives rise to the kind of risk of harm that the [Second] Circuit has described as irreparable," resulting in his finding that "plaintiffs have adequately shown that class members are at risk of suffering irreparable harm if defendants transfer them without following the procedures in the stipulation."  *Id.* at 49:3-10.

Judge Woods further held that Plaintiffs raised serious questions as to whether Defendants have complied with three provisions of the Stipulation, which require Defendants to provide reasonable accommodations, to not discriminate against class members, and to conduct an interactive and individualized reasonable accommodation process.  *Id.* at 53-55.

In particular, Judge Woods found that he was "persuaded by the dozens of examples in plaintiffs' materials that there are serious questions as to whether DHS is providing reasonable accommodations in the manner required by the stipulation."  *Id.* at 53:23-54:1.  In finding that Plaintiffs raised serious questions as to Defendants' violation of Stipulation, Judge Woods also

noted "several examples of class members who were told that no reasonable accommodations would be provided to address mental health issues, even when such class members provided medical documentation that such conditions would worsen in congregate settings," and "many examples where it appears class members were not individually assessed." *Id.* at 54:11-20, 55:2-3.

In addition, Judge Woods found that Plaintiffs met their burden of raising substantial questions as to whether Defendants' violations were "sufficiently significant or recurring as to be systemic," as required for Plaintiffs to bring the motion to enforce the stipulation. *Id.* at 56:18-23, 58:5-8. To support this finding, Judge Woods noted Plaintiffs' "examples of alleged violations involving DHS clients at more than 20 de-densification hotels, showing that the problems are not isolated to one or two particular locations." *Id.* at 57:22-58:1. Judge Woods also noted the evidence that DHS case managers "had inaccurate or incomplete information about the reasonable accommodation process," *id.* at 58:9-14, and found that "[t]he imperfect information ascribed to case managers at two separate facilities supports the conclusion that the issues raised by plaintiffs are systemic, not isolated," *id.* at 59:10-12. Moreover, Judge Woods found that Plaintiffs raised "serious questions" as to whether Defendants' procedures for moving class members were "being adhered to systematically." *Id.* at 60:1-3.

Finally, Judge Woods found that the balance of hardships and equities "tip decidedly in Plaintiffs' favor," given that Defendants "will still be able to accomplish their stated objective, just in a manner that avoids the irreparable harm to class members," *id.* at 61:14-17, 61:24-62:1, and that "injunctive relief is in the public interest," *id.* at 63:14-15. According to Judge Woods, "[t]he public has an interest in ensuring that the rights of disabled homeless persons, who may be among

the most vulnerable in our society, are protected," as well as an interest in seeing Defendants oblige

by their contractual obligations arising from the Stipulation.  *Id.* at 63:15-21.

Based on the above findings, Judge Woods granted injunctive relief, which he then

confirmed in a written order on July 14, 2021, ECF No. 94.  Specifically, Judge Woods enjoined

Defendants "from involuntarily moving any Class Member from a De-densification hotel unless

the following requirements are satisfied:

> a. Defendants shall have provided written notice to each Class Member—regardless of whether they are to be transferred to congregate shelters or to another hotel—consistent with the form notice agreed upon by the parties regarding the proposed move no later than seven (7) days prior to the proposed move; and
>
> b. Defendants shall have scheduled an individual meeting with each Class Member to take place no later than five (5) days prior to the proposed move. At each such meeting, a representative of Defendants must inform the client regarding the Reasonable Accommodation process and must be prepared to discuss Defendants' assessment of any Reasonable Accommodation request made by the client.

ECF No. 94 at 2.

Judge Woods also directed Defendants "to provide a script for its case managers to use"

during the individual meetings, and stated that a client's failure to attend a scheduled meeting

would "not limit the ability of Defendants to relocate that client" to another facility.  *Id*.  Judge

Woods emphasized that the relief in the temporary restraining order was "incremental to the

obligations of Defendants under the Stipulation of Settlement."  *Id*.

On July 21, 2021, this Court entered a Stipulation and Order converting the temporary

restraining order entered by Judge Woods into a preliminary injunction, to remain in effect until

at least August 20, 2021.  ECF No. 97 at 1.  This Court "maintain[ed] jurisdiction in this matter

should further judicial intervention be required."  *Id.* at 2.

