UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

SANDRA BUTLER et al.,

                                        Plaintiffs,

                    -against-

CITY OF NEW YORK, THE NEW YORK CITY
DEPARTMENT OF HOMELESS SERVICES and
STEVEN BANKS, as Commissioner of the New York City
Department of Social Services,

                                        Defendants.

------------------------------------------------------------------------x

DECLARATION OF
JOSLYN CARTER

15 CV 3783 (VEC)

      **JOSLYN CARTER**, under penalty of perjury, declares pursuant to 28 U.S.C. §

1746, that the following statements are true and correct:

      1.      I am the Administrator for the New York City Department of Homeless Services

("DHS").[1] I have held this position since July 2017. Before that I was the Associate Commissioner

for Family Intake from 2015-2017. I have spent in total 17 years at DHS serving in multiple

capacities with increasing responsibilities within the agency. I have a Masters in Social Work from

the Hunter College School of Social Work with post-graduate training at Yale; overall, in my

professional career at DHS and as a social worker, I have spent 30 years providing social services

to vulnerable clients. As Administrator for DHS, I am responsible for, among other duties,

managing the operations of the nation's largest and most comprehensive municipal shelter system

for adults and families experiencing homelessness through a network of directly-operated as well

as not-for-profit-operated providers and programs. Under my purview, I am responsible for

---

[1] DHS is the agency within the Department of Social Service ("DSS") charged with the responsibility to provide shelter to all such eligible homeless families and individuals. DHS also assists clients in finding permanent housing.

ensuring that the agency's mission of preventing homelessness when possible, addressing street homelessness, providing temporary shelter, and connecting New Yorkers experiencing homelessness to suitable housing are met through accountability, empathy and equity.   In my role, as Administrator I am responsible for oversight of the development and implementation of DHS's plans to move clients to commercial hotels at the height of the pandemic, and now relocate clients back to congregate shelters or to alternative sites, in accordance with State guidance following the ending of the State public health emergency.

2.      I submit this Declaration in support of defendants' opposition to plaintiffs' motion to amend the preliminary injunction. This declaration is based upon my personal knowledge, my review of the records and files maintained by DHS, and upon direct observations and communications with DHS employees.

3.      On Friday, July 30th, at plaintiffs' request, this Court held a conference regarding the moves from three COVID hotels planned for July 31st and August 1st.

4.      At the conference, with regard to the moves planned for July 31st and August 1st, DHS committed to measures that included: (1) not moving any clients on Saturday, July 31; (2) moving the majority of the clients to two comparable hotel sites (within DHS's pre-COVID hotel capacity); (3) moving clients to a comparable hotel room (e.g., those with single rooms will be moved to single rooms); (4) reviewing the files of the clients before they moved; (5) notifying clients on Saturday, July 31st of their new placement; and (6) having DHS staff on the ground at each site during the moves to confirm that clients were sent to the correct placement and to address any issues that arose.  DHS also agreed to meet with the Legal Aid Society on Monday, August 2nd to discuss the moves completed over the weekend and to pause moves scheduled for that day (which the City agreed to as part of our planning for additional moves for the rest of this week).

2

5.      After listening to DHS' commitments to protecting the reasonable accommodation needs of its clients, plaintiffs did not seek and the Court did not enter an order stopping DHS from continuing with the moves.

6.      As done in the past and aligning with the commitments made before the court on Friday evening, DHS staff, including the Deputy Commissioner and Associate Commissioner for Adult Services, were present at the two sites that moved on August 1st. Staff onsite confirmed that clients moved to placements that were appropriate to meet their needs, and were available to troubleshoot other issues as needed in real time. DHS staff engaged with clients, communicated with them in real time, calmed their anxiety and supported DHS's not-for-profit shelter providers operating the two sites. My staff reported to me that Legal Aid was pleased with the support these senior officials offered over the weekend, – including their patience and effectiveness in engaging clients.

7.      Despite the initial positive feedback, Plaintiffs subsequently sent a list of issues regarding the moves that took place on August 2nd, including allegations that: 1) DHS does not have enough accessible capacity available on a daily basis to meet the demand posed by the hotel moves on the current schedule; 2) there is confusion and uncertainty about the status of Reasonable Accommodation (RA) requests; and 3) the process of confirming client needs and identifying a suitable new placement requires more time and staffing than DHS has budgeted.

