To:    Valerie Caproni
        Thurgood Marshall U.S. Courthouse
        40 Foley Square
        New York, New York 10007

        Re:    *Butler v. City of New York*, No. No. 15-cv-3783(VEC)(S.D.N.Y.)

Friday, August 6, 2021

Valerie,

This letter is being filed to request authorization to be granted permissive intervention in the case referenced above as an interested party to facilitate your ability to make better-informed decisions about material matters. In the ongoing case of *Komatsu v. City of New York*, No. 20-cv-10942 (VEC)(RWL)(S.D.N.Y.) that I commenced to which you're also assigned, I apprised you about the fact I have been involved in litigation against the New York City Human Resources Administration ("HRA"). The matters that *Butler v. City of New York* concerns are about longstanding, pervasive, and systemic negligence by the City of New York, the New York City Department of Homeless Services ("DHS"), HRA, and the New York City Department of Social Service ("DSS") to the detriment of a large and vulnerable group of people who have disabilities and special needs in relation to their housing needs. I attended both the court hearing that you conducted yesterday in *Butler v. City of New York* and the court hearing that U.S. Magistrate Judge Gregory Woods held in it on 7/13/21. I talked with Martha Calhoun of DSS during a recess during the 7/13/21 hearing. I also told yesterday following your court hearing that I filed a motion in *Komatsu v. City of New York,* No. 20-2261 (2d Cir.) that is assigned to the U.S. Court of Appeals for the Second Circuit and correspond to an interlocutory appeal that I commenced in response to an order that was issued in *Komatsu v. City of New York*, No. No. 18-cv-3698(LGW)(GWG)(S.D.N.Y.) that is hereinafter referred to as "K1". U.S. Magistrate Judge Gabriel Gorenstein is someone who I know to be a cancer partly in regards to his assignment to

K1 in which he committed egregious judicial misconduct against me that enabled a snowball effect of illegal acts against me that led you to being assigned to a different case against me in September of 2018 about which I ultimately prevailed. Mr. Gorenstein is also a former general of HRA in the 1990s. His negligence as that general counsel is proximately among factors that explains why Butler v. City of New York was commenced in the first place. It's the job of people who work as General Counsel for organizations to make certain that they fully and consistently comply with all applicable laws and regulations. Martha Calhoun hasn't been doing that either as the General Counsel of HRA, DHS, and DSS. DHS and HRA exist under the DSS umbrella with respect to an organizational structure and are sibling agencies.

I requested that the motion that I filed yesterday with the Second Circuit to be filed under seal because Mr. Gorenstein issued orders on 1/15/21 in which he continued to be the dutiful, subservient, and vile cat' paw of HRA, DHS, the NYPD, New York City Mayor's Office, and City of New York to pretextually conceal illegal acts and omissions by agencies and personnel of the City of New York that includes that of DHS, HRA, the NYPD, and the New York City Mayor's Office. The orders that Mr. Gorenstein issued on 1/15/21 in K1 to which I'm referring are confidentiality and protective orders that unconscionably limit my ability to freely talk about and share discovery material that I received as a result of K1 after he issued those orders. On 2/1/21, I received a 185-page PDF file as discovery material from an attorney for the New York City Law Department as a result of K1. That PDF file is subject to Mr. Gorenstein's 1/15/21 orders in K1. The Second Circuit now has relevant excerpts from that PDF file that I provided to it yesterday to use in connection with K1 in regards to an interlocutory appeal that I commenced. The Second Circuit has a decision to make that has been pending since 3/25/21 about whether to

grant a request that I submitted to it to overrule Mr. Gorenstein's 1/15/21 confidentiality and protective orders in K1 to enable me to freely use all discovery material that I have received in K1 after 1/15/21 that is supported by the vagueness doctrine, the concept of offsetting penalties that exists in football, and the indisputable fact that personnel of HRA and other City of New York personnel repeatedly violated the terms of a sealing and anonymity order that I was granted on 1/17/17 by New York State Supreme Court Judge Barry Ostrager in a lawsuit that I commenced against HRA in January of 2017.