**III.      DEFENDANTS HAVE VIOLATED THE PRELIMINARY INJUNCTION AND CONTINUE TO VIOLATE THE STIPULATION OF SETTLEMENT.**

Immediately following this Court's order on July 13, 2021, a representative for Defendant DHS stated that it would make only "minor adjustments to our process," and that the moves would resume the following week.[2] Further, the day after the Temporary Restraining Order was issued, Mayor Bill de Blasio told reporters "[t]he movement out of the hotels back to the shelters will continue," and that implementing the processes to ensure each class member is provided opportunity to receive legally required accommodations would "add about a week to what we're doing, no more than that."[3]   In fact, Defendants resumed moves of individuals out of de-densification hotels on July 26.  Residents were woken up at 3 a.m. that morning, and told to be ready to move by 4:30 a.m.  *See* Third Declaration of Deborah Diamant ("Diamant Decl.") ¶¶ 5-6.  With its resolve to complete all moves by August 20 unabated, Defendants moved many individuals who had not met with a case manager to discuss receiving a reasonable accommodation, and in some cases without the required seven day notice.

Numerous individuals who have been moved, or who have moves scheduled imminently, have not had the opportunity to meet with a case worker at least five days prior to the scheduled move.  Class member MM had no meeting with a case manager before her scheduled move on July 26.  Third Declaration of Helen Strom ("Strom Decl.") ¶ 5.  After questioning from the Urban Justice Center Safety Net Project ("UJC SNP"), DHS claimed that it sent notice of a meeting on

---

[2] *Judge pauses transfer of disabled homeless New Yorkers from hotels to shelters*, Eyewitness News ABC (Jul. 13, 2021) https://abc7ny.com/hotel-homeless-shelter-disabled-residents/10885512/.

[3] Transcript: Mayor De Blasio Holds Media Availability, The City of New York Office of the Mayor Press Office (July 14, 2021).  *See also* Transcript: Mayor De Blasio Appears Live on the Brian Lehrer Show, The City of New York Office of the Mayor Press Office (July 16, 2021) ("It's much better to get people to the shelters that are built to support them and provide services on that way to affordable housing than to keep people in hotels when the key issue is really getting everyone vaccinated and we're going to be doing that constantly in the shelters.").

July 22 – though this was only four days before the move.  *Id.*  MM, who uses an oxygen tank that must be replaced every two days at a facility in the Bronx, was told she had to move to a facility in Queens or, alternatively, at a Brooklyn facility where she would be unable to plug in her medical equipment, including an oxygen tank.  *Id.* ¶ 6; *see also id.* ¶ 13 (client CB did not have a five-day meeting before being moved on July 26); *id.* ¶ 16(a) (client HB did not have a five-day meeting before being told she would be moved, with a pending RA); ¶ 16(b) (client SL scheduled to move without having had a five-day meeting).

Shelter resident ND reported at the time and location of her scheduled meeting with a case worker on July 21, which she received notice for earlier that same day, but when she arrived there were no shelter staff, and numerous other residents waiting to speak with a case worker.  Third Declaration of Gabriela Torres-Lorenzotti ("Torres-Lorenzotti Decl.") ¶ 7c.  ND waited, but ultimately had to leave so she could report to work.  *Id.*  She was ultimately told she would have to move to a facility in a borough that is not safe for her due to a history of domestic violence; the move was only halted after Legal Aid raised concerns numerous times.  *Id.*  Another resident, KM, received notice of her meeting at 10 p.m. on July 22—but the meeting had been scheduled for noon, earlier that same day.  *Id.* ¶ 6e.  Though she tried to meet with shelter staff subsequent to receiving the notice, nobody had agreed to meet with her until July 28, the day of her scheduled move.  *Id.*  She was ultimately moved to a congregate facility, then told her RA request was approved the following day and transported back to the hotel on July 29, and when that hotel was closed was moved to a third hotel on August 2.  *Id.*

Several other residents have similarly indicated that they never received notice of a meeting with a case worker to discuss a reasonable accommodation, and as such they have not been provided appropriate housing with required accommodations ahead of a scheduled move.  *See,*

9

*e.g.*, Strom Decl. ¶ 11-15 (CB); Strom Decl. ¶ 17 (DL); Andy Newman, *New York Moves Homeless People form Hotels to Shelters as Virus Cases Rise,* N.Y. Times (July 26, 2021) (Resident Dianne Marks telling a reporter that she was never informed of her right to apply for an RA and only learned of it by overhearing residents talking in the elevator).