8.      As set forth in more detail below, we have seriously considered the issues raised by Plaintiffs and developed the plan set forth below to accomplish the remaining moves and respond to the concerns raised. The proposed plan significantly reduces the number of people moving each day.    In addition, DHS is conducting several levels of review before clients are transferred to

assess each client for reasonable accommodation needs and providing multiple notices to inform clients of the move and apprise them of their right to seek reasonable accommodations.

9.      As of August 3, 2021, 5,032 clients have been moved out of temporary COVID density reduction hotels. Of that number, over 1,475 clients have been granted provisional or approved reasonable accommodations and have been placed in alternative non-congregate locations.  Based on these numbers alone, DHS is clearly identifying and addressing reasonable accommodation needs.

10.     For a complete statement of DHS's efforts to address the pandemic by de-densifying the single adult congregate shelter system, and the initial steps taken to relocate clients back to congregate shelter once the State ended the public health emergency, the Court is respectfully referred to the Declarations submitted in connection with Defendants' opposition to Plaintiffs' motion for a temporary restraining order, filed July 23, 2021 specifically: Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for a Temporary Restraining Order, and to enforce the Stipulation of Settlement, dated July 12, 2021; Declaration of Christopher J. Blanco, Senior Assistant Director at the New York City Office of Management and Budget dated July 12, 2021; Declaration of Molly Park, First Deputy Commissioner of the New York City Department of Homeless Services, dated July 12, 2021; Declaration of George Nashak, President and Chief Executive Officer of Care For the Homeless ("CFH") dated July 11, 2021; and Declaration of Conor Sheehan, Agency Attorney for Homeless Services in the Office of Legal Affairs, dated July 12, 2021.

11.     DHS's plan to return clients from the temporary de-density hotels has been thoughtfully developed over time.  DHS staff have communicated regularly with provider leadership, shelter staff and with clients.  DHS has also met regularly with class counsel to apprise

them of the steps in the plan, to share various communications and notices and has made revisions based on their feedback.

12.     As I sign this Declaration, there are fewer than 1,900 clients left in 19 temporary COVID de-density hotels.   There is no reason to halt transfers now, 5 weeks into an 8-week plan, when DHS has completed more than half of the transfers.  Moreover, the plan set forth below will address any concerns going forward.

Brief Background

13.     DHS' single adult system currently serves just over 16,200 individuals. Since inception, and its development in compliance with the 1981 State court *Callahan* Consent Decree, congregate shelters for single adults have been the norm.

14.     As set forth in more detail in the Park Declaration, beginning in early April 2020, in response to the pandemic, DHS began relocating clients out of congregate settings and into lower density commercial hotels. Over an 8-week period, DHS's de-densification initiative resulted in the relocation of approximately 10,000 shelter clients into more than 60 hotels.

15.     Now that State has declared that the state of emergency is over, and our State oversight agency has issued guidance on returning to traditional shelters, we have been returning clients to our conventional shelter system.

The Butler Stipulation

16.     In 2017, DHS entered into a Court-approved Stipulation of Settlement in *Butler et al., v. City of New York et ano.*, 15-CV-3783 (RWS) (JLC) ("*Butler*") signed on May 15, 2017, under which DHS committed to take a number of steps to provide meaningful access to DHS programs and services for clients with disabilities.

17.     As set forth in the Park Declaration, nothing in the *Butler* Settlement precludes the use of congregate shelter, nor requires the granting of single rooms in hotels or shelters as reasonable accommodations.

18.     DHS' RA Procedure directs facility staff to immediately approve a RA request if the requesting client has a disability that is obvious or apparent and the RA request relates to the disability.

19.     In contrast, when a client requests an RA based on a disability that is not obvious or apparent, or already known to DHS or not-for-profit shelter staff, the RA Procedure directs staff to ask the client to provide any disability-related information, including any medical documentation, that supports the need for the requested RA.

20.     Even if facility staff determines that a client must submit disability-related information to DHS for review, facility staff must provisionally fulfill or offer the requested RA before a full review of their supporting documentation in any instance where (1) DHS expects a nontrivial amount of time to pass before rendering a final determination, and (2) facility staff determines that not providing the requested RA will likely cause the client serious harm.