During yesterday's hearing in Butler v. City of New York, the following were some of the things that you and others talked about while I was left with a clear impression during that hearing by your remarks and tone of voice that you maintain a prohibited bias and partiality in favor of DHS and the City of New York that demands your recusal from that case to avoid the appearance of a lack of impartiality:

1. People who have been and remain homeless are entitled to be provided housing that meets all of the requirements that were previously agreed upon. This was discussed in the context of reasonable accomodations.

2. No one would want to be issued housing that wouldn't allow them to lock a door from the inside.

3. DHS' allegation that it is committed to meeting the needs of people with disabilities.

4. Not everyone can reside in Manhattan.

5. People can't choose the type of shelter that they are provided by DHS directly and otherwise.

6. People shouldn't have to be relocated from Queens to the Bronx when they're in need of housing.

7. New York City will continue to have a homeless problem after you follow William Pauley's lead by permanently retiring after I talked with him on 9/26/18 during a court hearing that he conducted to hear testimony from the public about deficiencies in public housing in New York City before I talked with you on that date in a different hearing that you're aware of.

Here is where things in this letter get really interesting and are clearly sufficient to cause you to immediately grant my request to intervene in this case or appear in it as an interested party against DHS, the City of New York, HRA, DSS, and their personnel that includes HRA Commissioner Steven Banks ("Mr. Banks"), Ms. Calhoun, and others. I generally pay very close attention to every single remark that you make during court hearings that you conduct. That was true when I previously attended court hearings that you conducted in cases that involved Todd Ransom Howe and Joe Percoco a few years ago while your hair was then brown, your diminutive status was the same, and you also delivered wisecracks back then.  One of the things that you stated during a court hearing back then was that someone should conduct a presentation that he or she would make to you by leading with that person's strongest arguments.

How can you possibly trust what Ms. Calhoun and the other personnel of DSS, DHS, HRA, and/or the New York City Law Department have expressed to you on account of the fact that Ms. Calhoun, Mr. Banks, and Ann Marie Scalia of HRA (Ms. Scalia is HRA's Deputy General Counsel) engaged in criminal negligence in August of 2010 and/or prior to then with others that partly consists of Urban Pathways, Inc. ("Urban") that likely caused a severely disabled military veteran named Robert Vargas who was a veteran of the U.S. Marines and Army National Guard to die on or about 8/11/20 in his apartment in the scatter-site shelter for military veterans in

which I reside that is operated by Urban as an alter-ego, agent, and proxy of HRA and DHS that is subsidized by taxpayers and comparable to NYCHA housing? The exhibit within the annexed **Exhibit A** shows the e-mail message that I sent on 8/3/20 at 1:27 pm to Ms. Calhoun, Mr. Banks, and Ms. Scalia about and on behalf of Mr. Vargas in which I urged them to immediately arrange to have an air conditioner to be made available to Mr. Vargas that he would be able to use in his apartment in the building in which I reside. He then resided in apartment 1D in it. Conditions in that that building then were very humid during what was then a very hot and humid summer in New York City. Mr. Vargas was a stroke victim and told me that he had suffered 6 strokes. Those strokes caused Mr. Vargas to be able to hardly move and caused his speech to be adversely affected as well. I periodically used to carry him up the street back to the building in which we were residing. I also repeatedly testified on his behalf and that of other military veterans who reside in the building in which I reside during public hearings that the New York City Council held to no avail. Mr. Vargas was never issued an air conditioner that he could use in his apartment in the building in which I reside. He instead was issued a body-bag on 8/11/20 by the New York City Chief Medical Examiner's Office after I recorded a video of members of the New York City Fire Department ("FDNY") as they then broke open the door to his apartment on that date prior to discovering that he died in that hot and humid apartment. A video recording that I recorded on 8/11/20 at 8:35 pm that is available at