Other residents have indicated they did not receive the required seven days' notice prior to a move.  Class member SL, who has asthma, seizures, heart problems, PTSD, anxiety, depression, chest pains, and a sleeping disorder, said she never received a transfer notice nor an appointment slip to meet with a caseworker.  Strom Decl. ¶ 16b.  SL was scheduled for a transfer on July 26, and told UJC SNP staff she had not met with a case worker in five months.  *Id.*  After UJC SNP intervention, DHS moved SL to a provisional hotel placement on July 27.  *Id.*  In a letter submitted to this Court, shelter resident Neil Currie indicated that he was notified on July 28 of a pending move back to congregate shelter scheduled for July 29.  ECF No. 102.  Resident Nicole Henry told a reporter that she received notice that she could apply for an RA on July 22, and then was told on July 23 that she would be moved to a congregate setting on July 26.  Andy Newman, *New York Moves Homeless People from Hotels to Shelters as Virus Cases Rise*, N.Y. Times (July 26, 2021).

Further still, numerous residents report they are being moved under circumstances that violate the *Butler* Stipulation itself.  Residents at one hotel report being bused to a congregate facility, only to be turned away because there were no more beds available.  Strom Decl. ¶ 17.  When the residents were then sent back to the hotel, they were turned away – and some slept on the street that night as a result.  *Id.*  Class member LST, who uses an electric scooter and manages a respiratory illness with two different breathing machines, was moved on July 26 to another hotel whose accessible entrance was roped off, leaving her outside for an hour until someone came to open the door for her.  Diamant Decl. ¶¶ 3-5.  She was ultimately assigned a room that does not

have an ADA-compliant bathroom, nor does it have a refrigerator where she can store her medications. *Id.* Class member JZ was asked to sign a document indicating she had been approved for an RA, but shortly thereafter received a message from her case manager that she would be moved to congregate shelter and there was no record of her RA. *Id.* ¶ 9.

Class member TD, who has dialysis three times each week to treat her End Stage Renal Disease, was told she would likely be placed in a single room after her hotel shelter was closed, but on July 26 was informed she was moving to a congregate shelter. Torres-Lorenzotti Decl. ¶ 7a. After Legal Aid intervention, she was placed in a double-occupancy room, and DHS later confirmed she was eligible for a single-occupancy room, though as of July 28 she had not been transferred to one. *Id.* Other residents were moved or have been told they are about to be moved despite pending RA requests, rather than being granted a provisional RA. Diamant Decl. ¶ 20 (TM); Torres-Lorenzotti Decl. ¶ 7f (DM); Strom Decl. ¶ 16a (HB), ¶ 40a (DK), ¶ 40c (LC), ¶40d (KT). Others still were forced to submit redundant or burdensome documentation from medical officials – and in some cases moved before they could secure this documentation. Diamant Decl. ¶ 10 (JC), ¶ 22 (WMR); Torres-Lorenzotti Decl. ¶ 7d (MS), ¶ 7g (BA), ¶ 7h (NG); Strom Decl. ¶ 40b (LK).

## IV.   FOLLOWING AN EMERGENCY CONFERENCE, DEFENDANTS CONTINUED MOVING RESIDENTS IN VIOLATION OF THEIR OBLIGATIONS AND CONTRARY TO THEIR REPRESENTATIONS TO THE COURT.