21.     The *Butler* stipulation notes the following regarding provisional RAs:

Where a non-trivial amount of time may pass between a Class Member's request for an RA and DHS' determination of that request, such as in instances where DHS requires that the Class Member provide documentation supporting the RA request and such documentation is not immediately available to the Class Member, DHS should confer with the Class Member and consider providing temporary measures in advance of its final determination. If the Class Member asks to confer, DHS must promptly confer with the Class Member. DHS shall provisionally grant RA requests

where DHS determines that the denial of the RA is reasonably likely to cause serious harm to a Class Member with a disability, except where doing so would fundamentally alter the nature of the DHS Shelter System and/or shelter-related services.

22.     The *Butler* stipulation does <u>not</u> require DHS to grant all requests for RAs on a provisional basis, rather DHS must determine whether not providing the requested RA is likely to cause the client serious harm.

23.     Significantly, class counsel agreed to these provisions as part of the 2017 Butler settlement. Plaintiffs' counsel also agreed that if clients are required to produce supporting documentation, they must do so within 10 days. If they do not, their request is administratively denied. DHS will grant clients more time to produce documentation when they indicate a reason for being unable to meet the time frame such as being unable to see their doctor.  See Interim RA procedure, Exhibit A to the Park Declaration.


<u>Return to Shelter</u>

24.     The density reduction hotel sites have always been a time-limited temporary response to the public health emergency.  As the COVID positivity rate in shelter and in New York City declined, and with the end of the emergency at hand, DHS began to prepare both not-for-profit providers and clients for the eventual return to congregate shelter.

25.     On June 16, 2021, the State Office of Temporary and Disability Assistance (OTDA) issued updated NYS OTDA guidance on the operations of congregate shelters.  This guidance removed most restrictions on congregate shelters and indicated that jurisdictions no longer needed

to submit a specific return to shelter plan. *See* OTDA Guidance attached to the Park Declaration as Exhibit D.

26.     As the return congregate shelter has proceeded in accordance with the State OTDA operational guidance, Defendants have continued to meet and confer with class counsel frequently, sometimes daily, to hear and respond to their concerns by amending communications to incorporate suggested edits.

Operational Improvements, Cooperation, and DHS' Increasingly Fine-Tuned Plans

27.     Since we began closing the temporary COVID density reduction hotels in late June, DHS has consistently refined the process and improved operations, working closely with the Coalition for the Homeless and class counsel, agreeing on notices and scripts as required by Judge Woods' July 21, 2021 order and adding additional clarification to the existing transfer notices.

28.     Most recently, we developed and executed a plan to move approximately 220 clients on Sunday, August 1 that was discussed with the Court on Friday night, July 30.

29.     While perfection is impossible, we successfully moved approximately 180 clients with improved processes including: having senior DHS staff on the ground at both sites to oversee the operation, confirm that clients were going to the correct placement and address issues raised by clients and advocates; we provided all clients with notice of the location to which they would be transferred the day before the move; and we provided transportation to ensure clients were moved to the correct location as well as made changes in real time as necessary. Going forward, we have identified additional single and double room capacity in our pre-COVID system to complete the remaining approximately 40 moves we discussed with the Court on the evening of July 30.

30.     It is my understanding that, at the time, class counsel seemed pleased on the ground on Sunday and thanked staff for their efforts.

31.     However, I am told that when class counsel spoke with our attorneys, they told a different story and, again, demanded that we pause moves.  On Monday night, August 2nd, class counsel provided DHS with a two-page single spaced document containing their complaints about Sunday's moves, as well as a long list of "Reforms."

32.     Plaintiffs' emergency motion demands that defendants provide: "a credible staffing and training plan, and schedule that ensures that any future moves will be conducted in compliance with existing court orders and the requirements of Butler Settlement."

33.     For context, so far, through the combination of the hotel close downs and shutting off referrals, we have 19 remaining hotels with ~1,900 people left to relocate. Our plan to complete these remaining moves is set forth below.

34.     First, we will significantly reduce the number of moves per week to further streamline the moves and make it easier for staff to conduct the required interviews, provide the requisite notices to clients and secure appropriate placements.

35.     This week, we will move approximately 250 clients from 5 hotels.  In contrast, in June and early July we were moving 10 – 15 hotels per week which led us to move approximately 5,000 individuals.  These 5 hotels are prioritized for two reasons. They are already partially vacated and keeping them open is an inefficient use of staff, providers are struggling to manage two sites, and is not financially responsible.  In addition, our contracts with these hotels are ending this week and they have hard termination dates.  In short, we must leave.

36.     The first hotel we will close involves moving only 38 people; this is the third hotel that was part of the discussion with the Court on Friday night, July 30.