https://drive.google.com/file/d/1otdIE5Ggj2QMzLvY1c6sSU7XFg3MHet4/view?usp=sharing

shows members of the New York City Chief Medical Examiner's Office as they rolled Mr. Vargas' body in a body-bag out of the building in which I reside. At 3:39 pm on 8/11/20, I recorded another video that showed members of the FDNY as they stood in front of the door to Mr. Vargas' apartment as they worked to force it open in response to the fact that Mr. Vargas

hadn't been responding to anyone after people had been trying to make contact with him to check on his welfare in his apartment. Back then, the door to his apartment was locked from the inside. The video that I just discussed is available at https://drive.google.com/file/d/1BGbVCcAlTCTy_WpODblxPbh7H-q1zYnk/view?usp=sharing. The exhibit within the annexed **Exhibit B** shows two e-mail messages. The first one is an e-mail message that Ms. Scalia sent to me on 8/10/20 at 10:42 am that was partly in response to the e-mail that I sent to her and others on 8/30/20 about Mr. Vargas' need for an air conditioner. She clearly acknowledged receipt of that earlier 8/3/20 e-mail message at the end of the e-mail message that she sent to me on 8/10/20 at 10:42 am. That e-mail message contains confidential information about me that wasn't related to Mr. Vargas that I redacted. That redacted information is confidential due to my privacy rights pursuant to 18 NYCRR §357 and New York State Social Services Law §136(2). Upon direction by this Court, I will file under seal in this case a non-redacted copy of that e-mail message and other information that is also confidential to which I refer in this letter.

The second e-mail message that appears in **Exhibit B** is of one that I sent on 8/3/20 at 1:27 pm to Ms. Calhoun, Mr. Banks, and Ms. Scalia about and on behalf of Mr. Vargas in which I urged them to immediately arrange to have an air conditioner to be made available to Mr. Vargas that he would be able to use in his apartment in the building in which I reside.

Prior to sending her that e-mail message, I talked with Mr. Vargas on 8/2/20 in his apartment as I legally recorded that conversation on audio at 9:11 pm. That audio recording is available at https://drive.google.com/file/d/1kgqME-aLSNUjKknYGY9lX03pfYBCQmM6/view?usp=sharing. That 8/2/20 audio recording confirms

that he told me then that he was very concerned about the possibility that he might die in his apartment from continuing to be deprived of an air conditioner as he rhetorically asked me if that was what others wanted to happen to him at the elapsed time of 37 seconds in that recording as he was then referring to Urban and HRA as those who might want for that to occur. He also told me during that conversation that he was having a hard time sleeping because of how humid it was in his apartment. Before Mr. Vargas and I began residing in the building in which I reside, we and others who have resided in the building in which I reside signed binding and fully-enforceable apartment lease agreements with Urban's management to do so. The lease agreements that we signed contained some boilerplate language. The next screenshot is from the top of the first page of the binding, fully-enforceable, and only apartment lease agreement that I signed with Urban's personnel to be issued sole possession of apartment 4C in the building in which I reside shortly after 2/16/16 in a fully-furnished condition with no roommate instead of any part of the apartment in which I reside. I signed that apartment lease on 2/16/16 with Lisa Lombardi of Urban at 33 Beaver Street in Manhattan inside of offices that are operated by DHS. Mr. Vargas' lease for his apartment in the building in which I reside and the lease agreements of other resident in that building also clearly stated that all of us were to be issued fully-furnished apartments in the building in which I reside. However, we were materially, substantially, and outrageously lied to about that and that cost Mr. Vargas his life.