On Friday, July 30, 2021, after Plaintiffs continued to raise ongoing violations of the terms of the Stipulation and the Preliminary Injunction, Defendants agreed to halt any moves scheduled for Monday, August 2 for an indeterminate amount of time. However, Plaintiffs then learned that Defendants intended to move hundreds of residents over the upcoming weekend, prior to the agreed-upon halt taking effect. Plaintiffs then called the Court to inform it that they were prepared

to file an emergency motion to amend the preliminary injunction to stop the moves for the coming weekend, and those afterward.  At a remote teleconference attended by both Parties, Defendants said they would make "absolutely every effort to place clients in appropriate settings," but identified that this commitment was subject to "capacity" limitations.  Torres-Lorenzotti Decl. ¶ 8, Ex. 5 (Remote Conference Tr.) ("Conf. Tr.") July 30, 2021 42:10-17.  Defendants further represented that the moves were from de-densification hotels to other hotels in the DHS shelter system, and they had "comparable" accommodations, including air conditioning and an elevator for those who required these features due to their disabilities.  *Id.* 37:12-22.  Defendants further represented that prior to moving these individuals on Sunday, August 1, they would review the files of each resident "to ensure that wherever they are moving to meets their needs."  *Id.* 38:20-39:4.  Defendants stated that every individual who was being moved – 192 residents in total – had had a meeting to discuss their potential needs for a reasonable accommodation.  *Id.* 40:3-6.  Finally, Defendants said clients would be alerted of what location they were being moved to on Saturday. July 31.  *Id.* 45:9-11.  Based on these representations, Plaintiffs told the Court they were not seeking any emergency action at that time.

Unfortunately, Plaintiffs have since learned that there were numerous violations of the Preliminary Injunction in the moves that took place on Sunday, August 1.  Additionally, it appears that many of the representations the City made to the Court about the weekend's moves were inaccurate.

On Sunday, August 1, Defendants moved residents from two of the three de-densification hotels that Defendants had identified to the Court at the Friday hearing without appropriate

accommodations and clearly without having been screened for all of their needs.[4]  At least one hotel where residents were moved had no functioning elevator.  Diamant Decl. ¶ 38.  At least five residents with disabilities were improperly moved to that hotel on Sunday, necessitating another transfer, but only after the residents spent hours waiting in the lobby, and the elevator at this hotel remains inoperative.  *Id.*  Staff at one of the hotels where individuals were moved to on Sunday reported that they were told by Defendant DHS to expect a transfer of male residents, largely in double-occupancy rooms – but both men and women were transferred there, and many required a single-room placement, sending the hotel scrambling.  *Id.* ¶ 35.  At least two female residents with histories of domestic violence said that they were frightened after being placed on floors with men.  *Id.* ¶ 34.  Two of the sites did not have in-unit refrigerators that the clients could use to store their medications, and were told to store their medications in a refrigerator that stores communal foods.  *Id.* ¶¶ 36, 39.  One of the shelter directors told Coalition staff that she would order refrigerators for clients who need them.  *Id.*  Additionally, numerous residents reported receiving notice of where they would be moved only on Sunday morning, and some of the notices failed to include where the client would actually be moving.  *Id.* ¶ 24.  Other clients received notices that described the wrong site to which they would be moved.  *Id.* ¶¶ 24, 40.  Many clients being moved also expressed confusion at learning they had received provisional placements when they believed their RA requests were complete.  *Id.* ¶ 24.

---

[4]  *See* Josephine Stratman and Leonard Greene, *Homeless, advocates decry move from Upper West Side hotel to Queens hotel with broken elevator*, N.Y. Daily News (Aug. 2, 2021), https://www.nydailynews.com/new-york/ny-homeless-hotels-shelter-20210803-q5tijniiqzdnzg7sx5txqgrfju-story.html

## ARGUMENT

**A MODIFICATION OF THE PRELIMINARY INJUNCTION IS REQUIRED TO PREVENT DEFENDANTS' RECURRING VIOLATIONS.**

A trial court has the inherent power to modify a preliminary injunction, in its discretion. *See Sierra Club v. U.S. Army Corps of Engineers*, 732 F.2d 253, 256 (2d Cir. 1984) ("An injunction is an ambulatory remedy that marches along according to the nature of the proceeding. It is executory and subject to adaption as events may shape the need."). Modification of a preliminary injunction is appropriate where a "defendant continues to violate the terms" of that injunction. *Advanced Access Content Sys. Licensing Adm'r, LLC v. Shen*, 2015 WL 13840969, at *15 (S.D.N.Y. Mar. 16, 2015) (modifying preliminary injunction based on continuing violations); *see also A.V. by Versace, Inc. v. Gianni Versace, S.p.A.*, 2002 WL 2012618, at *12 (S.D.N.Y. Sept. 3, 2002) (same).