37.     For subsequent moves, we will plan to close one site per day, which can involve from 50 to 175 people per day.  Because the schedule may change, we will confirm the moves for the subsequent week on Thursday of the preceding week.  We will also advise class counsel of any new capacity that is being created to accommodate clients from the hotels that are closing.

38.     For this week's moves to close down the five hotels that have already been partially emptied, we are reviewing every single case to confirm reasonable accommodations and determine placement.

39.     If there are clients who did not appear for their interview, staff will attempt to engage them in a discussion of any reasonable accommodation needs, even though Judge Woods' order did not require this.

40.     The remaining 1,900 clients moving from temporary COVID density reduction hotels will be provided with an individualized notice letting them know the status of their RA.  The notice will include their name and whether they have been denied or approved for each RA requested, and whether they are moving to a single our double occupancy room or a congregate placement.  Clients will also receive individualized information about where they will be transferred.

41.     A third of the clients in this first group of moves have already been assigned to another hotel site in DHS's pre-COVID hotel capacity.  DHS is carefully reviewing the two-thirds of clients who may be able to return to congregate settings to ensure that their needs have been met, and that they have received all required documents.

42.     To accommodate these clients who are entitled to RAs or provisional RAs and were in hotels that are closing, we are continuing to add capacity to accommodate individuals by converting two hotels formerly used in our families with children system for use by single adults.

These hotels have amenities similar to the current hotels, including elevators, air conditioning and access to refrigerators and microwaves.

43.     All sites have received the 7-day notice as required.  Going forward, DHS will continue to provide the 7-day notice and conduct the scripted interviews.   In addition, at the conclusion of the interview, clients will receive a receipt indicating whether they have submitted requests for RAs, a reminder to submit required documentation, and the status of those RAs if known at the time.

44.     DHS conducted training for its not-for-profit provider staff on conducting the scripted interviews; however we will provide refresher training emphasizing that all questions must be asked unless the client refuses to engage, emphasizing that where clients are required to provide supporting documents the requirement is carefully discussed, including the fact that staff can help clients obtain necessary documentation, and emphasizing the requirement to provide a receipt at the conclusion of the interview.

45.     Training will also remind staff of the notices that must be provided to clients and how to document provision of these notices, including the 7-day notice, the appointment notice for the 5-day interview and the transfer notice.

46.     As noted above, RA determination notices for moves from the temporary de-density hotels will have the client's name, the status of any requested RAs, and the type of placement (single or double occupancy room or congregate shelter) to which they will be transferred.

47.     DHS will provide notices for provisional and approved RAs.

48.     Finally, DHS will continue to have staff on site on the day of any moves to confirm that clients are being directed to appropriate placements and to address any problems and answer any questions.

11

49.     I firmly believe that the above-described plan will enable DHS to close the remaining 19 density hotels in a manner that provides clients with appropriate placements that meet any reasonable accommodation needs.

Low Positivity Rates, Vaccinations and Testing

50.     Finally, I would like to update the Court that as of August 3, 2021, the last date for which data is available, there were 17 positive cases of COVID-19 in the entire DHS single adult shelter system, of which six were detected by DHS's testing program at intake prior to shelter entry.  The positivity rate for the most recently completed round of testing, which ended on July 26, was 0.1%.

51.     DHS continues to actively encourage shelter clients to get vaccinated. DHS launched a mobile vaccination program on March 4, 2021, that provides vaccinations to shelter clients directly at the shelters and hotels where they reside on approximately a monthly basis. In addition to monthly vaccinations programs that DHS implemented earlier this year, beginning the week of August 9th, we will offer vaccinations at least once per week at all 150 Single Adult shelters.

52.     DHS continues to offer testing at shelter intake as well as on-site at shelters and hotels on an approximately monthly basis, and isolation spaces for anyone exhibiting symptoms or testing positive.

53.     Moreover, to further enhance client safety all shelter staff are required to be vaccinated on or before August 16 or be tested weekly.

54.     The combination of all of these measures has led our State oversight agency and City public health officials to determine that the use of congregate shelters can be resumed.

Conclusion

55. For all these reasons, I respectfully request that the Court deny the Plaintiffs' request for further relief and permit the City to phase out the remaining 19 temporary hotel sites, including the five that we must be out of now.

Dated:          New York, New York
                August 4, 2021

                                        _____
                                                Joslyn Carter