> This Rental Agreement ("Lease" or "Agreement"), ated 2/1/16, and is between Urban Pathways Inc. (the "LESSOR"), and Towaki Komatsu (the "TENANT(S)").
> WHEREAS, Urban Pathways hereby leases to TENANT, a fully-furnished 1BR/2BR Apartment 4C on the 4 floor of the Building known as **798-802 Fairmount Place, Bronx, New York 10460**, in the Borough of **Bronx** and State of **New York** (the "Premises"), for the term of **12 Months**, unless sooner terminated as hereinafter provided, to be used and occupied as a strictly

On 2/8/17, I received a report in the mail that HRA prepared that indicated that its personnel and/or that of DHS were personally involved in illegally changing the terms of the apartment lease agreement that I signed on 2/16/16 that I just discussed. On 3/7/16, I received a copy of that illegally revised document that certainly isn't a valid lease agreement because I never signed it nor otherwise agreed to its terms. The following is a screenshot from the top of that document's first page that confirms that it doesn't contain the handwritten information shown in the preceding screenshot and isn't for apartment 4C and instead of a shared apartment.

> This Rental Agreement ("Lease" or "Agreement") is dated 2/16 , and is between Urban Pathways Inc. (the "LESSOR"), and Towaki Komatsu (the "TENANT(S)").
>
> WHEREAS, Urban Pathways hereby leases to TENANT, a fully-furnished **1BR/2BR** Apartment **4b rm 1** on the 4th floor of the Building known as **798-802 Fairmount Place, Bronx, New York 10460**, in the Borough of **Bronx** and State of **New York** (the "Premises"), for the term of **12 Months**, unless sooner terminated as hereinafter provided, to be used and occupied as a strictly

The next screenshot appears on page 40 in the report that I received on 2/8/17 from HRA. There is a huge difference between changing a street address for where someone resides and changing someone's apartment number in a building in someone resides. HRA clearly indicated on 2/18/16 that a change was made to an apartment number for an apartment that was associated with me. HRA has illegally refused to provide me more details about that than what is shown in this screenshot to illegally engage in a cover-up about a patently illegal bait-and-switch fraud and forgery that the personnel of HRA and/or DHS committed with personnel of Urban against me that concerns the binding and fully-enforceable apartment lease that I signed on 2/16/16. I have repeatedly ordered Mr. Banks and Ms. Scalia to provide me that information and they have illegally refused. Ms. Calhoun was included as a courtesy copy recipient in e-mail messages that I sent partly about that to HRA personnel.

| 2/18/2016 | Error Correction | Benjamin-Solis, K | Correction to Aprtment number |

I was thereafter viciously assaulted on 7/2/16 by the roommate that I was forced to have for the apartment in which I reside. Both that assault and an attempted assault that he tried to commit against me on 5/12/16 occurred in the living room of where I reside and were timely reported to Urban. HRA and DHS also likely were timely reports about that 5/12/16 incident. However, that roommate (Ronald Sullivan) was allowed to continue to be my roommate after 5/12/16 over objections that I then raised as I demanded for him to be evicted immediately because of security reasons. His attempted assault against me and his actual assault never would have happened if HRA, DHS, and Urban had simply complied with the terms of the lease I signed on 2/16/16. I took more than 15 punches to my head on 7/2/16 from that assault, was diagnosed with a concussion on 7/30/16, and had to reprogram my brain somewhat as a result that seems to have collaterally caused me to develop a photographic memory and empathy towards some people as a side effect from all of the intense efforts that I made to recover from that assault.