As it currently stands, the preliminary injunction has two requirements: (1) Defendants must provide written notice to each Class Member at least seven days prior to a proposed move; and (2) Defendants must schedule an individual meeting with each Class Member to be held at least five days prior to a proposed move, where Defendants must inform the client regarding the RA process, and be prepared to discuss their assessment of any RA request by the client. *See* ECF No. 94 at 2; ECF No. 97. Since resuming the moves, Defendants have violated each provision numerous times.

        1.      *Defendants Have Repeatedly Violated the Preliminary Injunction and Stipulation, and Have Acted Contrary to the Representations Made to the Court at the July 30 Hearing.*

Despite the clear evidence that Defendants' rushed moves were causing the violations of the Stipulation that led to the entry of the TRO and then preliminary injunction, Defendants, following political pressure, returned to rushing those moves as soon as they were permitted by

the Preliminary Injunction's schedule.  And as soon as Defendants' hastily executed moves began

again, so did reports of violations of the Preliminary Injunction and Stipulation.

Several residents report not receiving notice of the scheduled move seven days before the

move was to take place.  *See supra* at 10.   And several shelter residents have been moved, or face

moves in the coming days, without having had the opportunity to meet with shelter staff at least

five days in advance of the move.  *See supra* 8-11.  Class member MM reports never receiving

notice of a meeting, and DHS itself told UJC SNP she received the notice only four days prior to

her scheduled move – which resulted in a scheduled move to facilities that were too far from the

Bronx facility where she must go every two days to get a new oxygen tank. Strom Decl. ¶¶ 5-10.

Another resident reported shelter staff was not at the meeting at the time indicated on their notice,

leaving her and numerous other residents waiting for an appointment that did not occur, Torres-

Lorenzotti Decl. ¶ 7c (ND), and another received the notice hours after the meeting was ostensibly

scheduled to take place.  *Id.* ¶ 7e (KM).  Numerous other residents report never having had a five-

day meeting, and not receiving notice of the opportunity to meet with their case workers.  *See*

*supra* at 8-11.

Legal Aid and other non-profit partners also presented numerous incidents of individuals

who have been moved in apparent violation of the *Butler* Stipulation, which further underscores

the need for a modified injunction.  UJC SNP reported that residents at one hotel were bused to a

shelter that did not have beds available, and were then denied re-entry to the hotel and so had to

sleep on the streets.  Strom Decl. ¶ 17. Class member LST, who uses an electric scooter to get

around, was moved out of her hotel and into a hotel that did not have an accessible entrance

available, and ultimately into a room that lacked an ADA-compliant bathroom or an accessible

refrigerator that she needed for her medication.  Diamant Decl. ¶¶ 3-5.  Numerous other residents

have been moved despite pending RA requests, with no apparent consideration of granting a provisional RA, and others have been forced to submit redundant and burdensome medical documentation, in contravention of the Stipulation. *See supra* at 11.

These violations continued after Defendants represented to the Court that they planned to move individuals on August 1 from three de-densification hotels to two "comparable" hotels. On Sunday, when Defendants executed their moves of 192 residents with RAs and provisional RAs out of two de-densification hotels and into "comparable" hotels, they actually moved at least five individuals with mobility issues into a hotel where the elevator was in operable. Diamant Decl. ¶ 38. They moved residents with a history of domestic violence onto mixed-gendered floors, with doors that could not be locked from inside. *Id.* ¶ 34. Further, though Defendants indicated that all of these individuals had been screened for their needs prior to the Friday conference, and would be checked again prior the Sunday moves, they moved several individuals to hotels where they were not provided an in-unit refrigerator to store their medications. *Id.* ¶¶ 36, 39.

These continuing violations further exemplify Judge Woods's finding that "substantial questions" have been established "about the efficacy and implementation of the process developed in order to implement the de-densification program." Hr'g Tr. 55:20-23.