Also, shortly after signing that lease on 2/16/16, an intruder stole an iPhone that belonged to me from a room that DHS assigned strictly to me to sleep in overnight in a notorious facility that DHS operates in Manhattan and is located at the intersection of East 30th Street and First Avenue. That theft occurred overnight between 2/21/16 and 2/22/16. That theft occurred for several reasons that are all DHS' fault. First, DHS unconscionably allowed me to be able to return to that facility in January or February of 2016 to temporarily reside in while conditions certainly were not in compliance with applicable laws that required DHS to have video security cameras to be installed throughout that facility to deter crime. DHS unconscionably allowed me

to return to that facility then for that purpose while HRA and/or DHS were providing funding to their business partners to keep people who were in need in need of reasonably safe, sanitary, and decent shelter in New York City temporarily housed in hotels that had video security cameras in them and doors that could be locked from the inside for guest rooms. When my iPhone was stolen between 2/21/16 and 2/22/16, there was no locking mechanism installed in the door for the room that I was assigned in the facility that DHS operates. That fact and circumstance enabled the person who stole it to enter that room while I slept, take my iPhone, and then leave that room without being detected due to the absence of security cameras and a security guard in the hallways outside of that room. Upon realizing that my iPhone had been stolen overnight when I woke up on 2/22/16, I immediately completed a written report about that and gave it to security personnel on the first floor in that facility. However, DHS and HRA have illegally refused to reimburse me for my stolen iPhone and additional costs that I incurred as a result of that. The next screenshot shows the top half of the complaint that I then completed and submitted to DHS personnel in that facility about that theft. I was given a photocopy of that complaint.

> **CLIENT COMPLAINT FORM**
>
> DATE: 2/22/16
>
> TIME REPORTED: _____   REPORTED TO: _____
>
> CLIENT NAME: Towaki Komatsu   HA# _____
>
> D.O.B. _____   SOC. SEC. # _____
>
> NATURE OF COMPLAINT: Someone came into my room and stole iPhone
>
> COMPLAINT:
> Someone came into my room at the men's shelter on East 30th St. in the middle of the night and stole my iPhone 5S. My room is 30 on the west side in the shelter. This happened between 11 pm on 2/21/16 and 7 am on 2/22/16.

This explains why I spent the day before a birthday of mine at an AT&T store to replace the iPhone of mine that had just been stolen due to the criminal negligence of DHS and/or HRA. *Johnson v. NYC Health & Hosps*, 246 A.D.2d 88, 676 N.Y.S.2d 38, 676 N.Y.S. 38 (App. Div. 1998) confirms that DHS and/or HRA are liable for that theft, the illegal bait-and-switch fraud and forgery with my 2/16/16 apartment lease, and the consequences that I suffered from them as a result of a snowball effect. On 3/1/16, I met and talked Mr. Banks for the first time at the Yale Club in Manhattan that is located near Grand Central Station. Hindsight confirms that meeting was the first time of many during which he behaved as a con artist toward me by lying to my face. He told me then that he would try to cause me to be provided some legal help in response to a request that I then made to him for that while HRA was legally required to do so. I also told him that my iPhone was stolen between 2/21/16 and 2/21/16 within the facility that I discussed above due to DHS' negligence. He told me then in response that the NYPD was then involved in a 90-day review of security in that facility and similar facilities that DHS was operating. Roughly 1.5 months after that conversation, someone had his throat slit in the same facility in which my iPhone was stolen before that person's murderer attacked someone in Queens. I'm referring to the following news article that the New York Daily News published on 4/16/16:

> https://www.nydailynews.com/new-york/manhattan/nypd-probes-death-man-50-garroted-manhattan-shelter-article-1.2602595

Shortly after I read that news article, I wondered about the extent to which Mr. Banks' hands were permanently stained from blood from that murder victim Mr. Banks' hands. They certainly remain so due to his criminally negligent failure to have immediately taken decisive measures following my conversation with him on 3/1/16 about inadequate security in that specific facility to have thereafter immediately caused proper security to have been immediately implemented

throughout that facility and actively monitored. That curiosity and outrage prompted me to contact Graham Rayman of the New York Daily News as a major whistleblower against Mr. Banks and DHS. The following shows excerpts from e-mail messages that I sent to and received from Mr. Rayman on 4/16/16 about that subject before I learned that Mr. Rayman is a trashy whistleblower news censor in journalism:

> **From:** "Rayman, Graham" <grayman@nydailynews.com>
> **Subject:** Re: Your article about murder at homeless shelter
> **Date:** April 16, 2016 at 5:08:04 PM EDT
> **To:** Towaki Komatsu <towaki_komatsu@yahoo.com>
>
> I Am at 646 651 0977
>
> Sent from my iPhone
>
> On Apr 16, 2016, at 5:07 PM, Rayman, Graham <grayman@nydailynews.com> wrote:
> Yes sir. How do we reach you. Do you have a number?
>
> Sent from my iPhone
>
> On Apr 16, 2016, at 3:50 PM, Towaki Komatsu <towaki_komatsu@yahoo.com> wrote:
> Hi,
>
> I'm sending you this message in response to the following article you wrote yesterday about a murder that took place at a New York City homeless shelter:
>
> http://www.nydailynews.com/new-york/manhattan/nypd-probes-death-man-50-garroted-manhattan-shelter-article-1.2602595
>
> The reason why I'm writing to you is to try to find out how interested you would be in reporting about the fact that I clearly expressed concerns about that particular shelter in February and March of this year both to the security staff working at that shelter on February 22, 2016 and to Steven Banks face-to-face on March 1, 2016 while he and I attended an event that was held at the Yale Club in Manhattan near Grand Central Station.
>
> The following two attachments are **a)** a photo of a slightly redacted form I received when I checked into that shelter and b) a photo that I took of Mr. Banks on 3/1/16 at the event that was held by a group known as Modern Courts at the Yale Club.

The New York Daily News, Mr. Rayman, Greg Smith, Erin Durkin, Michael Gartland, Julia Marsh, and others who have worked for the New York Daily News and other press organizations have never reported anything about me in spite of what they know about my status as a whistleblower. That fact cements the status that all of them have in journalism as total trash as far as I'm concerned.

While I'm sure that I can continue to present more grounds upon which to grant this application, I believe that I have provided sufficient grounds. I also have relevant and highly incriminating audio recording and video recording that are partly of face-to-face conversations that I have had with Mr. Banks, Ms. Scalia, and others that support this application. If you me to share them with you, then let me know.  I should also point out that HRA and/or DHS have a contract with Urban for the building in which I reside that enables Urban to be the slumlord of it. It also authorizes Mr. Banks to replace Urban as the slumlord of that building and charge Urban for whatever costs that the City of New York may incur to do so. I can provide that contract to you as well. It sufficiently shows that HRA micromanages Urban in regards to how Urban operates as the slumlord of the building in which I reside.

In closing, a key question that you need to consider is about why it is exactly that should buy the BS that Martha Calhoun, Jocelyn Carter, and the other people representing the City of New York and DHS in this case have been dishing out to you like "**ziti**" that would lead you to give DHS and the City of New York what they want at the expense of the legal rights, safety, and security of people with disabilities? The information that I have provided in this letter and the annexed exhibits as well as what I filed with the Second Circuit yesterday overwhelmingly establishes

that Mr. Banks and those who work for him in management positions need to be in jail instead of trusted. That information also certainly confirms that Ms. Calhoun isn't trustworthy.

From,

Towaki Komatsu

s_/Towaki Komatsu

802 Fairmount Pl., Apt. 4B
Bronx, NY 10460
Tel: 347-316-6180
Towaki_Komatsu@yahoo.com

# Exhibit A

**From:** Towaki_Komatsu <towaki_komatsu@yahoo.com>
**Subject: Question about helping a disabled military veteran in my building**
**Date:** August 3, 2020 at 1:27:32 PM EDT
**To:** "Scalia, Ann Marie" <scaliaa@dss.nyc.gov>
**Cc:** "banksst@dss.nyc.gov" <banksst@dss.nyc.gov>, "Calhoun, Martha" <calhounm@dss.nyc.gov>

Ms. Scalia,

I'm sending you this to find out what you, Mr. Banks, and HRA is willing to do to help the disabled military veteran who lives in apartment 1D in the building in which I reside who needs an air conditioner to be installed in his living room.