> **2.**   *Plaintiffs Face Irreparable Harm Absent a Modification of the Injunction.*

Absent immediate relief, Class Members will again face the same irreparable harms found by Judge Woods. *See Advanced Access Content*, 2015 WL 13840969, at *16 (modifying preliminary injunction where plaintiff established irreparable harm). Several Class Members either have been moved or are scheduled to be moved in violation of the Preliminary Injunction and the Stipulation, causing them the psychological, physical, and emotional harm that would result from being "transferred out of the de-densification hotels to shelters that [do] not

accommodate their disabilities." Hr'g Tr. 49 (finding irreparable harm). The "Second Circuit has found that the loss of medical benefits leading to a substantial risk to health and to anxiety associated with uncertainty 'comports with this Court's understanding of irreparable harm as harm shown to be non-compensable in terms of money damages." *Id.* at 47–48 (quoting *LaForest v. Former Clean Air Holding Co.*, 376 F.3d 48, 55 (2d Cir. 2004).

Further, many class members remain at substantial risk of COVID-19 and the dangers of living in a congregate setting. Although Judge Woods noted that, at the time of the hearing, there had been substantial improvement in the levels of COVID-19 cases in New York City, *id.* at 49–50, the number of cases in the City has continued to rise since then, to the point that the City's former Commissioner of the Department of Health, Dr. Oxiris Barbot has warned in a letter that moving forward with the moves back to congregate shelter at present will put "the entire city" in danger.[5]

These harms have occurred under the provisions of the current Preliminary Injunction, underscoring the need for a modification. Absent judicial intervention pausing those moves, Plaintiffs will again suffer irreparable harm.

**3.**     *The Injunction Should Be Modified to Halt Moves until Defendants Can Demonstrate Compliance.*

Following Judge Woods's findings that the Plaintiffs had raised serious questions about whether Defendants' rushed moves were leading to repeated violations of Plaintiffs' rights pursuant to the Stipulation, thus causing substantial harm to a vulnerable population, Defendants appeared to conclude that they should proceed nearly the same pace as they had been before. *See*

---

[5] *See* Chris Sommerfeldt, *NYC Mayor de Blasio's ex-health czar says he'd put 'entire city' risk of COVID by booting homeless from hotels*, N.Y. Daily News (Jul. 26, 2021), https://www.nydailynews.com/news/politics/new-york-elections-government/ny-de-blasio-ex-health-commissioner-dangerous-plan-homeless-hotels-20210726-ajitlcuzobednbrfoobt6p2ocy-story.html.

*supra* at 8 (DHS statement that only "minor adjustments" were needed; Transcript: Mayor De Blasio Holds Media Availability, The City of New York Office of the Mayor Press Office (July 14, 2021) (stating that the Order would "add about a week to what we're doing, no more than that").  The rushed pace of the moves has led to a new set of violations against a new set of Class Members.

Where Defendants violate a preliminary injunction, it is appropriate for the Court to modify it to prevent future violations of a similar type, in order to reduce the recurring harm to Plaintiffs and Class Members.  *See, e.g.*, *A.V. by Versace*, 2002 WL 2012618, at *13 (expanding a preliminary injunction's ban to a broader set of commercial use in light of continuing trademark violations).  Here, Defendants insistence on moving forward with hurried moves, despite a clear lack of capacity to do so while in compliance with the Preliminary Injunction, is causing the continued violations.  A modification of the injunction is thus required to ensure Defendants can develop an appropriate staffing and training plan and schedule that will allow them to complete the moves in compliance with the Preliminary Injunction and Stipulation.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should modify the preliminary injunction to pause all involuntary moves of class members out of density hotels until Defendants can present to the Court a credible staffing and training plan and schedule that ensures that any future moves will be conducted in compliance with the Preliminary Injunction's and the Stipulation's requirements.

Dated: August 3, 2021                    Respectfully Submitted,
New York, New York

                                         */s/Joshua Goldfein*
                                         Judith Goldiner
                                         Joshua Goldfein
                                         Beth Hofmeister
                                         THE LEGAL AID SOCIETY

199 Water Street
New York, NY 10038
Tel: (212) 577-3300
Fax: (212) 809-1574
Email: JGoldfein@legal-aid.org

Dawn L. Smalls
Jacob D. Alderdice
Andrew C. Elliott
JENNER & BLOCK LLP
919 Third Ave., 38th Floor
New York, NY 10022
Telephone:  212-891-1600
Email: dsmalls@jenner.com

Ali I. Alsarraf
JENNER & BLOCK LLP
353 N. Clark St., 44th Floor
Chicago, IL 60654

*Counsel for Plaintiffs*