He told me yesterday that Urban Pathways, Inc.'s personnel told him that though it has an air conditioner to install that is located in the basement of that building, it will take 2 weeks from when he was told last week for bars to be cut outside of his living room window to install that air conditioner.

I previously talked with you and Mr. Banks on his behalf and i also testified on his behalf during a City Council public hearing.

The person I'm talking about has had several strokes and can barely move.

It is unconscionable for HRA to allow him to have to sweat in his apartment only because Urban's personnel, its contractors, and HRA won't get off of their fat ass to abide by applicable health and safety laws in the middle of Summer.

I'm not anticipating a response to this e-mail and will likely use it in my federal lawsuit to further establish that HRA is blatantly disregarding its legal duties with its business partners.

From,

Towaki Komatsu

# Exhibit B

**From:** "Scalia, Ann Marie" <scaliaa@dss.nyc.gov>
**Subject:** RE: Update
**Date:** August 10, 2020 at 10:42:40 PM EDT
**To:** Towaki_Komatsu <towaki_komatsu@yahoo.com>
**Cc:** "Aaronson, Nicola" <aaronsonn@dss.nyc.gov>, "Clary, Carin" <claryc@hra.nyc.gov>, "Wilkinson, Thatiana" <wilkinsont@hra.nyc.gov>, "Galindo, Daniel" <galindod@hra.nyc.gov>, "Jennifer, kelly" <Kellyjen@hra.nyc.gov>

Good Evening Mr. Komatsu
Hope you are well. I have read the emails you sent in the last couple of weeks and wanted to give you contacts to direct your issues and concerns related to your housing. I have also included them on this email chain. Please communicate with the below identified people regarding issues you are having with your facility. Also, the below people can give you information regarding the organizations that you can contact for delivery of food if that is something you are still interested in.

**Thatiana Wilkinson**
Program & Contract Manager
wilkinsont@hra.nyc.gov

**Daniel Galindo**
Executive Director, Affordable Housing
galindod@hra.nyc.gov

**Carin Clary**
Assistant Deputy Commissioner, Supportive/Affordable Housing and Services
claryc@hra.nyc.gov

Regarding the disabled veteran you referred to below we are look into this but we will not be able to communicate with you regarding this individual and his circumstances.

Thank you.

**From:** Towaki_Komatsu <towaki_komatsu@yahoo.com>
**Sent:** Monday, August 10, 2020 11:43 AM
**To:** Scalia, Ann Marie <scaliaa@dss.nyc.gov>
**Cc:** Banks, Steven <banksst@dss.nyc.gov>; Calhoun, Martha <calhounm@dss.nyc.gov>
**Subject:** Update

Ms. Scalia,

In addition to HRA's inexcusable failure to have a disabled military veteran provided an air conditioner in the building in which I reside, a rat was waiting for me at my door in that building when i returned to it last night, the ceiling in that hallway hasn't been fixed since I last talked with Mr. Banks about it face-to-face, and a door hasn't been fixed on that floor either.

All of this is entirely true and accurate while I recently read this report about how Mr. Banks has gone out of his way to help similarly-circumstance people in a manner that violates the Fourteenth Amendment rights of those who reside in the building in which I reside:

https://www.thecity.nyc/2020/8/6/21358054/people-sheltering-from-the-street-secure-city-pledge-to-fund-hotels

Additionally, the following court decision sufficiently confirms that HRA has been and continues to be entwined with Urban Pathways' operations in regards to the building in which I reside to allow me and others to hold HRA's personnel liable:

*HELP SOCIAL SERV. CORP. v. Harris*, 2020 N.Y. Slip Op 50818 (Civ. Ct. 2020)

From,

Towaki Komatsu

Page 2 of 2